1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
RAFAEL SOTO,

                    Plaintiff,

                                        Index No.
        -against-                       12 CV 4241
                                        (MKB) (VVP)

THE CITY OF NEW YORK, COUNTY OF KINGS,
DISTRICT ATTORNEY CHARLES J. HYNES,
DETECTIVE DANIEL BONILLA, POLICE OFFICER
ADAM FEDER, ASSISTANT DISTRICT ATTORNEY
JOHN GIANNOTTI, ASSISTANT DISTRICT ATTORNEY
LINDSAY GERDES, LIEUTENANT CHRISTOPHER
MARROW, and DETECTIVE BRIAN MEICHSNER,
                    Defendants.
-------------------------------------------X

                    January 16, 2014
                    11:25 p.m.

        EXAMINATION BEFORE TRIAL of ASSISTANT

DISTRICT ATTORNEY LINDSAY GERDES, one of the

Defendants here, taken by Plaintiff, held at

225 Broadway, New York, New York, pursuant

to Order, before a Notary Public of the

State of New York.

                HARRIET BEIZER ASSOCIATES
            'THE VERBATIM REPORTING SERVICE'
                    70-50 AUSTIN STREET
            FOREST HILLS, NEW YORK 11375-4252
                    (718) 544-4199

14

1                    L. GERDES, ESQ.

2      A         No.

3      Q         Have you ever been

4  arrested?

5      A         No.

6      Q         When was the first time

7  that you learned about the underlying

8  criminal matter with Masahira Yoshida,

9  which is the subject of the lawsuit that

10  we're here for today?

11     A         The day of the crime, on

12  October 20, 2011.

13     Q         How did you hear about it?

14     A         I got a call from my boss.

15     Q         Who is your boss?

16     A         Jeff Levitt.

17     Q         What was his position?

18     A         He's the Executive of the

19  Blue Zone.

20     Q         What did he tell you?

21     A         He told me that there was

22  an arrest.  This is in sum and substance,

23  because we're talking about a

24  conversation that took place over two

25  years ago.

```
 1                    L. GERDES, ESQ.

 2        Q            Absolutely, yes.

 3        A            Basically, that there was

 4   an arrest at the 76 Precinct.  This is

 5   based on what my recollection is.  That

 6   it was a serious case, because a man was

 7   abducted, but found.  That one of the

 8   guys who committed the crime wanted to go

 9   on video.

10                    That there was a rider from

11   our office.  There is a special unit

12   called the Investigations Bureau at my

13   office.  When there is a defendant who

14   wants to make a videotaped statement,

15   there is somebody, basically, who goes to

16   the precinct to take the statement from

17   them.

18                    He said that there is a

19   rider who is at the precinct, but you're

20   going to be assigned the case.  You're

21   going to handle it from, you know, Grand

22   Jury to trial.  So, you know, I think it

23   would be a good idea, if you can, to go

24   so that you can, you know, learn as much

25   about the case as quick as possible.
```

16

1              L. GERDES, ESQ.

2      Q         By "rider," do you mean

3    someone who is coming along, or is that

4    some other term that you use?

5      A         No.  That's what our office

6    calls it.  It's basically -- I don't know

7    how it started.  I think it's like ride

8    along maybe with the police, but that

9    might be my own of what I have just

10   gleaned that term to mean.

11              That's their general role.

12   The Investigations Bureau also writes up

13   search warrants, when there needs to be a

14   search warrant, or if they need to get a

15   trap and trace, or a pen register.  They

16   take care of things like that.

17              So he was going --

18   basically, the precinct calls our office

19   and says, we have a guy here who -- this

20   is generally how it works -- wants to go

21   on video.  You know, can an ADA come down

22   and do the video?

23              Somebody from tech

24   services, who is the video man, comes

25   with a camera and an ADA, who, you know,

```
 1                    L. GERDES, ESQ.
 2   does these videos, and goes down.  That
 3   was John Giannotti in this case.
 4       Q          John Giannotti actually
 5   worked with the special investigation
 6   unit?
 7       A          I believe it's called the
 8   Investigations Unit.
 9       Q          I apologize.  The
10   Investigations Unit.
11       A          That was really the first
12   time I ever had interactions with him in
13   my six years.
14       Q          John Giannotti?
15       A          Yes.  In my four years, I
16   guess, at the time.
17       Q          Do you know what his title
18   at the Kings County DA's Office is?
19       A          Assistant District
20   Attorney.  You're using different terms.
21   You said what his title is, but before
22   you asked me what my position was.
23                  You know, everyone, setting
24   aside from the District Attorney, is an
25   Assistant District Attorney.  There is a
```

18

```
 1                  L. GERDES, ESQ.
 2   difference between -- like, Assistant
 3   District Attorney is not my title, when
 4   we were back in the beginning and you
 5   asked me that.  That's my position, but
 6   that's not my title.
 7        Q         I see.  What is your title?
 8        A         I'm Of Counsel to the Blue
 9   Zone.
10        Q         What is the distinction
11   between that and, say, another position?
12        A         It's, basically, a
13   promotion.  You start off as an Assistant
14   District Attorney.  When you work your
15   way up through, you know, trials and
16   seniority in the office, you go to then
17   Senior Trial Attorney and then Of
18   Counsel.  I don't know what John
19   Giannotti's title is.  He's been in the
20   office longer than me, I believe, but I'm
21   not even 100 percent positive about that.
22                  So, he was at the precinct.
23   So, I was actually at the school.  It's a
24   Legal Lives Program that my office does.
25        Q         Legal wise?
```

19

1                    L. GERDES, ESQ.

2        A          Legal Lives, L-I-V-E-S.  I

3    was teaching fifth-graders about the

4    criminal justice system, and I got a call

5    from my boss explaining what I just laid

6    out to you.

7                    Then I took, you know, the

8    car service that was bringing me from the

9    school back to the office, and we

10   diverted and went to the 76 Precinct.  I

11   got dropped off at the 76 Precinct, and

12   John Giannotti was already there.

13       Q          Had the interview started

14   by the time you had gotten there?

15       A          No.

16       Q          Were you there for the

17   entire interview?

18       A          Of Pablo Dickinson?

19       Q          Of Pablo Dickinson,

20   correct.

21       A          Yes.

22       Q          What, if anything, else,

23   other than the actual interview, did you

24   do while you were at the precinct?

25       A          I spoke to some of the

67

```
 1                    L. GERDES, ESQ.
 2    I'm answering these questions to the best
 3    of my ability.
 4        Q        That is all I want.  I'm
 5    not trying to make you guess about
 6    anything.  Again, these questions are
 7    about the Kings County District
 8    Attorney's Office's practices and
 9    procedures.  Not necessarily what your
10    obligations are when you go to court on a
11    particular matter.
12                 Again, do you know if there
13    is some sweep that they do of their hard
14    drives?  For example, if you have an
15    indictment or a computer file that's been
16    on the computer for nine years, do they
17    delete it after that time?  Those are
18    just examples.  Do you know anything
19    about that at all?
20        A        Not to my knowledge.
21        Q        You indicated earlier that
22    when you got to the 76 Precinct that you
23    spoke with Detective Bonilla; is that
24    correct?
25        A        Yes.
```

68

1                    L. GERDES, ESQ.

2        Q          What was the sum and

3    substance of your conversation with

4    Detective Bonilla?

5        A          It's difficult for me to

6    say exactly what information came from

7    which officer, because it's like, you

8    know, Police Officer Feder was there,

9    Police Officer Erdochowski was there, the

10   victim was there.

11                   So, at this point, you

12   know, two years later, as far as what

13   information came from which of those

14   respective sources, I don't -- you know,

15   it's difficult for me to say that.

16                   Basically, I learned about

17   the overall case, the circumstances of

18   the victim's assault, abduction.  You

19   know, they found him in the van, what was

20   in the van.  I learned about the victim

21   and the bread route.  You know, I learned

22   about his dealings with Rafael Soto, his

23   dealings with Mr. Route.

24                   I learned about what Pablo

25   Dickinson was saying to Detective

69

1                       L. GERDES, ESQ.

2     Bonilla.  I learned about what kind of

3     evidence was recovered inside of the

4     victim's van; meaning, zip ties, the

5     guns, the extent that there was a lot of

6     blood there.  I saw the victim's

7     injuries.

8                       So, I got an overall

9     picture of, you know, what we were

10    dealing with.  You know, over two years

11    later, as far as which tidbit of

12    information came from which of those

13    respected sources, it's difficult for me

14    to say that now.

15        Q         Understandable.  One of the

16    things that's, obviously, at issue here

17    is when you knew certain things.

18        A         Right.

19        Q         Bear with me, if I'm going

20    through things piecemeal; okay?

21        A         Totally fine.

22        Q         I know that you've given us

23    a general overview of the subject matters

24    that you learned about when you were at

25    the 76 Precinct that initial time.

70

```
 1                    L. GERDES, ESQ.
 2                    Can you go into more detail
 3       about exactly what you were told?
 4       Obviously, I know that you don't remember
 5       who necessarily it came from.
 6          A          Right.
 7          Q          Are you able to go into
 8       more detail?
 9          A          About what I learned?
10          Q          Yes.
11          A          Yes.  I, basically, had
12       learned that the victim was coming home
13       from work that day.  That he, basically,
14       was coming home at his normal time.  That
15       he goes to, basically, some type of
16       depot, or whatever, just to make sure the
17       bread trucks get out on time and that
18       everything is stocked.  When he's
19       finished with that, he comes home.
20                    His wife was also there at
21       the precinct.  I learned that his wife
22       was awake, you know, at this time,
23       because she was working on -- she's an
24       accountant and she was working on some
25       type of job.
```

71

1                    L. GERDES, ESQ.

2              The victim explained what

3    had happened to him and what people said

4    to him.  That these perpetrators, these

5    masked perpetrators, who were speaking

6    Spanish at different times and some

7    English, were demanding the $100,000 from

8    his safe in his apartment.

9              He said that they ambushed

10   him after he got out of his car and was

11   heading towards his building.  That he

12   was pistol-whipped.  That they were

13   saying, you know, take us to your

14   apartment.  Take us to your apartment.

15   They were demanding the $100,000 from the

16   safe in his apartment.

17              He explained to me how he

18   was trying to stall, fumbling for his

19   keys.  That he tried to misdirect them at

20   first, because he knew his wife was home.

21   That one of them knew his floor.  It's

22   not like he could really distinguish as

23   to who was saying what, because they were

24   both masked.  That one of the guys was

25   then saying, no.  We know you live at

72

```
 1                  L. GERDES, ESQ.
 2    2-G.  That they knew his exact apartment
 3    number.
 4                  He explained to me then
 5    that once he knew that, he had to take
 6    them to his correct floor.  He was trying
 7    to stall in the hallway, dropping his
 8    keys.  They were hitting him with the
 9    guns.  They hit him with a hammer.  He
10    said he put the keys in his door, was
11    trying to make noise to alert his wife.
12                  That finally he, basically,
13    said to them, look, I have money out in
14    my car.  Take me out to my car.  I have
15    some COD money, which was cash on
16    delivery money, out in my car.  They took
17    him out to the car.  When they got to the
18    car, they realized that there's no money
19    in the car.
20                  Then, they throw him in the
21    back of his van.  Now, we're talking
22    about the victim's white industrial type
23    of van.  They zip-tie him.  Then, they
24    beat him a little bit more in the back of
25    the van, he said.  Then they drive off.
```

73

```
 1                    L. GERDES, ESQ.
 2     It's like they're panicking, kind of.
 3     They don't know what they're doing.
 4     They're telling him they know he's got
 5     money, $100,000, in his safe.
 6                    He tries to tell them,
 7     look, call my wife.  Maybe she can get
 8     you some money.  That he had given them,
 9     I believe, his phone, but he doesn't know
10     if the call ever went through to his
11     wife, because he wasn't on the other end.
12     He wasn't a party to that phone call.
13          Q          Right.
14          A          Then, he said they were
15     speaking Spanish between the two of them.
16     He's, like, facedown in the back hogtied
17     at his hands and feet.  They pull over
18     and stop and that they're talking.
19                    Basically, what he's
20     telling me is that he felt like they were
21     trying to figure out what they were going
22     to do.  At one point they were telling
23     him that they were going to kill him and
24     throw him over the bridge.  Then, all of
25     a sudden, this police car comes and saves
```

74

1                    L. GERDES, ESQ.

2     him, basically.

3                    He explained that he never

4     really got a good look -- the people had

5     masks on during the incident.  When the

6     police take them out, they were facedown

7     on the ground.  At one point, he could

8     barely see the side of somebody's face,

9     but not to, like, really make them out.

10    So, he didn't know who did this to him at

11    the time.

12                   Then, when we got to the

13    precinct, he was trying to, like,

14    mentally process all of this and figure

15    out who did this to him and why this

16    happened.  He was, basically, coming back

17    to this idea of the potential purchase of

18    Rafael Soto, because he told Rafael Soto

19    that he had $100,000 in a safe.

20                   He was telling me that he

21    mentioned this to Soto, because he wanted

22    to legitimize himself as a buyer.  These

23    are all-cash deals, always.  So, he

24    wanted him to know, look, I'm ready to

25    move.  I can do this.  Take me seriously.

1                    L. GERDES, ESQ.

2    He was explaining to me that he had

3    looked into buying his route in August, I

4    believe.  The end of July or August, but,

5    basically, the summer of 2011.

6                    He told me that he went out

7    on the route one day with his driver,

8    Jonathan.  He said, you know, they drove

9    through the route.  That they had lunch

10   together that day, he and Jonathan.  He

11   told me he had never met Rafael himself.

12                   As he's telling me the name

13   Jonathan, I'm realizing that I know one

14   of the perpetrators in custody has the

15   first name of Jonathan.  This is a

16   pretty -- I don't know if you want to

17   call it a coincidence.  This is very

18   interesting that he's saying this.  He

19   says the guy is Dominican and this guy,

20   you know, appeared to be Dominican.

21                   What he was telling me was

22   that as part of this potential deal, he

23   had given over his name, his address, and

24   said that he had the $100,000 in the

25   safe, and that's what these people were

76

```
 1                L. GERDES, ESQ.
 2   coming and asking for.  The one person
 3   who knew that he had the $100,000 in his
 4   safe and who he was saying knew his
 5   address was Rafael Soto, his personal
 6   address, because at no time did he ever
 7   take Jonathan to his house or give
 8   Jonathan his home address.
 9                So, as he's saying this,
10   Detective Bonilla has him look at
11   Jonathan in a cell and he says -- well,
12   they didn't tell him his name was
13   Jonathan.  They have him look at Mena in
14   a cell and he says, yes, that's Jonathan.
15   That's the guy who I drove around with.
16   Yes, that's him.
17       Q        Were you there for that?
18       A        I was at the precinct.
19       Q        When they showed Mr.
20   Yoshida Jonathan in the cell?
21       A        I was physically at the
22   precinct.
23       Q        Did you actually see that
24   happen though?
25       A        I couldn't hear what the
```

77

```
 1                L. GERDES, ESQ.
 2    victim said to the cop, but then I spoke
 3    to the victim after, and he told me that
 4    that was Jonathan.  I was on the same
 5    floor and, like, I think I could maybe --
 6    I think, if memory serves me correctly, I
 7    could see the victim, but I wasn't within
 8    earshot to hear.
 9                Then, I spoke to the victim
10    after and he's, like, in shock, kind of.
11    Not in shock.  You know, he's like yes,
12    that's him.  So, as he's saying all of
13    this, Bonilla is filling me in on what
14    Pablo Dickinson had said, because they
15    had talked before I arrived.
16                Pablo Dickinson was saying,
17    basically, that he got a call the night
18    before from Jonathan asking him if he
19    wanted to do this job with him.  That
20    this was going to be easy money.  That
21    they were going to go rob this Asian guy.
22    That he was going to have $100,000 in his
23    safe, and that they were each going to
24    get a cut.
25                I believe he thought he was
```

78

```
1                    L. GERDES, ESQ.
2     going to get 20,000.  Then, Dickinson had
3     told the detective, and told us on video,
4     that he and Mena, I believe, were going
5     to each get 20 or something.  Basically,
6     that amount.  I would have to look at the
7     transcript or the video.  I believe you
8     have that, as far as the exact amount.
9     That the rest of the cut, the rest of the
10    $100,000, was going to this third person.
11                    So, from what Dickinson was
12    then telling us that day at the precinct,
13    there was a third person who was involved
14    in this criminal transaction, who, in my
15    mind, was the mastermind of this, because
16    this third person is getting
17    substantially more than the two of them.
18    Best case scenario, they're each getting
19    20, and then this third person is
20    getting, you know, the difference, the 60
21    grand.
22                    So, from day one, the idea
23    that there was this third person involved
24    came to light.  The reason why, you know,
25    the evidence was pointing towards it
```

79

1                    L. GERDES, ESQ.

2    being Rafael Soto was because we knew

3    that the victim had told Rafael Soto, you

4    know, that he had $100,000 in his safe,

5    and that the victim had given his name

6    and address in connection with this

7    purchase.  So, the person who knew these

8    pieces of information was Rafael Soto.

9                    We also then knew that the

10   van -- Pablo Dickinson had explained to

11   them that the van was still parked there.

12   That the police were able to locate the

13   van right away.  That the van was

14   registered to Rafael Soto.  So, the van

15   that they actually got at the scene of

16   this abduction is registered to the man

17   who has knowledge that the victim has

18   $100,000 in his safe, and registered to

19   the same man who knew the victim's home

20   address.

21                    So, I'm trying to give you,

22   kind of -- that's the large majority of

23   what we knew that day at that time at the

24   precinct.  Information as far as --

25   there's a lot more information that I

80

1                    L. GERDES, ESQ.

2    find out before Rafael Soto's arrest.

3        Q          Sure.  We'll go through

4    that piece by piece as the investigation

5    progressed.

6        A          Sure.

7        Q          At that particular time,

8    did you have any other information or

9    evidence that pointed towards Rafael

10   Soto?

11       A          Let me think.  I also knew

12   from the victim that -- I told you that,

13   you know, when he was really looking into

14   buying Soto's route, it was either in

15   late July or early August.  Basically,

16   summer of 2011.

17                  He also said that in

18   September, the broker reached out to him,

19   Mr. Route, to say, look, that route that

20   you had looked at is still available.

21   Are you interested?  So, we knew that he

22   was still, basically, looking for someone

23   to unload his $100,000 -- really $135,000

24   route on in September.  So, he was

25   needing money, in my estimation, as of,

```
1                    L. GERDES, ESQ.
2     you know, a couple of weeks before this
3     happened.
4                    I also knew that the person
5     who Mena recruited to do this job, who
6     was somebody who also knew Soto, was,
7     basically, quote unquote, "like a friend
8     of the family."  These guys went way back
9     together.  This wasn't, you know,
10    somebody who was just friends with Mena.
11    This was somebody who, in theory, could
12    be trusted within that inner circle.
13                   According to what Dickinson
14    told us, I also knew that Mena had his
15    own car.  In his videotaped statement, he
16    gave the type of car that Mena typically
17    drove.  So, in theory, instead of driving
18    his own car, he was driving Soto's van.
19    I think that's, in the big picture, the
20    things that I knew that day.
21        Q         Well, it's very important
22    for me to know specifically if that's the
23    totality of --
24        A         Of that day?
25        Q         Yes, because, again, what
```

```
 1                    L. GERDES, ESQ.
 2      is at issue here is what you knew, when
 3      you knew it, and whether or not you had
 4      probable cause.
 5          A        To arrest, but he wasn't
 6      arrested that day.
 7          Q        Correct.  I still need to
 8      know when you knew different things.
 9                   MR. FRANCOLLA:  Is there a
10                   question?  I think what she is
11                   saying is, that's what she
12                   remembers.
13          A        That's what I remember.  As
14      I sit here today, that's what my memory
15      is.  Am I saying that I 100 percent know
16      that there wasn't another piece of
17      information that I knew?  As I sit here
18      today, over two years later, that's what
19      I remember learning that day.
20                   MR. MOUTON:  I'll leave a
21                   blank in the transcript.  If
22                   you remember anything else,
23                   you can fill that in; okay?
24                   THE WITNESS:  Okay.
25                   MR. FRANCOLLA:  So that
```

83

```
 1              L. GERDES, ESQ.
 2              we're clear for the record,
 3              that's as to the facts that
 4              she learned which presumably
 5              would go to probable cause to
 6              arrest Rafael Soto on October
 7              20, 2011?
 8                   MR. MOUTON:  Yes.
 9                   MR. FRANCOLLA:  Okay.
10  INSERT:_____
11     A          Oh, the license plate
12  thing.  I also knew that they covered
13  license plates, which would have come
14  back to Rafael Soto with Minnesota
15  license plates.
16              Pablo Dickinson had told us
17  that they changed the license plates more
18  than once.  He couldn't remember.  He
19  knew they went over a bridge.  He
20  couldn't remember which bridge it was,
21  because he was saying he's not that
22  familiar with Brooklyn, basically.
23              I knew that they were
24  covering up license plates which would
25  have identified that vehicle, not to
```

84

```
 1                    L. GERDES, ESQ.
 2      them, to Rafael Soto.  So, that was even
 3      more evidence that pointed towards Rafael
 4      Soto's potential involvement, because
 5      they're trying to shield his
 6      participation in this and his involvement
 7      by doing him the solid, basically, of
 8      covering up his license plate when they
 9      crossed over the bridge.
10                    It was also very important
11      information, because if he wasn't
12      involved, it wouldn't be as important for
13      them to cover up his license plate,
14      because, again, this car wasn't going to
15      come back to -- it wasn't registered to
16      either of them.  So, that was very
17      important.
18          Q          I just want to get a brief
19      list.  Obviously, it's not going to be
20      the full explanation you've given, but I
21      just want to give you a brief list, and
22      you can tell me if my understanding is
23      complete as to the evidence that you
24      believed you had against Rafael Soto on
25      October 20, 2011, because I want to ask
```

85

```
1                    L. GERDES, ESQ.
2    you questions about each specific one;
3    okay?
4        A          Isn't that what the record
5    is for?  I mean, because I don't want to
6    feel like you forget to tell me one of
7    the things I just said on the record.
8        Q          If I forget to tell you,
9    that's my fault.  I just want to have the
10   information about it so that I can ask
11   you about it.
12       A          Okay.
13       Q          Let me just take a minute
14   and write it up.
15       A          Okay.
16       Q          My understanding, just as a
17   brief synopsis, is that Soto had
18   Yoshida's address.  Soto had knowledge of
19   the $100,000 in Yoshida's safe.  That
20   Yoshida had gone with Jonathan on the
21   route for one day.  That he did not tell
22   Jonathan his address.  He didn't tell him
23   about the money.  That he did not take
24   Jonathan to his home address.
25                    Dickinson said that there
```

86

```
 1                    L. GERDES, ESQ.
 2    was a third person.  The van was
 3    registered to Soto.  Soto was trying to
 4    unload his route.  Dickinson knew Soto.
 5    Mena had his own car, but decided to use
 6    Soto's van, and they had covered the
 7    plates so as not to trace the car back to
 8    Soto.
 9                    MR. FRANCOLLA:  I'm going
10                    to object to the extent that
11                    this information has already
12                    been provided.
13                    You can answer.
14       A         There's two things.  I
15    never said that Yoshida never told Mena
16    about the money.
17       Q         Okay.
18       A         Mr. Yoshida wasn't sure
19    whether or not he told Mena about that,
20    but I knew he didn't tell Mena about his
21    address.  Yoshida was, basically, saying,
22    in so many words, there's only one person
23    who knew both of those things.  In his
24    mind, that's what he's telling me.
25                    He said that he filled out
```

87

```
 1                    L. GERDES, ESQ.
 2     this Mr. Route paperwork.  So he's
 3     thinking that Soto, obviously, has this.
 4     He also had spoken to Soto multiple times
 5     on the telephone, and Soto was supposed
 6     to come meet him at Mr. Route's once and
 7     never showed.
 8                    The other thing that was,
 9     kind of, important is that I was, kind
10     of, getting an impression that certain
11     things with Soto were, like, a little
12     fishy, because Mr. Yoshida was also
13     telling me that the route -- the reason
14     why the deal fell through was because
15     Soto couldn't get him the numbers that he
16     wanted to substantiate for the route.
17                    So, really, the route
18     wasn't worth what Soto was saying that it
19     was worth, and what he was trying to sell
20     the route for, because he could never
21     back up the numbers.  Like, he provided
22     him with certain numbers that he said the
23     route made.  That Mr. Yoshida was asking
24     for the details, and he never got him
25     that.
```

110

1                    L. GERDES, ESQ.

2    There was something else that made you

3    believe, as well, that pushed it even

4    further in your mind, that there is this

5    third person involved, and it's Soto, and

6    he's taking a larger piece of the pie,

7    and it's not just that Mena is saying

8    that, or that Jonathan told him that?

9         A         Correct.

10        Q         So, there was a text

11   message that --

12        A         Just so -- because I want

13   to clarify even what my knowledge is as

14   of now.  Pablo Dickinson then later did

15   tell us that Mena told him that Soto was

16   getting the rest, just so you know that.

17        Q         When was it that he told

18   you that?

19        A         When he met with our

20   office.  He, basically, was the subject

21   of a threat in jail.  I believe it was in

22   December of 2011, if memory serves me

23   correctly.

24                  We met with him for the

25   first time, I think, after the initial

111

L. GERDES, ESQ.

1                           L. GERDES, ESQ.

2    precinct interview, in connection with a

3    threat.  Then we met with him, like, once

4    after with his attorney, or maybe twice

5    after.  He told us that Mena told him

6    that Soto was, you know, getting the

7    rest.

8              He told us that the reason

9    he didn't say that on the video that day

10   was because he and Mena were, basically,

11   caught redhanded.  He knew he was, you

12   know, dead to right, but he wasn't

13   necessarily looking to bring a third

14   person down that day who didn't get

15   arrested.  You know, I guess, when I

16   heard that later, my suspicions were

17   confirmed.

18     Q        Sure.  That interview that

19   you had in December of 2011 with

20   Dickinson, was that recorded?

21     A        No.

22     Q        Was it written down

23   anywhere?

24     A        No.  His attorney was

25   present though.  His attorney was David

115

1                    L. GERDES, ESQ.

2       A          No.  I actually think that

3    at some point I spoke to Jonathan Mena's

4    wife, and she told me -- because I was

5    telling her what Mena was saying.  She

6    told me that they had cars.

7       Q          Did she tell you how many

8    cars they had?

9       A          No.

10      Q          Did she tell you what kind

11   of cars they had?

12      A          I can't remember.

13      Q          At this particular

14   juncture, did you look into any financial

15   background of Jonathan Mena?

16                 MR. FRANCOLLA:  What

17                 particular juncture?

18      Q          On October 20, 2011, did

19   you begin to inquire about his financial

20   stability or background?

21      A          Well, he wasn't talking to

22   us.  He just gave his pedigree

23   information to the police.  So, we didn't

24   have, you know, his bank account

25   information.  I didn't know what banks he

116

```
1                    L. GERDES, ESQ.
2    banked with.  I didn't know anything
3    about that, and he wasn't talking.
4        Q         When did you speak to his
5    wife?
6        A         I don't remember the exact
7    date.  At some point.
8        Q         Was it before or after
9    Rafael Soto was arrested?
10       A         It was after.
11       Q         Would it surprise you to
12   know that Jonathan Mena was actually in
13   the process of being evicted from his
14   apartment, owed money to several people,
15   and did not own a vehicle?
16       A         Would it surprise me to
17   know that now?
18       Q         Yes.
19       A         I think he filled out a
20   rental application for a new apartment
21   and talked about his income.  So, yes,
22   that would surprise me now.
23                 I believe that his wife
24   told me that they did have a car.  At
25   least a car.  So, if you told me that
```

119

1                    L. GERDES, ESQ.

2        A          I recognize it.

3        Q          What is that document?

4        A          It's my understanding that

5    this is a document -- you know, this is

6    my understanding from how it was

7    vouchered and what I know about the case.

8    This is a document that was found in the

9    van registered to Soto, the FedEx van.  I

10   saw this document shortly before Mena's

11   trial started.

12       Q          It was in evidence, and it

13   was accessible to you; is that correct,

14   before Rafael Soto was arrested?

15       A          Correct.

16       Q          It's just that you did not

17   review it?

18       A          Right.  I didn't know it

19   existed.

20       Q          It was accessible to you,

21   because you knew about the voucher

22   numbers, you knew about all the evidence

23   that had been vouchered, and you just had

24   not reviewed it; is that correct?

25       A          I knew that there was

120

```
1                    L. GERDES, ESQ.
2     miscellaneous papers recovered.  I
3     believe that's how the police entitled
4     the voucher.  I think it was maybe
5     something like 67 or X number of
6     miscellaneous pages.
7                    This was another receipt,
8     this Home Depot receipt, that is marked
9     A11514.  This was also recovered in the
10    car.  You know, because, what I assume
11    we'll be talking about later pertaining
12    to the zip ties, this became relevant.
13                   So, this one receipt or
14    document (indicating) from the car got
15    vouchered, and I saw a copy of this
16    before Soto's arrest.  As far as these
17    papers (indicating), I did not see these.
18    Q            Now, you indicated that you
19    believed that because Rafael Soto was
20    selling his route that he was hard up for
21    money; is that correct?
22    A            That he was, yeah.  That he
23    was looking -- hard up for money, yes.
24    That I thought he was looking for money
25    at that point.
```

174

1                    L. GERDES, ESQ.

2       A          Correct.

3       Q          Do you know when they

4    brought that van into the 76 Precinct, if

5    at all?

6       A          I think it was within about

7    a day.  Within, like, the 24-hour period.

8    Whether it was later, I think it got

9    towed.  It was soon.  The search warrant

10   was executed on the van on October 24th

11   of 2011.  When the search warrant was

12   executed, the van was at the precinct.

13      Q          Now, I'm just going to go

14   back, because earlier you indicated that

15   on 10/20/11 is when you saw the various

16   documents from the vehicle.  Would it be

17   safe to assume that --

18      A          I didn't say that.  What I

19   saw on 10/20 was the notes that the

20   victim had brought.  I didn't see any

21   documents from Soto's vehicle, with the

22   exception of the Home Depot receipt until

23   just before the Mena trial.

24      Q          I apologize.  You're right.

25   Were you aware that there was other

185

1                    L. GERDES, ESQ.

2        A          No, that was the only time

3    in connection with this case that I was

4    at the precinct.

5        Q          As the detectives would

6    find things or voucher things, would they

7    send you the voucher numbers, et cetera?

8        A          I think they might have

9    given me a lot of the paperwork when they

10   came to Grand Jury.

11       Q          Between the time of

12   10/20/11, when you were at the precinct,

13   and excluding the time when they gave you

14   the photos on 10/24/11, before Mr. Soto

15   was arrested, did you ask the police

16   officer if they came up with any more

17   documents or evidence regarding the

18   incident on 10/20/11?

19       A          Of course, because, you

20   know, we got subpoenas for the phones, or

21   the police did.  I don't remember who got

22   the subpoenas.  So, I knew Detective

23   Bonilla was going to TARU to get the

24   phones downloaded.

25                  So, before Mr. Soto's

186

1                    L. GERDES, ESQ.

2     arrest, I saw text messages from the

3     phone.  On 10/24/11, I also learned that

4     they found in the van the Home Depot

5     receipt, which was for the packaging or

6     the purchase, I should say, of two packs

7     of 24 zip ties.

8                    When they told me about

9     that, then Bonilla told me that he would

10    go out to the Home Depot.  I believe it

11    was in Linden, New Jersey, maybe.  The

12    receipt told us which Home Depot location

13    it was.  Yes, it was in Linden, New

14    Jersey.

15                    He went to that store and

16    had one of the loss prevention officers

17    download video surveillance that

18    corresponded to the purchase of these zip

19    ties.  Information on the receipt,

20    basically, identifies the register where

21    this transaction took place.  There was a

22    self-checkout line.

23                    So, they were able to hone

24    in right on this exact self-checkout line

25    at that time.  The detective got the

187

1                    L. GERDES, ESQ.

2     video and got stills printed from the

3     video, which captured Mena and Dickinson

4     buying the zip types.

5                    The purchase of these zip

6     ties was made a mere 36 hours before the

7     victim is abducted.  These were large zip

8     ties.  They weren't just, you know, small

9     12-inch zip ties.  They were industrial

10    grade zip ties that are the kind that you

11    would want to use to bind a person.

12                    If you want to talk to me

13    about other uses for them, yes, I'm sure,

14    because Home Depot is probably not in the

15    business of selling zip ties to bind

16    human beings.  So, yeah, there could be

17    other explanations for that.

18                    When I saw that, what I was

19    seeing was evidence that somebody who I

20    knew was involved in this crime, Jonathan

21    Mena, was out purchasing zip ties 36

22    hours prior to Yoshida's abduction with

23    the man who had the van, the victim, you

24    know, used to get to the abduction with

25    that man's van.  They purchased nothing

188

2    else, other than these zip types.

3                    I also noticed in the video

4    that Soto was the driver of the van that

5    day.  It wasn't Mena who was driving the

6    van.  Soto was the driver of the van.

7    These were the zip ties then that binds

8    the victim.  So, this gave me very, very

9    probative, relevant and powerful evidence

10   connecting Soto to this case.

11       Q          After 10/20/2011, what

12   other steps did you take to investigate

13   the incident on 10/20/2011?

14       A          I was urging the detective

15   to get this video to me quick.  To get

16   the results of this information quickly.

17   I mean, your client wasn't arrested.

18       Q          I understand.

19       A          You're asking me what other

20   steps.  So, there was a period from

21   10/20/11 until 11/7/2011, where we were

22   seeing, you know, what direction the

23   evidence pointed us in.

24       Q          Absolutely.  I'm just

25   trying to figure out what steps you took

189

1               L. GERDES, ESQ.

2    along that route to get there.  What

3    investigative steps --

4        A        I reviewed the video

5    surveillance.  I knew that this was

6    Jonathan Mena, because he was wearing the

7    same jacket that he was arrested in.  I

8    also knew that this was clearly Rafaela

9    Soto, because he too was wearing the

10   same, like, jacket sweatshirt thing that

11   he wore to the police precinct on

12   10/21/11.  So, I was able to compare

13   those two.

14               So, I have him with the

15   person who does the abduction in the car

16   that gets them to the scene of the

17   abduction.  I also have the fact that,

18   you know, I know that the deal has fallen

19   through.  That he is still looking for a

20   buyer and he doesn't have a deal.  I

21   reviewed the subpoenas.  You're asking me

22   a general question.

23       Q        No, I'm not.  It's not a

24   general question.  I just need to know

25   the steps.  I don't want to know what you

190

```
 1                    L. GERDES, ESQ.
 2     knew.
 3        A         I'm listing those.  I'm
 4     reviewing this evidence.
 5        Q         Absolutely.
 6        A         That's a step.  My review
 7     is a big part of this.
 8        Q         I must have misunderstood
 9     you then, because I heard you say, I knew
10     that he did X, Y, Z, because of something
11     else.  I just want to know the steps you
12     took.  That's it.
13        A         I'm trying to tell you
14     that.
15        Q         I apologize.
16        A         No problem.  So, I then saw
17     text messages between Mena and Soto that
18     were from Mena's telephone, and that
19     indicated to me about his wife and the
20     baby.  It also indicated -- you know, I
21     reviewed the text message where Mena told
22     him -- when I say, "reviewed," I'm seeing
23     how these pieces of evidence fit together
24     with what we know.
25                    Again, I know from what
```

191

```
 1                  L. GERDES, ESQ.
 2      Mena -- excuse me.  From what Dickinson
 3      is telling us, there is a third person
 4      involved.  I know from the victim that
 5      there is only one person who knew both
 6      his address and the $100,000 in the safe.
 7      I know that the car used belongs to Soto.
 8                  Through my review of
 9      everything, I know that Soto purchased
10      the zip ties.  Soto is the one who was
11      ringing them up at the register, too.  It
12      wasn't Mena ringing them up at the
13      register.  Soto is the one who rang them
14      up and paid for them.  Soto is the one
15      who then -- it's his van that they're
16      getting in.
17                  I reviewed the text
18      messages where Mena is telling Soto, I
19      found a tiguere who can go over there
20      with me.  I told him, you know, he's only
21      getting ten, because I'm getting twenty.
22          Q          I apologize.  Do you speak
23      Spanish?
24          A          No.
25          Q          Go ahead.
```

192

1                    L. GERDES, ESQ.

2       A          I took Spanish in high

3   school, but I'm not, like, fluent or

4   anything like that.  Detective Bonilla

5   speaks a little bit of Spanish.  Then, I

6   was also looking on, like, Urban

7   Dictionary on the computer.

8                    There's, you know, what are

9   Puerto Rican slang words, or different

10   things like that.  I was talking to other

11   people who speak Spanish who were

12   specifically Puerto Rican or Dominican,

13   and talking to people about what this

14   word means.

15                    Basically, it means, like,

16   a -- it has a negative connotation.  It

17   doesn't mean, like, I have a new employee

18   or a new businessman.  In the context of

19   people who are Dominican and Puerto

20   Rican, it's, like, a downhome, dirty dude

21   who will go over there and, like, take

22   care of business.

23       Q          We are going to go over

24   each of the text messages and talk about

25   what you gleaned from each one.  So you

195

1                    L. GERDES, ESQ.

2    done.

3        A        I'm done.

4        Q        Can you tell me what that

5    document is?

6        A        This is a Home Depot

7    receipt that was found.  My understanding

8    from the police is that this was found in

9    Soto's van, along with a Home Depot bag.

10   Like, the store shopping bag.  You know,

11   the little brown plastic bag.  Also, with

12   this was the packaging for two packs of

13   24 zip ties.

14                On the video, I could see

15   that -- you can see what Soto has in his

16   hand.  It's, essentially, you know, the

17   same length of the packaging and the zip

18   ties and the receipt confirms that those

19   are the 24-inch zip ties.

20       Q        On this receipt, does it

21   indicate whether or not this purchase was

22   paid for in cash or with a credit card?

23       A        It looks like cash.

24       Q        Now, if you were looking at

25   this receipt in a vacuum, would you be

196

1                    L. GERDES, ESQ.

2    able to tell from this receipt who

3    purchased the zip ties?

4         A          Just this by itself, if I

5    look at this?

6         Q          Yes.

7         A          No.  With the video

8    surveillance, I believe, it showed Soto

9    taking, actually, the money out of his

10   pocket and making the purchase.

11        Q          My next question about this

12   receipt is:  Can you tell from this

13   receipt what the brand name of the zip

14   ties are?

15        A          At the time, I think, I

16   looked this up on the internet on Home

17   Depot.  I had gone to their website and,

18   I think, that this stood for natural tie.

19        Q          Did you ever go to Home

20   Depot to get a sample or to purchase the

21   zip ties that are reflected on this

22   receipt to compare them to the ones that

23   were recovered from the scene of the

24   incident?

25        A          No, I did not.

197

1                    L. GERDES, ESQ.

2        Q          Did you direct anyone to do

3    that?

4        A          No, I did not.

5        Q          Do you know if any of the

6    detectives went to Home Depot to do that?

7        A          Whether or not they took a

8    zip tie from the scene and asked Home

9    Depot if this zip tie was their zip tie?

10       Q          Or compared it to the ones

11   that were on the shelf.

12       A          Well, what I did was, I

13   looked at the video surveillance, which

14   shows the zip ties in Soto's hand, the

15   pack of zip ties.

16                  So, you see the length.

17   You see what the packaging looks like.

18   It was clear packaging.  You see that the

19   packaging was, basically, the same size.

20   When I say, "size," the length of the zip

21   tie.

22                  Then I, myself, when I was

23   at the precinct, saw those zip ties.  I

24   didn't see any serial numbers on the zip

25   ties or any stamps on the zip ties that

198

1                    L. GERDES, ESQ.

2    said Home Depot, but I was able to do,

3    myself, a visual comparison of what Soto

4    had in his hands at the register.

5                    Knowing that it was two

6    bags, also.  Knowing then that two bags

7    were found in the van, two empty bags,

8    with the receipt, with the Home Depot

9    bag.  You see them walking out with the

10   Home Depot bag.

11                   So, you know, it's not like

12   they just walked out, oh, we don't need a

13   bag for these.  They put them in a Home

14   Depot shopping bag and walked out.  They

15   take the receipt, put the receipt in the

16   bag and walk out with those items.  So, I

17   did a visual comparison of what I saw

18   Soto purchase versus the zip ties that

19   the police recovered.

20       Q        So, the answer would be

21   that you don't know if the detectives

22   went to Home Depot to compare the zip

23   ties that were recovered to the ones that

24   Home Depot actually sells?

25       A        Correct.

200

```
                        L. GERDES, ESQ.
1
2    people are?
3        A          Not in that photograph.
4    That's not them though, because this
5    (indicating) is the FedEx van, and
6    they're in this van (indicating.)
7        Q          Showing you what has been
8    marked as Defendant's Exhibit M, do you
9    recognize this document?
10       A          I do.
11       Q          Is this also a still from
12   the video?
13       A          Correct.
14       Q          In this particular
15   photograph, can you tell who the people
16   are that are depicted there?
17       A          I can tell about the
18   jacket.  That this is the exact same
19   jacket that Mena was arrested in.  It's a
20   distinct jacket.  You can see the black
21   in the hood.  This isn't the best
22   picture.  This other one --
23       Q          We'll talk about that one
24   in just a minute.
25       A          Okay.
```

201

                        L. GERDES, ESQ.

1

2       Q         My question is:  Do you

3   recognize the two people in that

4   photograph?

5       A         Yeah.  This (indicating) is

6   Mena and this (indicating) is Soto.

7       Q         Before Mr. Soto's arrest,

8   had you ever met Mr. Mena or Mr. Soto?

9       A         No.

10      Q         Are there any facial

11  features that you recognize in Exhibit M?

12      A         Are you just asking me,

13  just looking at this photo by itself, and

14  not knowing anything about the case that

15  I know, and not knowing that I have seen

16  all of the video surveillance in its

17  entirety, and that I've seen other

18  pictures than just this?

19                Are you asking me, if I

20  just look at this, can I tell you looking

21  at the back of this person's head that it

22  was Mr. Mena?  No, I cannot tell you

23  that.

24      Q         That's what my question

25  was.

202

```
1                    L. GERDES, ESQ.
2       A           Right, but there was lots
3   of still images from the video.  I
4   watched the video countless times.  I
5   paused it.  You know, I could zoom, you
6   know, if I copied the image.
7                    There's better video that
8   shows even the jacket that Soto is
9   wearing and his hairline.  When you
10  compare, like, his jacket, his hairline,
11  and his size in relation to Mena's size,
12  and that they're getting into the FedEx
13  van, it's very clear that this is them.
14                   Also, even when Mr. Soto
15  testified in the Grand Jury, I showed him
16  these pictures.  He, very quickly,
17  identified himself as this being him in
18  the still and this being Mr. Mena.
19      Q           You said that you saw a
20  copy of the Grand Jury minutes?
21      A           Correct.  So, he knew right
22  away that that was him.  He knew right
23  away that -- he had no trouble
24  identifying himself in the picture along
25  with Mr. Mena.
```

204

1                    L. GERDES, ESQ.

2    different angles.

3        Q        We'll watch the video in a

4    little while.

5        A        Then it was the FedEx van.

6    This was, like, a leather jacket, a black

7    leather jacket, with the black hood that,

8    kind of, hung out, which was the exact

9    same thing that he was wearing when he

10   came to the precinct on 10/21 and was

11   photographed.

12       Q        I'm looking at these photos

13   myself and they look to be a bit fuzzy.

14   You're saying that this is a black

15   leather jacket.  So, my question is:  How

16   can you tell it's a black leather jacket,

17   other than it has --

18       A        There was other pictures

19   where you could see that it was what I

20   thought was leather.

21       Q        Again, that would be shown

22   in the video?

23       A        I don't know if it was in

24   the video or still.

25       Q        As to Exhibit N, can you

1                    L. GERDES, ESQ.

2    transcript.  I only got to watch part of

3    the video, but I didn't get to re-watch

4    the part where he talks about Soto.  I

5    just got interrupted.  I had a pretty

6    crazy last few days of work.

7        Q        When you learned that they

8    covered the plates with another plate,

9    and you believe that was because they

10   didn't want it to be traced back to Soto,

11   did you instead think that maybe they did

12   that so that no one would find out who

13   they were instead of who Soto was?

14       A        Yes.  But, at the same

15   time, it's not like -- when you think of

16   possibilities, you have to think about

17   why something may be more likely than

18   another.  Why is one explanation more

19   likely than an alternative explanation?

20       Q        We have the video and the

21   text messages.  If I'm not mistaken, I

22   believe that those were the only other

23   things that you reviewed prior to his

24   arrest; is that correct, that we haven't

25   gone over yet, or am I wrong?

220

```
 1                    L. GERDES, ESQ.
 2      A          No.  I think you're right.
 3      Q          Let's go over those.   Then
 4  we can talk about why you drew certain
 5  conclusions.
 6      A          Okay.
 7      Q          When did you first come
 8  into receipt of text messages between
 9  Rafael Soto and Jonathan Mena?
10      A          At some point prior to his
11  arrest.
12      Q          I am going to show you
13  documents that were marked yesterday at
14  the plaintiff's deposition.   They're
15  dated 1/15/2014.   They're marked O, P, Q,
16  R, S, T, U, and P-1.
17                    MR. MOUTON:  Why was this
18                    marked P-1?
19                    MR. FRANCOLLA:  I don't
20                    know why she did it that way,
21                    but I think she marked it and
22                    then marked it afterwards.
23      Q          I'm going to ask you to
24  look at these exhibits collectively, and
25  let me know when you're done.
```

221

1                    L. GERDES, ESQ.

2      A          Okay.  I can tell that

3   these are all text messages from Mena's

4   telephone.

5      Q          Now, from these text

6   messages, can you tell me which text

7   messages from those exhibits that you

8   relied on in coming to any other

9   conclusions that you told me; that Rafael

10  Soto needed money, that he had children

11  on the way, that he had engaged someone

12  to rob Mr. Yoshida for $10,000 or

13  $20,000?

14                    MR. FRANCOLLA:  Just for

15                    the record, the binding that

16                    you just took off of P-1,

17                    those are not individually

18                    Bates stamped.  To the extent

19                    that any of those are things

20                    that you want to take out, we

21                    should probably mark that, as

22                    well, so we know.

23                    MR. MOUTON:  Sure.

24                    MR. FRANCOLLA:  That's

25                    just for the record.

1          L. GERDES, ESQ.

2               MR. MOUTON:  Do you want

3               to do what we just did before

4               with the Bates numbers?

5               MR. FRANCOLLA:  They're

6               not Bates stamped, because you

7               just got them yesterday.

8               MR. MOUTON:  That's right.

9               MR. FRANCOLLA:  That's the

10              only reason I'm saying that.

11              If there is anything in that

12              pile, let's just make sure

13              that we know --

14              THE WITNESS:  I'm missing

15              a date and a time.  We would

16              know which one, because we put

17              the same date in the contents.

18     A          So, the way that I came to

19     learn about any text messages was that

20     one of the detectives took the phone to

21     TARU, and TARU then downloaded the

22     contents.  They call it, like, a phone

23     dump.  They put the contents of the phone

24     onto a CD.  Then, also, they generated a

25     report.

223

                    L. GERDES, ESQ.

1                    In the report, it lists the

3    way that somebody has their contact

4    information stored.  Like, in this case,

5    "Be Bless" corresponded to the phone

6    number that everyone was saying belonged

7    to Rafaela Soto.

8                    Now, Detective Bonilla

9    brought -- TARU gave a CD and a report

10   to, I believe, Detective Bonilla.  I

11   don't know if there was maybe another

12   detective who he assigned that task to.

13   TARU generates a CD and report.

14                   I then am given a copy of

15   the report and a copy of the CD.  On the

16   CD, I reviewed text messages prior to

17   Soto's arrest that corresponded to his

18   contact with Mena, I think, from, like,

19   the 18th and the 19th, or maybe the 17th,

20   18th, or 19th.  Really, like, a couple of

21   days leading up to the arrest.

22                   I think I started closest

23   in time to the incident.  Then, I saw a

24   text -- before I looked at things,

25   Bonilla, I believe, or an officer led me

224

```
 1                    L. GERDES, ESQ.
 2   to believe, that there is a text message
 3   where they're possibly discussing the
 4   payments and who is getting what amount
 5   of money.  So, it's not as if I looked at
 6   the CD blind, not knowing if there is
 7   anything relevant on it.
 8        Q          Do you recall who that was
 9   who told you that?
10        A          I think it was Bonilla.  I
11   think.
12        Q          Why don't we just go
13   through each one, and you can tell me
14   what they meant when you read them, or
15   what you thought they meant when you read
16   them.  So, we're looking at which one?
17        A          I'll put them in order.
18                   MR. FRANCOLLA:  Letter
19                   order is probably the easiest
20                   way.
21        A          There were two key text
22   messages, after I looked at this, that
23   really stood out to me.  The first being
24   Defendant's Exhibit Q.  The second being
25   Defendant's Exhibit T.
```

1              L. GERDES, ESQ.

2     Q          Are there any other text

3 messages that you have that you believed

4 were important?  The only reason why I'm

5 asking you is, I'm asking you that so

6 that we can narrow what we talk about

7 down.

8     A          I also saw this text

9 message, Defendant's Exhibit U, about his

10 wife in surgery.  I thought that there

11 was a text message that he was, like,

12 waiting at the hospital or something.

13 Waiting for the doctor since 5:00 a.m.

14              This is in this other

15 stack.  This is Defendant's Exhibit P-1.

16 This is dated October 18, 9:43 a.m.  It's

17 from "Be Bless" to "Me," which is Mena.

18 It says, "I'm at the hospital with my

19 wife.  She's having contractions.  The

20 doctor's on her way, since 5:00 a.m."

21              So, this is telling me that

22 his wife is in a health predicament.

23 Like, they're having a baby.  You know,

24 that he's with her at the hospital.

25     Q          I'm sorry.  You classify

226

1                    L. GERDES, ESQ.

2    having a baby as a health predicament?

3        A         Well, because I think I saw

4    the other one about his wife recovering

5    from surgery.  So, this led me to believe

6    that it wasn't so routine.

7        Q         Would you consider a

8    C-section surgery?

9        A         Of course.  Let's start

10   over.  I believe that his wife gave birth

11   to a child at some point between October

12   18th, at 9:43 and October 19th, at 9:17

13   p.m.  That it was not necessarily a

14   routine labor.

15                 I'm not married.  I don't

16   have a child.  So, that his wife is going

17   to be out of commission for a few weeks,

18   and that he's at the hospital.

19       Q         Well, let me ask you

20   this --

21       A         You're not letting me

22   finish.

23       Q         Okay.

24       A         Let me continue to finish.

25   So, I'm seeing this.  An explanation is

1                    L. GERDES, ESQ.

2    that he is unavailable to do this

3    robbery, because he's sitting bedside

4    with his wife.  That's maybe why he

5    didn't go do this with Jonathan Mena.

6    That's one plausible explanation.

7                    I'm sure you can give me an

8    alternative.  Yes, there's different ways

9    to interpret this.  As I'm seeing this,

10   he would be -- given that his wife had a

11   baby at some point in this 24-hour

12   period, she would not have been

13   discharged from the hospital.

14                   That there was a surgery.

15   She would not have been discharged to go

16   home as of the time of this crime.  So,

17   I'm thinking he's unavailable to go

18   commit this crime.  He's bedside with his

19   wife.

20                   I'm next seeing a text

21   message, Defendant's Exhibit P, where

22   Soto asks Mena, "Are you trying to

23   deliver bread?"  Then Mena writes back, a

24   minute later, Defendant's Exhibit Q, "No,

25   bro.  I'm at home.  I'm just waiting on

228

```
 1              L. GERDES, ESQ.
 2    you for the other thing.  All the bread
 3    shit we can cover tomorrow."  So, the way
 4    I'm interpreting this is that Mena is
 5    waiting on Soto for something unrelated
 6    to the bread route, the bread business at
 7    that time.
 8              Then at 8:44, Defendant's
 9    Exhibit T, Mena is telling Soto this
10    message that is written in Spanish, "I
11    got a dude."  Again, I spoke about what I
12    learned to be the Dominican or Puerto
13    Rican connotation for this word
14    "tiguere," T-I-G-U-E-R-E.  "I got a dude
15    who can go over there with me."
16              Over there, somewhere other
17    than New Jersey.  Not you can do this
18    something here with me.  Who can go over
19    there with me.  So, he's telling Soto
20    he's going somewhere with somebody else
21    that's not in New Jersey.  "I told him
22    he's only going to get ten, because I am
23    only getting twenty."
24              I had known what Pablo
25    Dickinson said.  That, you know, he
```

```
 1                    L. GERDES, ESQ.
 2     believed he was getting twenty, basically
 3     dealing with the same amounts and the
 4     same division.  Then, you have Soto's
 5     response back, talking about, "I think
 6     $10 an hour is fair.  Please let him know
 7     that it's only for a couple of weeks
 8     until my wife recovers from surgery."
 9                    You already had Mena
10     telling him that he was waiting on him
11     for the thing, unrelated to the bread
12     route.  So, they're engaged in a
13     conversation that isn't pertaining to the
14     bread route, and this text message is
15     coming eight to nine hours before this
16     victim is abducted.
17                    So, when I know the
18     connotation for what "tiguere" is, when I
19     know that this is a job that Mena feels
20     is so important to update Soto that he's
21     got this dude who can do the job with
22     him, that's the -- you know, knowing what
23     I know about the zip ties, knowing what I
24     know about him still looking for a buyer
25     for the route, knowing that he's
```

230

1                L. GERDES, ESQ.

2    unavailable to commit this crime with

3    Mena, because he's helping his wife at

4    the hospital, knowing that he's the only

5    one who knows those two key pieces of

6    information -- the victim's address and

7    the $100,000 in the safe.  He's the only

8    one who knows both of those.

9                Remember, the victim never

10   told Mr. Route that -- although these

11   transactions are in cash, he never told

12   Mr. Route that the money was in a safe,

13   and that's what these people were

14   demanding.

15   Q                Let's just do this one at a

16   time.

17   A                Sure.  Remember, I told you

18   that I reviewed text messages for the two

19   days.  When Mena is talking to Soto and

20   referring to, say, $20, this text message

21   clearly shows how he wants to refer to

22   $20.

23                This is a text message from

24   October 18, 9:49 a.m., where when Mena

25   wants to say $20, U.S. currency, he puts

231

1              L. GERDES, ESQ.
2    the dollar symbol and writes "20."  He
3    has no problem expressing $20.
4        Q        You're assuming that was
5    his practice from that one text message?
6        A        Well, these were -- when we
7    say, "one text message," these were two
8    text messages sent within a 24-hour
9    period.
10       Q        Right.  So, obviously, it
11   wasn't his pattern and practice, as you
12   just testified, to do that, because
13   he, in fact, did it a different way, in
14   possibly another text message; is that
15   correct?
16       A        But in this one he's
17   saying -- they're talking about no gas in
18   the van.  This is a very different tenor
19   to this text message.
20       Q        Let's just go through each
21   of these text messages one by one.
22       A        Okay.
23       Q        Defendant's Exhibit O, can
24   you tell me what that says in English?
25       A        You want me to translate

232

```
 1                    L. GERDES, ESQ.
 2    it, you're saying?
 3        Q        Yes.
 4        A        I can't right now.  I had
 5    the translations done.
 6        Q        It's in Spanish?
 7        A        Yes.
 8        Q        Can you flip over to the
 9    next one?
10        A        Okay.
11        Q        That's Exhibit P?
12        A        Correct.
13        Q        That's from "Be Bless" to
14    Mena?
15        A        Correct.
16        Q        It says, "You're trying to
17    deliver bread"?
18        A        Correct.
19        Q        Let's go to the next one.
20    We already covered that one.
21        A        I remember "tato" means
22    okay.
23        Q        Can you tell me what
24    Defendant's Exhibit S says?
25        A        This was something to the
```

233

1                      L. GERDES, ESQ.

2    effect that I talked to Lo's and he said

3    something.  I forget if this means after

4    or before five, but I definitely knew

5    what this meant.  Well, as far as the

6    translation.

7         Q          Did you ever find out who

8    Lo's was?

9         A          Well, I know what Mena said

10   at trial as to who Lo's was.

11        Q          Who?

12        A          He said that he was a

13   person who was going to be working the

14   route, essentially.  Like, taking his

15   place.

16        Q          Taking whose place?

17        A          Taking Mena's place.

18        Q          Did you ever learn before

19   Mena was arrested that the Lo's meant

20   Carlos?

21        A          No.

22        Q          Did you inquire into who

23   Lo's was?

24        A          I believe I knew.  I saw

25   that there was a Carlos whose phone

234

```
1                    L. GERDES, ESQ.
2     number -- at some point, I don't know
3     when, I saw that there was a Carlos
4     stored -- maybe stored in one of the
5     phones on the report or something.
6          Q          That was before --
7          A          But I didn't know that this
8     meant Carlos when I looked at this.  I
9     didn't know that this meant Carlos until
10    Mena testified.
11         Q          But you knew that they were
12    referring to --
13         A          It says, "Lo's."  No, I
14    didn't really know that this was
15    referring to, like, a named man.  It
16    says, "Lo's."  I didn't really know what
17    that meant.
18         Q          Let's go to the next one.
19    I think you testified about Defendant's
20    Exhibit T; correct?
21         A          Yes.
22         Q          That you took from that
23    that someone was going to get ten for
24    something that was unrelated to the bread
25    route, and Mena would get twenty?
```

235

```
1                  L. GERDES, ESQ.

2      A          Correct.

3      Q          Is it indicated in that

4   text message that it was $10,000, or

5   $20,000, $10, $20?

6      A          No.

7      Q          Let's go to the next one.

8   In that text message, Defendant's Exhibit

9   U, can you tell me who that's to and who

10  that's from?

11     A          From Soto to Mena.

12     Q          Is that text message in

13  response to Defendant's Exhibit T?  Is

14  that the next text message that was sent

15  to Mena from Rafael Soto?

16                    MR. FRANCOLLA:  Objection.

17                    If you know.

18     A          I don't know.

19     Q          Does it appear that way?

20     A          I can tell you that this

21  (indicating) was sent at 8:44, and then

22  this (indicating) was sent at 9:17.  As I

23  sit here today, do I know if any other

24  text messages were sent in between?  No,

25  I don't know.
```

236

1                    L. GERDES, ESQ.

2      Q          Fair enough.  The police

3   did a phone dump; is that correct?

4      A          Correct.

5      Q          That phone dump has all the

6   text messages that were recovered from

7   the cell phone; is that correct?

8      A          That's not correct.

9      Q          It does not?

10     A          Correct.

11     Q          Does it have all the text

12  messages between Mena and Rafael Soto?

13     A          I don't know the answer to

14  that.

15     Q          Does it have all the text

16  messages between --

17     A          Here's what happened.  When

18  I was preparing for trial against Mena, I

19  had all of their phone records then at

20  that point.  As I was looking at their

21  phone records, I could see that there

22  were text messages on the phone records

23  that I did not have copies of from that

24  disk.

25                    I called TARU and I said to

237

1                    L. GERDES, ESQ.

2     TARU, like, look, when you guys generally

3     do these phone dumps, do you put all of

4     the texts on the disk?  They're like

5     yeah, that's the general practice.

6                    So, then I realized that

7     definitely wasn't what happened here,

8     because the likelihood of all the texts

9     on Mena's phone being between him and

10    Soto and no one else was slim to none.

11        Q        Sure.

12        A        So, I realized then that

13    this is all that I had.  Then, I also

14    realized that when I looked at the phone

15    records there were definitely, you know,

16    texts where it was saying that Mena was

17    either receiving or sending a text, and I

18    didn't have one that corresponded to that

19    date and time.

20                   So, then I got a second

21    search warrant.  This is while we're in a

22    trial part.  I think even practically

23    while the trial was going on, we might

24    have been mid-trial when I realized this.

25    So, then I had permission to go back into

238

1             L. GERDES, ESQ.

2    the phone.

3             When I went back into the

4    phone, I could clearly see then that

5    there were text messages between Mena and

6    other parties.  What I can't remember is

7    if there were any more between Mena and

8    Soto, other than what I have.  I honestly

9    can't remember that.

10    Q       At the time of Soto's

11    arrest, what we have here today with

12    Exhibits P-1, O, Q, R, S, T, and U, those

13    are the ones that you had that were

14    available to you?

15    A       Well, I don't know how you

16    generated this.

17             THE WITNESS:  Is this the

18             disk that I gave you printed

19             out?

20             MR. FRANCOLLA:  Yes, I

21             could say that on the record.

22             Exhibit P-1, as well as

23             Exhibits O through U, are

24             copies of the text messages

25             that were on the disk Miss

239

```
 1                    L. GERDES, ESQ.
 2                Gerdes provided me yesterday,
 3                which was sent to our copy
 4                center, and then printed and
 5                provided to me, which was then
 6                provided to plaintiff's
 7                counsel.  That's my
 8                assumption, yes.
 9       A        Then, that's what I had pre
10   Soto's arrest.
11       Q        My question then is:  If
12   you look at all of these documents that
13   you have in front of you, can you tell me
14   if there appears to be other text
15   messages that would fall between
16   Defendant's Exhibit T and U?
17       A        These aren't even in order.
18       Q        They're not?
19       A        No.  We go from August 30th
20   to the 23rd, to September 15th, back to
21   September 2nd.  Yes, it appears that
22   there are no text messages sent between
23   the two, you know, in between this time
24   period, between Defendant's Exhibits T
25   and U.
```

240

1                    L. GERDES, ESQ.

2        Q        Is it safe to say then that

3   before Soto's arrest, when you read these

4   text messages, that you believed or it

5   appeared to be that Rafael Soto's

6   response, that's depicted in Defendant's

7   Exhibit U, was a response to Mena's text

8   message that is depicted in Defendant's

9   Exhibit T?

10       A        It was the next text that

11  was sent.  I don't feel as though it's

12  responsive to what Mena sent though.

13       Q        Now, in that text message,

14  we've already covered that Mena mentions

15  ten, that he's going to pay some ten; is

16  that correct?

17       A        That Mena is?

18       Q        Or someone agreed to be

19  paid ten; is that correct?

20       A        Correct.  That they're

21  going to be doing the same thing

22  together.  Some job where they're going

23  to be working in tandem.  That it's going

24  to be twenty.  One's getting paid twenty.

25  That being Mena.  The other one is

241

1              L. GERDES, ESQ.

2    getting paid ten.  That's the person who

3    he, essentially, brought on who has

4    agreed to do this with him.

5              Not that this is what he

6    used to make.  It means what I'm getting

7    for a future job.  That some job that is

8    happening in the future, that is

9    happening over there.  That this isn't a

10   continual job.  This is a one-time thing,

11   because I'm only getting this.  Again,

12   the context of what that word "tiguere"

13   means.

14      Q      What led you in that text

15   message to believe that that was a

16   one-time job?

17      A       Because I knew what had

18   happened to the victim.  I knew that Mena

19   was a regular employee of Soto.  That

20   Mena was his driver.  That Mena was

21   Soto's driver who did the route.  That

22   this is a payment that he's going to be

23   getting in the future for something he

24   does over there.  That was the conclusion

25   that I drew.

242

1                    L. GERDES, ESQ.

2      Q          My question is a little bit

3    different from your answer.

4      A          Sure.

5      Q          My question is not what

6    influenced your decision to construe the

7    text message the way that you construed

8    it, but rather what in that text message

9    made you believe that it was only for a

10   one-time job?

11     A          Because I'm knowing what I

12   know about what Pablo Dickinson said.

13   That he's getting $20,000.

14     Q          So is your answer that --

15     A          That Mena is getting some

16   portion, also.  So, I'm knowing what

17   Pablo has told me, and that somebody else

18   is getting the rest.  So, the fact that

19   it's important for Mena to tell Soto that

20   he's -- it's like the three of them are

21   talking about this.

22                 Knowing what I know about

23   Pablo Dickinson, Pablo Dickinson is not

24   an employee who they would want to hire

25   to, you know, drive the route for them.

243

1                    L. GERDES, ESQ.

2    They know Pablo Dickinson.  They know

3    he's a drug dealer.  A bad guy.

4                    So, the person who I know

5    he recruited, because Pablo had told us,

6    you know, that Mena had called him

7    earlier in the night, and that he agreed

8    to do it.  Then that Mena was going to

9    call him to pick him up.  So, the time

10   that he was doing this was, like,

11   basically, falling in line, because we

12   spoke to Pablo first.

13                   It was falling in line with

14   exactly what Pablo had told us.  That he

15   had been recruited by Mena to go over

16   there, to go to Brooklyn.  That he's a

17   downhome, dirty criminal.  That's the

18   only reason they asked him, out of all

19   the friends and acquaintances they had.

20   That's why he was recruited.

21                   That he was going to be

22   getting 20,000.  You know, it's the same

23   division of money.  That there was this

24   third person who was going to be getting

25   the rest.  So, when I see this, when I

1              L. GERDES, ESQ.

2     know that Mena has just recruited an

3     accomplice, it's, essentially, him

4     telling Soto, look, I just got my

5     accomplice.  We're set.

6                   He's saying, you're with

7     your pregnant wife at the hospital.  You

8     can't do this.  I got somebody.  I got a

9     downhome dude who will go over there and

10    commit this crime with me.  I told him

11    about the payments.  He's on board.  That

12    you're going to still get your money,

13    basically.

14       Q         When Soto says, "I think

15    $10 an hour is fair," that didn't

16    register in your mind that that meant $10

17    an hour and not $10,000?

18       A         There never needed to be --

19    Jonathan was the driver.  It's not like

20    Soto worked for the route.  As you have

21    said, you know, Soto wasn't hands on

22    every day taking a payment.  Jonathan was

23    his worker.  Jonathan was his driver.

24                   So, the fact that Soto was

25    out of commission, it didn't affect

245

```
 1                    L. GERDES, ESQ.
 2    Jonathan from being able to do the route.
 3    It's not like Jonathan's wife was the one
 4    who had the baby so that he's hiring
 5    someone to fill his place.  Because this
 6    is only temporary, that person is going
 7    to get less than what he got.  You know,
 8    the fact that Soto -- yeah, this is
 9    totally nonresponsive and smart.
10                    That's why I thought, like,
11    Soto was, you know, very smart in how
12    this crime was committed.  The license
13    plate thing not coming back to him.  You
14    know, him not ultimately being the one
15    who went over to do this.  You know, him
16    wanting to get his van back from the
17    precinct as quickly as possible so the
18    police might not be able to find those
19    Home Depot receipts.
20        Q        Now, let me ask you this:
21    If Jonathan Mena had been planning to
22    move to Virginia and meet with someone to
23    take over for him before Soto was able to
24    take over the route, would that have been
25    a reasonable explanation for that?
```

246

```
 1                    L. GERDES, ESQ.
 2        A          No, because then that would
 3   have been a permanent job.  That wouldn't
 4   have been only for a couple of weeks.
 5        Q          Why wouldn't it have --
 6        A          Because the route.  Who is
 7   going to continue to drive the route?
 8        Q          What if I told you that
 9   Rafael Soto had intentions of taking over
10   the route himself because he had found
11   out that Mena had been stealing money
12   from his business?
13                    MR. FRANCOLLA:  Objection.
14               Is there a question?
15                    MR. MOUTON:  Yes.
16                    MR. FRANCOLLA:  That
17               wasn't a question.
18        A          I mean, I know what Soto
19   said in the Grand Jury.  It sounds like
20   you maybe know bits and pieces of what he
21   said.  There was no evidence before me
22   that suggested Mena was moving to
23   Virginia.
24        Q          Well, the reason why I'm
25   asking you is because you're saying that
```

247

1               L. GERDES, ESQ.

2    he said, I think $10 an hour is fair, and

3    you thought that was a smart and slick

4    thing that he did.

5               My question to you is:  Did

6    it ever occur to you that maybe you were

7    attributing the wrong definition or

8    translation to what Mena sent to Rafael

9    Soto, and that it could possibly be, in

10   fact, that he was saying $10 an hour?

11              MR. FRANCOLLA:  Objection.

12       A      So, what you're trying to

13   suggest is that Rafael Soto planned to

14   become the driver of this route?

15       Q      I'm asking you:  If I told

16   you those things; that Mena had plans to

17   move to Virginia, that Rafael Soto knew

18   that he was stealing from his route, and

19   that he had planned to fire him anyway,

20   and that he wanted to bring someone else

21   on to learn the route, because he didn't

22   know it, temporarily, while his wife was

23   out of commission, and that he agreed to

24   pay the gentleman who was taking over,

25   Carlos, who was mentioned in the previous

248

```
1                    L. GERDES, ESQ.
2    text, $10 an hour, would that be a
3    reasonable explanation as to this series
4    of text messages?
5                    MR. FRANCOLLA:  Objection.
6       A          No, because your client
7    also said that the route was sold.  So,
8    if the route is sold, what do they care
9    about bringing on a new driver?
10      Q          If the route hadn't been
11   sold, would it have been reasonable?
12                   MR. FRANCOLLA:  Objection.
13      A          No, again, it wouldn't,
14   because then if he's firing Mena because
15   he's a thief, and moving to Virginia,
16   Carlos, this new, you know, hypothetical
17   employee, would then become a full-time
18   worker.  He wouldn't only be working for
19   a couple of weeks.
20      Q          If Rafael Soto himself was
21   going to then take over the route, would
22   he not be working only for a few weeks?
23                   MR. FRANCOLLA:  Objection.
24      A          The same Rafael Soto that
25   you said was working a full-time job at
```

249

```
 1                    L. GERDES, ESQ.
 2     FedEx, and also the same Rafael Soto who
 3     you said didn't know anything about the
 4     route?
 5          Q         Certainly.
 6          A         No, it wouldn't make any
 7     sense.
 8          Q         Let me put it this way.
 9     Yesterday, Mr. Soto testified that he
10     was, in fact, leaving FedEx because he
11     needed to take care of these routes so
12     that he could then purchase a FedEx
13     route, and that he had plans to do that,
14     and, again, that he had found out that
15     Mena had been stealing from him.
16                    So, he wanted to take over
17     these routes and learn them so that he
18     could know who the customers were, find
19     out who they were and how much he was
20     bringing in.  That way he could sell the
21     route, but that at this particular
22     juncture his wife was pregnant and was
23     about to have a baby.  So he needed a
24     temporary worker.
25          A         That's why it doesn't make
```

250

```
 1                    L. GERDES, ESQ.
 2   any sense, because when your client
 3   testified before the Grand Jury, he said
 4   that his route was sold.  If his route is
 5   sold, there is no need for him to worry
 6   about his thieving employee hiring a new
 7   employee.  That becomes the new buyer's
 8   problem.  No, that doesn't make sense.
 9        Q         That was something that you
10   learned at the Grand Jury?
11                    MR. FRANCOLLA:  What was
12                  something that she learned?
13        Q         That was something that was
14   said at the Grand Jury, and that's when
15   you first learned that?
16        A         He said that there was a
17   buyer in place.
18        Q         "A buyer in place"?
19        A         Right.  What I knew at this
20   stage, when I was reviewing these texts,
21   was that Soto did not participate in the
22   daily operations of the route.  So, the
23   fact that Soto's wife was going to be out
24   of commission, as she recovered from
25   surgery, that would not have impacted the
```

251

1                    L. GERDES, ESQ.

2    daily operations of the route, because

3    Soto was not involved in the daily

4    operations of the route.

5         Q         But Mena moving would have;

6    is that correct?

7         A         No.

8         Q         It wouldn't have impacted

9    the daily operations of the route?

10        A         Clearly, Soto was a

11   hands-off owner, because he couldn't even

12   bother to get this information to the

13   prospective buyer.

14        Q         My question isn't about

15   those particular documents or what

16   information he provided.

17                  My question is:  If Mena is

18   the only employee and he knows everything

19   about the route, and he's the one who

20   runs the route, if he moved, that would

21   not impact the operation of the bread

22   route?

23        A         If Mena moved, that would

24   impact the operation of the bread route,

25   but there was no evidence before me that

252

1                    L. GERDES, ESQ.

2    Mena had any intention on moving, nor did

3    your client at any time when he -- to my

4    knowledge, when he spoke to Detective

5    Bonilla, you know, in the days leading up

6    to his arrest, did he ever tell Detective

7    Bonilla that Mena was moving to Virginia?

8    I understand that they had a few phone

9    conversations.

10       Q        Phone conversations with

11   detectives and people who call into a

12   precinct, are they recorded?

13       A        Not to my knowledge.

14       Q        Are telephone conversations

15   between people at Rikers Island and the

16   people they call recorded?

17       A        Some of them.

18       Q        What would trigger a

19   recording?

20       A        You would have to speak to

21   somebody at Rikers Island about that.

22       Q        What about when someone

23   meets someone in person at Rikers Island,

24   is there a microphone placed somewhere

25   and a recording made?

253

```
 1                    L. GERDES, ESQ.
 2      A          Not to my knowledge.
 3      Q          Have you ever been
 4  pregnant?
 5                    MR. FRANCOLLA:  Objection.
 6                       No, you're not answering
 7                    that question.
 8      A          I've never been pregnant.
 9      Q          Have you ever had a
10  Cesarean section?
11      A          No, but I had friends who
12  had.
13      Q          You testified earlier that
14  you would classify that as surgery; is
15  that correct?
16      A          Yes.
17      Q          You indicated earlier that
18  that was something serious, but not
19  necessarily.  It could have been a number
20  of things that you could have attributed
21  it to, the fact that she was having
22  surgery; is that correct?
23                    MR. FRANCOLLA:  Objection.
24      A          Well, he said that his wife
25  was in labor in one of the other texts.
```

254

1                    L. GERDES, ESQ.

2        Q        At the time when you read

3    that, did you believe that she was having

4    a Cesarean section?

5        A        When those two texts are

6    sent within 24 hours of each other, yes.

7        Q        At the time that you read

8    it, you believed that she was going to be

9    out for a couple of weeks because she had

10   a Cesarean section; is that correct?

11       A        Yes.  Also, with this text

12   message, you just can't overlook the

13   timing of it.  I mean, this is sent.

14                Again, when you combine all

15   of this together and you look at the big

16   picture, when you have this sent about

17   seven to eight hours before the victim is

18   abducted, and after he speaks to

19   Dickinson on the phone, I mean, knowing

20   what we know about all of the other

21   circumstantial evidence in this case --

22   because that's what my job as a

23   prosecutor is to do.

24                You don't necessarily look

25   at just one piece by itself and make a

255

```
 1                    L. GERDES, ESQ.
 2    decision.  You look at all of the pieces
 3    of the puzzle, and you put all of those
 4    pieces that you have before you and
 5    consider it all.
 6                    You know, while there may
 7    be an innocent explanation for this one
 8    text; maybe he was moving to Virginia,
 9    it's very difficult to say that that's
10    the most reasonable conclusion that you
11    should draw when you look at all of the
12    other evidence and when you look at what
13    we know.  When I looked at everything,
14    the one naturally flowing, reasonable,
15    logical conclusion was that he planned
16    this.
17        Q        That conclusion was
18    something that you had already formed on
19    October 20, 2011?
20        A        Of course not.  You never
21    asked me that question, and I never said
22    that.
23        Q        You stated earlier that
24    there is an argument to say that on
25    October 20, 2011, you had probable cause
```

256

1               L. GERDES, ESQ.

2    to arrest Rafael Soto.

3               Was it your belief for that

4    because you believed that at that

5    particular juncture that there was enough

6    circumstantial evidence to form probable

7    cause, and that Rafael Soto had actually

8    committed the crime?

9               MR. FRANCOLLA:  Objection.

10    A       I don't know if -- I mean,

11    we didn't make the arrest that day.

12    That's the fact.  It was very strong and

13    powerful evidence.  I don't know the

14    answer to that.  I don't know if it was

15    without a doubt probable cause to arrest

16    that day, but we didn't arrest.  So, we

17    don't have to make that decision.

18    Q       Your beliefs and the

19    conclusions that you came to on the

20    initial day of the arrest, did that

21    influence your investigation?

22               MR. FRANCOLLA:  Objection.

23    A       I mean, of course, when you

24    learn something.  You don't start at

25    Point A, when you -- or Point Z, when you

257

1                    L. GERDES, ESQ.

2      know everything that happened before.  I

3      mean, what you know does drive an

4      investigation.  It does point you in

5      different directions.  We weren't working

6      blindly.

7                    Of course, what Dickinson

8      was telling us, the van, you know, what

9      the victim was telling us about his

10     conversations with Soto, and the

11     information he had conveyed to Soto

12     versus what he had conveyed to Mena,

13     sure, all of that is playing a role in

14     why I thought that Soto was involved in

15     this.

16          Q        Now, I'm going to go back

17     to what was marked as Plaintiff's Exhibit

18     5.

19          A        Sure.

20          Q        You looked at these

21     earlier.  Does it appear that this set of

22     documents contains a lot of documents

23     that look to be financial in nature?

24          A        No.  I mean, besides the

25     Chase Bank, there's bridge tolls.  Do you

288

```
 1                  L. GERDES, ESQ.
 2       Q          Did Mr. Levitt have any
 3  sway in your decision to bring charges
 4  against Mr. Dickinson?
 5       A          Against Mr. Dickinson?
 6       Q          I'm sorry.  Against Mr.
 7  Soto.  I apologize.
 8       A          Yes.  Before he was
 9  arrested, we discussed, you know, what
10  the evidence was against him.
11       Q          What did Mr. Levitt tell
12  you after you discussed the evidence with
13  him?
14       A          He was in agreement with me
15  that we had probable cause to arrest.
16       Q          Did he direct you to have
17  Mr. Soto arrested?
18       A          I don't know who -- well, I
19  didn't personally arrest Mr. Soto.  I
20  don't know if we were all in the same
21  room; Bonilla, me, and Jeff.  I can't
22  remember now, but all three of us were on
23  the same page that we had probable cause.
24  That we had more than probable cause for
25  arrest in this case.
```

289

1                    L. GERDES, ESQ.

2       Q         Was there any one person

3    who made the decision to arrest Mr. Soto?

4       A           No.  I think it was that

5    everyone was in agreement.

6       Q           Everyone was in agreement.

7    Did the three of you together make the

8    decision that Mr. Soto should then be

9    arrested?

10      A           I don't know who made the

11   final call.  I really don't.  No one was

12   wavering, or no one was suggesting that

13   we needed more.  All three of us were on

14   the same page when we reviewed all of

15   this evidence that there was probable

16   cause to arrest.

17      Q           If the Kings County

18   District Attorney's Office had made that

19   final decision to make the arrest, would

20   they have drafted some sort of document

21   to send to the NYPD to effect the arrest?

22      A           No, not to my knowledge.

23   It wasn't done in this case.  I mean, I

24   don't think -- I'm not familiar with

25   something like that.

```
 1                   L. GERDES, ESQ.
 2       Q         If you were the person that
 3   directed Detective Bonilla to make the
 4   arrest, would you have called him on the
 5   phone and told him, we have enough
 6   probable cause, so please arrest Mr.
 7   Soto?
 8                        MR. FRANCOLLA:  Objection.
 9       Q         Or something along those
10   lines, obviously.
11       A         Like I said, I can't
12   speculate.  I don't know who -- I don't
13   know if we were all in the same room.
14   You know, I know that at some point, you
15   know, Bonilla was at our office at
16   different points in time.  I know that I
17   was in Jeff's office.
18                   You know, I don't know if
19   somebody communicated, you know, yes, go
20   ahead and make the arrest to Bonilla via
21   phone.  Whether or not that was an
22   in-person conversation, I don't know the
23   answer to that.
24       Q         Have you ever ordered the
25   NYPD to arrest someone?
```

364

1              L. GERDES, ESQ.

2    District Attorney's Office?

3              MR. FRANCOLLA:   Objection.

4    A         I don't know what drive the

5    screening database is considered to be a

6    part of, because any ADA can sign onto a

7    screening database.  The Complaint

8    Drafting database, I don't know what

9    drive that's on.

10   Q         Is it fair to say that you

11   don't know if there is?

12   A         I guess so.

13   Q         Before Mr. Soto was

14   arrested, did Dickinson tell you anything

15   that led you to believe that Rafael Soto

16   had any direct communications with Pablo

17   Dickinson prior to the October 20th

18   incident?

19   A         Did Dickinson ever tell us

20   prior to Soto's arrest that he had direct

21   contact with Soto?  No.

22   Q         The second license plate

23   that you pulled that was on the FedEx

24   van, Soto's van, do you know whose

25   license plate that was?

365

1                     L. GERDES, ESQ.

2      A          I think it was registered

3   to, like, a van or a truck in Minnesota.

4      Q          Do you know to this day --

5      A          I don't think it was ever

6   reported stolen, to my knowledge.  I

7   don't think, if memory serves me

8   correctly.

9      Q          Do you know to this day who

10  put the plate on the back of the van?

11     A          Pablo Dickinson said that

12  Mena did that.

13     Q          Do you to this day know

14  where Mena got that plate from?

15     A          No.

16     Q          Do you know to this day who

17  directed Mena to put the plate on the

18  back of the van?

19     A          Well, I know it wasn't

20  Dickinson.

21     Q          I'm asking you:  Do you

22  know who it was?

23     A          Well, I'm telling you,

24  there's one person I can exclude.  It

25  wasn't Dickinson.

366

```
 1                    L. GERDES, ESQ.
 2        Q          Other than that, you don't
 3   know who it was?
 4        A          No, besides Dickinson and
 5   Soto.  They would be the only two people
 6   who ever were in the van coming back.
 7        Q          I believe you said that you
 8   don't have Bonilla's case file anymore;
 9   is that correct?
10        A          Correct.
11                   MR. MOUTON:  I am going to
12                   keep this deposition open, or
13                   deem it to remain open,
14                   subject to receiving the
15                   various documents that, I
16                   believe, are missing from the
17                   discovery here today, and, as
18                   well, because of counsel's
19                   direction to his client not to
20                   answer questions related to
21                   financial information.
22                   MR. FRANCOLLA:  For the
23                   record, I see absolutely no
24                   basis whatsoever to ever
25                   reopen this deposition.  We'll
```