1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
RAFAEL SOTO,

              Plaintiff,

                            Index No.
   -against-               12 CV 4241
                            (MKB) (VVP)
THE CITY OF NEW YORK, COUNTY OF KINGS,
DISTRICT ATTORNEY CHARLES J. HYNES,
DETECTIVE DANIEL BONILLA, POLICE OFFICER
ADAM FEDER, ASSISTANT DISTRICT ATTORNEY
JOHN GIANNOTTI, ASSISTANT DISTRICT ATTORNEY
LINDSAY GERDES, LIEUTENANT CHRISTOPHER
MARROW, and DETECTIVE BRIAN MEICHSNER,
              Defendants.
----------------------------------------X

              January 16, 2014
              11:25 p.m.


     EXAMINATION BEFORE TRIAL of ASSISTANT

DISTRICT ATTORNEY LINDSAY GERDES, one of the

Defendants here, taken by Plaintiff, held at

225 Broadway, New York, New York, pursuant

to Order, before a Notary Public of the

State of New York.


       HARRIET BEIZER ASSOCIATES
   'THE VERBATIM REPORTING SERVICE'
        70-50 AUSTIN STREET
   FOREST HILLS, NEW YORK 11375-4252
         (718) 544-4199

2

1

2   A P P E A R A N C E S:

3

4

5      THE LAW OFFICE OF GREGORY P. MOUTON, JR.

6      Attorneys for Plaintiff

7           305 Broadway, 14th Floor

8           New York, New York 10007

9      BY:  GREGORY P. MOUTON. JR., ESQ.

10

11

12     MICHAEL A. CARDOZO,

13     CORPORATION COUNSEL

14     Attorneys for Defendants

15          100 Church Street

16          New York, New York 10007

17     BY:  BRIAN C. FRANCOLLA, ESQ.

18

19

20

21

22

23

24

25

3

1

2                    S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED by

5    and between the attorneys for the respective

6    parties hereto that the sealing, filing and

7    certification of the transcript of the

8    within examination before trial be, and the

9    same hereby are waived.

10

11       IT IS FURTHER STIPULATED AND AGREED

12   that said transcript may be signed and sworn

13   to before any Notary Public or Commissioner

14   of deeds with the same force and effect as

15   if signed and sworn to before an officer of

16   this Court.

17

18       IT IS FURTHER STIPULATED AND AGREED

19   that all objections, except as to the form

20   of the questions, are reserved to the time

21   of the trial.

22

23

24

25

58

1              L. GERDES, ESQ.

2              address?

3                  MR. FRANCOLLA:  I could

4              assert an official information

5              privilege.

6                  THE WITNESS:  Do you have

7              a copy of the e-mail?

8                  MR. MOUTON:  It's

9              somewhere in the discovery.

10                  Are you directing her not

11             to answer?

12                  MR. FRANCOLLA:  Do you

13             have an issue giving your work

14             e-mail address?

15                  THE WITNESS:  No.

16                  MR. FRANCOLLA:  Okay.  Go

17             ahead.

18     A        I would imagine that it

19     would have been on the e-mail that I gave

20     you, but gerdesl@brooklynda.org.

21     Q        Do you recall receiving an

22     e-mail from the victim for the underlying

23     criminal matter?

24     A        Yes.

25     Q        When did you receive that

59

1                    L. GERDES, ESQ.

2   e-mail?

3       A          I can't remember the exact

4   date, as I testify here today.   The

5   e-mail is dated though.

6       Q          The victim in this matter

7   was Masahira Yoshida?

8       A          Correct.

9       Q          Other than the one e-mail

10   that's been disclosed to us, do you

11   recall receiving any other e-mails from

12   the victim related to his abduction and

13   robbery on October 20, 2011?

14       A          That's all I recall.

15       Q          Have you ever searched your

16   e-mail to see if you have any other

17   documents related to this incident?

18       A          No.   Relating to this

19   incident, or relating to e-mails from the

20   victim?

21       Q          This incident, generally.

22       A          I have no idea how I would

23   go about searching my e-mail for e-mails

24   relating to an incident in general.

25       Q          Have you searched for

85

1                    L. GERDES, ESQ.

2    you questions about each specific one;

3    okay?

4        A          Isn't that what the record

5    is for?  I mean, because I don't want to

6    feel like you forget to tell me one of

7    the things I just said on the record.

8        Q          If I forget to tell you,

9    that's my fault.  I just want to have the

10   information about it so that I can ask

11   you about it.

12       A          Okay.

13       Q          Let me just take a minute

14   and write it up.

15       A          Okay.

16       Q          My understanding, just as a

17   brief synopsis, is that Soto had

18   Yoshida's address.  Soto had knowledge of

19   the $100,000 in Yoshida's safe.  That

20   Yoshida had gone with Jonathan on the

21   route for one day.  That he did not tell

22   Jonathan his address.  He didn't tell him

23   about the money.  That he did not take

24   Jonathan to his home address.

25                  Dickinson said that there

1          L. GERDES, ESQ.

2    was a third person.  The van was

3    registered to Soto.  Soto was trying to

4    unload his route.  Dickinson knew Soto.

5    Mena had his own car, but decided to use

6    Soto's van, and they had covered the

7    plates so as not to trace the car back to

8    Soto.

9              MR. FRANCOLLA:  I'm going

10                  to object to the extent that

11                  this information has already

12                  been provided.

13                  You can answer.

14    A          There's two things.  I

15    never said that Yoshida never told Mena

16    about the money.

17    Q          Okay.

18    A          Mr. Yoshida wasn't sure

19    whether or not he told Mena about that,

20    but I knew he didn't tell Mena about his

21    address.  Yoshida was, basically, saying,

22    in so many words, there's only one person

23    who knew both of those things.  In his

24    mind, that's what he's telling me.

25              He said that he filled out

87

```
 1                 L. GERDES, ESQ.
 2    this Mr. Route paperwork.  So he's
 3    thinking that Soto, obviously, has this.
 4    He also had spoken to Soto multiple times
 5    on the telephone, and Soto was supposed
 6    to come meet him at Mr. Route's once and
 7    never showed.
 8                 The other thing that was,
 9    kind of, important is that I was, kind
10    of, getting an impression that certain
11    things with Soto were, like, a little
12    fishy, because Mr. Yoshida was also
13    telling me that the route -- the reason
14    why the deal fell through was because
15    Soto couldn't get him the numbers that he
16    wanted to substantiate for the route.
17                 So, really, the route
18    wasn't worth what Soto was saying that it
19    was worth, and what he was trying to sell
20    the route for, because he could never
21    back up the numbers.  Like, he provided
22    him with certain numbers that he said the
23    route made.  That Mr. Yoshida was asking
24    for the details, and he never got him
25    that.
```

91

1                    L. GERDES, ESQ.

2    Route's that he had $100,000 in his safe.

3        Q        Well, here is my question:

4    On October 20, 2011, did the victim tell

5    you how much Rafael Soto had listed the

6    route for?

7        A        I can't remember.  I knew

8    it was at least $100,000.  I knew it was

9    at least $100,000.

10       Q        Did he also tell you that

11   the terms of any potential agreement was

12   that the route cannot be purchased with

13   financing, and that it had to be a cash

14   transaction?

15       A        I don't know if I knew that

16   that day.  At some point I learned that,

17   but I don't know at what point I learned

18   that.  I don't think they all had to be

19   purchased with $100,000 from the safe.  I

20   don't think they -- you know, that was

21   the difference there.

22       Q        On October 20, 2011, you

23   knew that potentially Jonathan Mena knew

24   or had been told by Mr. Yoshida that he

25   had $100,000 in a safe in his apartment?

92

```
 1                    L. GERDES, ESQ.

 2                    MR. FRANCOLLA:  Objection.

 3                       You can answer.

 4                    Characterization.

 5      A           I don't know if he told me

 6   that that day.

 7      Q           Did you learn that prior to

 8   Mr. Soto's arrest?

 9                       MR. FRANCOLLA:  Learn

10                    what?

11                       MR. MOUTON:  That Mr.

12                    Yoshida had possibly told

13                    Jonathan that he had $100,000

14                    in his safe in his apartment.

15      A           Yes, I believe I learned

16   that at some point before the arrest.  I

17   don't know what point.

18      Q           You also indicated that you

19   learned that Mr. Yoshida had gone out for

20   one day with Jonathan on his route; is

21   that correct?

22      A           Right.

23      Q           Did Mr. Yoshida indicate to

24   you that he had taken any notes while he

25   was on that route?
```

93

```
 1                    L. GERDES, ESQ.
 2      A          I don't know if he told me
 3  he took the notes while he was physically
 4  on the route, but I did know that he took
 5  notes, and I saw the notes that day at
 6  the precinct.
 7      Q          So you did see his notes?
 8      A          Yes.
 9      Q          On those notes, did you
10  view or see where Mr. Yoshida had written
11  down numbers and figures about various
12  deliveries that Jonathan Mena had made
13  during his time on the route?
14      A          I didn't know exactly what
15  all -- the main thing with the notes that
16  day was that he knew it had Jonathan's
17  phone number on there.  He was trying
18  to -- we were trying to get Rafael Soto's
19  phone number.
20                 I think, if memory serves
21  me correctly, he was trying to look for,
22  like, the Mr. Route paperwork and Rafael
23  Soto's number, but it was more pertaining
24  to the phone numbers.
25                 As I sat at the precinct on
```

122

L. GERDES, ESQ.

1

2  these routes.  He didn't owe the bank

3  money on this route.  If he sold this to

4  someone, he was going to have in excess

5  of $100,000, basically, in his pocket,

6  minus the percentage that went to the

7  broker.

8      Q        When did you speak with the

9  broker in relation to Mr. Soto's arrest?

10     A        After Soto's arrest and

11 after Soto testified in the Grand Jury.

12     Q        What you're saying about

13 your belief that he needed money was

14 simply an assumption, and you had nothing

15 to support that assumption; is that

16 correct?

17                MR. FRANCOLLA:  Objection.

18                She explained that she did.

19                MR. MOUTON:  At the time

20                before he was arrested.

21                MR. FRANCOLLA:  When you

22                say she had nothing, she

23                explained why she thought

24                that.  If you disagree with

25                it, that's your position, but

182

```
 1                    L. GERDES, ESQ.
 2        Q          Did you investigate before
 3   or after Mr. Soto was arrested?
 4        A          Before.
 5        Q          My question then is:  As
 6   part of your investigative acts, did you
 7   review documents in evidence that the
 8   police had gathered or that you had
 9   gathered?
10        A          Yes.
11        Q          In the case of documents
12   that the police had gathered, as a matter
13   of practice, did you go through
14   everything yourself to determine what was
15   pertinent, or did you allow the officers
16   to determine what was pertinent before
17   you looked at it?
18        A          I can't answer the question
19   as a whole.  If you want to ask me, like,
20   about certain things.  Overall, in this
21   case, they, kind of, found things and
22   then showed me or presented it to me once
23   they, you know, discovered it or
24   recovered it or collected it.
25                   This wasn't a case where
```

183

```
 1                  L. GERDES, ESQ.
 2   I -- you know, I never personally went to
 3   Home Depot.  I didn't go to the TARU.
 4   So, I was, basically, being kept informed
 5   of information as it was coming to light.
 6   Also, speaking to the victim and learning
 7   things from the victim.  I'm trying to
 8   answer as best I can.
 9       Q          I understand.  For
10   instance, in the case of this voucher,
11   you indicated that you didn't
12   independently look through all the
13   documents even though you knew that these
14   documents existed; correct, before Mr.
15   Soto was arrested?
16       A          Correct.
17       Q          My question to you then is:
18   For the rest of the vouchers and
19   vouchered evidence that the police
20   collected, did you independently go
21   through each voucher, or did you only go
22   through that voucher if the police said,
23   hey, look, here is some information that
24   is pertinent to this investigation?
25       A          Well, I saw a lot of it
```

197

L. GERDES, ESQ.

1

2    Q        Did you direct anyone to do

3  that?

4    A        No, I did not.

5    Q        Do you know if any of the

6  detectives went to Home Depot to do that?

7    A        Whether or not they took a

8  zip tie from the scene and asked Home

9  Depot if this zip tie was their zip tie?

10   Q        Or compared it to the ones

11  that were on the shelf.

12   A        Well, what I did was, I

13  looked at the video surveillance, which

14  shows the zip ties in Soto's hand, the

15  pack of zip ties.

16            So, you see the length.

17  You see what the packaging looks like.

18  It was clear packaging.  You see that the

19  packaging was, basically, the same size.

20  When I say, "size," the length of the zip

21  tie.

22            Then I, myself, when I was

23  at the precinct, saw those zip ties.  I

24  didn't see any serial numbers on the zip

25  ties or any stamps on the zip ties that

198

```
 1                    L. GERDES, ESQ.
 2    said Home Depot, but I was able to do,
 3    myself, a visual comparison of what Soto
 4    had in his hands at the register.
 5                    Knowing that it was two
 6    bags, also.  Knowing then that two bags
 7    were found in the van, two empty bags,
 8    with the receipt, with the Home Depot
 9    bag.  You see them walking out with the
10    Home Depot bag.
11                    So, you know, it's not like
12    they just walked out, oh, we don't need a
13    bag for these.  They put them in a Home
14    Depot shopping bag and walked out.  They
15    take the receipt, put the receipt in the
16    bag and walk out with those items.  So, I
17    did a visual comparison of what I saw
18    Soto purchase versus the zip ties that
19    the police recovered.
20         Q         So, the answer would be
21    that you don't know if the detectives
22    went to Home Depot to compare the zip
23    ties that were recovered to the ones that
24    Home Depot actually sells?
25         A         Correct.
```

209

1                    L. GERDES, ESQ.

2    before you direct me to a certain photo.

3        Q         I believe you said that you

4    had five photos, and then you named the

5    photos; is that correct?

6        A         Right.  Go ahead.

7        Q         Can you tell me what in D97

8    you believe or gives you reason to

9    believe that one of those persons

10   depicted there is Mena and one is Soto?

11       A         I feel like when I did

12   this -- because you're asking me, when we

13   looked at the first -- basically, you

14   showed me the most grainy pictures from

15   the video first.  Then, I'm the one who

16   asked you for all of the photos from the

17   video.

18       Q         Sure.

19       A         When I went about

20   identifying these two people, it's no one

21   picture by itself standing alone that I

22   made the identification on.  It's no one

23   feature alone.  It's everything as a

24   whole.  It's not like this is a yearbook

25   picture of Rafael Soto.

210

1                    L. GERDES, ESQ.

2                 I've seen lots of video

3      surveillance.  You never get video

4      surveillance really that's like them.

5      So, when I'm making this identification,

6      I'm looking at everything collectively

7      that I know about this case.  When I'm

8      dealing with identification issues, in

9      general, you can't just look at the one

10     piece.  It has to be the one piece in

11     association with the next.

12                 So, to make my conclusion

13     that Rafael Soto is the person in the

14     black and Jonathan Mena is the person in

15     the hooded, kind of, grayish blue jacket,

16     I'm looking at everything.  I'm looking

17     at the fact that the receipt for this

18     purchase is found in Soto's van.  I'm

19     looking at the fact that when Soto showed

20     up at the precinct, he was wearing a

21     black leather jacket and a black hood.

22                 If you look at Picture No.

23     D76, you can tell from this picture that

24     the material in the hood is different

25     than the jacket material.  The light is

211

1                    L. GERDES, ESQ.

2    reflecting differently telling me that

3    this is two different types of materials.

4                    So, the person, you know,

5    whose van this receipt is in has this

6    very unique combination of outerwear

7    here.  Not only does he have this unique

8    outerwear, he's with -- not a young girl,

9    not a young boy, not his wife.  He's with

10   the man who was arrested in connection

11   with this van, wearing the exact same

12   jacket that he was arrested in.

13                   I'm also looking at that

14   you could tell that Mena was taller than

15   Soto in the video.  I knew that to be

16   true before he was arrested.

17   Q         How did you know that to be

18   true before he was arrested?

19   A         I believe they had some

20   pedigree information.  I believe that to

21   be true.  I should say that.

22   Q         What was your basis for

23   that belief?

24   A         I think, actually, what it

25   was, I saw his picture.  I don't think I

212

1                    L. GERDES, ESQ.

2    knew it to be a fact.  I think that I

3    believed he was shorter.

4                    I saw his picture, which

5    was a shot of his body, and he appeared

6    to be smaller in stature than Mena.  I

7    saw Mena physically at the precinct.

8         Q         Did you see a picture of

9    this entire body?

10        A         No.  I just said I think --

11   I thought I said his upper.  Like,

12   basically, from his shoulder up.  He

13   appeared to have a smaller stature, and

14   the person in here appeared to have a

15   smaller stature.  So, it's all of these

16   things together that are leading me to

17   draw what I believe is the one

18   inescapable conclusion that this is Mena

19   and Soto.

20                    So, it's not just this one

21   picture by itself.  If you look at the

22   hairline, it looks to be similar.  The

23   hairline, the hair length.

24        Q         The hairline in D97?

25        A         D97 and D72, basically.

324

1                    L. GERDES, ESQ.

2     particular photograph, were the two

3     photographs on that sheet of paper the

4     same as this photograph, or were they

5     different?

6        A        I believe they were the

7     same.  I mean, they were definitely dated

8     10/21.  I believe they were the same, but

9     the quality is off here.

10                    Like I said, there were

11    two.  So, I don't know if they were the

12    exact same, or one showed a little bit

13    more of an inch than the other one.

14       Q        Let me ask you this

15    question:  From that picture, can you

16    tell me what is unique about Mr. Soto's

17    hairline?

18       A        He doesn't have a ponytail.

19    He does not have a hairline that starts

20    in the middle of his forehead.  He does

21    not have the same type of receding

22    hairline like you do.  He does not have

23    bangs that hang down on his forehead like

24    Brian does.  He has brown hair, and the

25    length appears to be the same length as

325

1                    L. GERDES, ESQ.

2    this guy.

3                    Again, I'm not just

4    looking -- it's identification by

5    association, when I am summing up the

6    jury on things like this.  You can't look

7    at one thing by itself.  It's not like

8    I'm saying, oh, because his ear is shaped

9    like this, I know it's Rafaela Soto.

10                    You know, it's everything.

11   That he's next to Mena.  That he's buying

12   these zip ties and getting in the van

13   that's registered to him.  That he's got

14   the sweatshirt that's made of a different

15   material than the jacket.

16                    There's things that I could

17   see how certain people may have a

18   different opinion on, but this one seems

19   like a ground ball when we know

20   everything else.  That's not just looking

21   at this.

22                    Again, I don't think if you

23   necessarily present this picture,

24   Defendant's Exhibit J, and D97, to a

25   stranger on the street and ask, is this

326

1                    L. GERDES, ESQ.

2     the same man who, you know, is on the

3     left-hand side of D97?  It very well

4     could be.

5                    I don't think you could

6     rule it out.  I don't think you could

7     necessarily say, no, I affirmatively know

8     it's a different man.  Very similar.

9     Again, that's not what -- you got to

10    evaluate all of it, and that's what I

11    did.

12        Q        Now, in that picture that's

13    marked as Defendant's Exhibit G, do you

14    see any receipts or papers scattered

15    about in the back of this van?

16        A        Not in the back of the van.

17    I think you have pictures also of the

18    front of the van.

19        Q        Yes, I do.

20                    MR. MOUTON:  Just give me

21                    one moment.

22                    (Brief recess was taken.)

23                    MR. MOUTON:  Mark this as

24                    Plaintiff's 9, please.

25                    (Laser Photocopied Photograph