1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
RAFAEL SOTO,

                    Plaintiff,

                                        Index No.
        -against-                       12 CV 4241
                                        (MKB) (VVP)
THE CITY OF NEW YORK, COUNTY OF KINGS,
DISTRICT ATTORNEY CHARLES J. HYNES,
DETECTIVE DANIEL BONILLA, POLICE OFFICER
ADAM FEDER, ASSISTANT DISTRICT ATTORNEY
JOHN GIANNOTTI, ASSISTANT DISTRICT ATTORNEY
LINDSAY GERDES, LIEUTENANT CHRISTOPHER
MARROW, and DETECTIVE BRIAN MEICHSNER,
                    Defendants.
----------------------------------------X

                    January 16, 2014
                    11:25 p.m.


        EXAMINATION BEFORE TRIAL of ASSISTANT

DISTRICT ATTORNEY LINDSAY GERDES, one of the

Defendants here, taken by Plaintiff, held at

225 Broadway, New York, New York, pursuant

to Order, before a Notary Public of the

State of New York.


            HARRIET BEIZER ASSOCIATES
        'THE VERBATIM REPORTING SERVICE'
            70-50 AUSTIN STREET
        FOREST HILLS, NEW YORK 11375-4252
                (718) 544-4199

177

```
 1                    L. GERDES, ESQ.

 2   pieces of paper?

 3      A          Yes, I think so.

 4      Q          Now, is that set of

 5   documents in Plaintiff's Exhibit 5 less

 6   the documents that are marked as

 7   Plaintiff's Exhibit No. 2?

 8      A          Is it less?

 9      Q          Right.

10      A          This was also in the car.

11      Q          This was also vouchered

12   under the same voucher number that --

13      A          Exactly.

14      Q          That was Voucher No.

15   S037740?

16      A          Correct.

17      Q          At the top of the page

18   that's marked, is that your handwriting

19   at the top?

20      A          Yes.

21      Q          That's at the top right?

22      A          Yes.

23      Q          Is there a particular

24   reason why you didn't review those

25   documents prior to Mr. Soto's arrest?
```

178

1                    L. GERDES, ESQ.

2       A          No.  The police, basically,

3  just told me that they were miscellaneous

4  papers; like, receipts.  That there were

5  no other -- I remember asking if there

6  were any other Home Depot receipts in the

7  car.  They told me that there were no

8  other Home Depot receipts.

9                    You know, like, the police

10 who were working on this knew what

11 evidence there was in the case.  So, they

12 didn't, I guess, bring anything else;

13 like, you know, you really need to look

14 at this.  They told me they were, kind

15 of, just miscellaneous receipts and

16 papers.

17      Q          Now, from October 20, 2011,

18 until the day of Mr. Soto's arrest on

19 November 7, 2011, did you review only the

20 documents that the detectives would bring

21 to your attention, or did you conduct

22 your own investigation of the documents

23 or evidence?

24      A          Well, the victim brought

25 documents to my attention.  He brought

179

```
 1                 L. GERDES, ESQ.
 2     those to the precinct and I saw those.
 3     Then, everything else I looked at, I
 4     believe, at that point was, basically,
 5     collected from the police department.
 6         Q        My question is this:  Would
 7     you go to look for documents or evidence
 8     that you believed was pertinent, or did
 9     you only review what the officers or
10     detectives would bring to you and say was
11     pertinent?
12         A        I didn't have anything else
13     to review at that time.
14         Q        Well, for instance, we can
15     both agree that prior to Mr. Soto's
16     arrest either you or the police came into
17     custody of these documents; correct?
18         A        Correct.
19         Q        These documents are marked
20     as Plaintiff's Exhibits 2 and 5; correct?
21         A        Correct.
22         Q        My question is:  From what
23     you're telling me the police looked
24     through the documents, and then told you
25     what was pertinent, and you didn't look
```

1                    L. GERDES, ESQ.

2    for yourself; is that correct?

3       A          That's correct.

4       Q          Generally, up until the

5    time that Mr. Soto was arrested, is that

6    how you conducted your investigation;

7    that you only looked at what the officers

8    told you was pertinent?

9                    MR. FRANCOLLA:  Objection.

10      A          We talked about these

11   receipts.  Like, they, basically, were

12   saying they were -- I'm not a prosecutor

13   who -- I think you would find anyone in

14   the office who would say that I am not

15   somebody who's very prepared,

16   investigates cases and does that.  So, to

17   a certain extent, I guess, when it comes

18   to the contents of this specific voucher,

19   I did not look at the specific contents

20   of this particular voucher.

21                   I was relying on what the

22   police told me when they said -- they,

23   kind of, said that the van was, kind of,

24   messy and jumbled, and it was, like,

25   miscellaneous papers.  I mean, that's how

181

1                    L. GERDES, ESQ.
2        they classified them even on the voucher.
3                    So, when it comes to -- you
4        know, I don't want to -- I just want to
5        speak about this voucher and these papers
6        specifically.  I was relying on what they
7        told me about these other papers.
8        Q        Certainly.  My question is
9        just generally about the way you
10       conducted the investigation, because you
11       conducted an investigation, as well; is
12       that correct?
13                   MR. FRANCOLLA:  Objection
14                   to the --
15       A        We were doing it together.
16       I mean, we were all doing it together.
17       It's difficult as far as me conducting an
18       investigation.
19       Q        I'm not trying to suggest
20       that they were directing you or you were
21       directing them.  I'm just asking you:
22       Did you investigate the claims that
23       Yoshida made in connection with this
24       criminal act on 10/20/11?
25       A        Yes.

182

L. GERDES, ESQ.

1

2      Q          Did you investigate before

3   or after Mr. Soto was arrested?

4      A          Before.

5      Q          My question then is:  As

6   part of your investigative acts, did you

7   review documents in evidence that the

8   police had gathered or that you had

9   gathered?

10      A          Yes.

11      Q          In the case of documents

12  that the police had gathered, as a matter

13  of practice, did you go through

14  everything yourself to determine what was

15  pertinent, or did you allow the officers

16  to determine what was pertinent before

17  you looked at it?

18      A          I can't answer the question

19  as a whole.  If you want to ask me, like,

20  about certain things.  Overall, in this

21  case, they, kind of, found things and

22  then showed me or presented it to me once

23  they, you know, discovered it or

24  recovered it or collected it.

25              This wasn't a case where

183

1                    L. GERDES, ESQ.

2    I -- you know, I never personally went to

3    Home Depot.  I didn't go to the TARU.

4    So, I was, basically, being kept informed

5    of information as it was coming to light.

6    Also, speaking to the victim and learning

7    things from the victim.  I'm trying to

8    answer as best I can.

9         Q          I understand.  For

10   instance, in the case of this voucher,

11   you indicated that you didn't

12   independently look through all the

13   documents even though you knew that these

14   documents existed; correct, before Mr.

15   Soto was arrested?

16        A          Correct.

17        Q          My question to you then is:

18   For the rest of the vouchers and

19   vouchered evidence that the police

20   collected, did you independently go

21   through each voucher, or did you only go

22   through that voucher if the police said,

23   hey, look, here is some information that

24   is pertinent to this investigation?

25        A          Well, I saw a lot of it

184

1               L. GERDES, ESQ.

2    before it was vouchered, because I was at

3    the precinct.  Like, you know, I saw the

4    guns before they were vouchered.  I saw

5    the zip ties.  I saw, like, this thing

6    that goes over a person's head with eye

7    holes cut out.  I saw bloody gloves.  I

8    saw a bloody hammer.

9               I saw pictures.  I never

10   personally inspected Soto's FedEx van,

11   but they took pictures on 10/24/11.  I

12   saw all of the pictures of the van.  It's

13   not as if they only showed me the picture

14   of the bullet in the cup holder there,

15   for example.  I saw all of those

16   pictures.

17       Q        That was on 10/20/11;

18   correct, that you saw all of these

19   things?

20       A        Well, the FedEx van was

21   10/24/11.

22       Q        Except for the FedEx van,

23   yes.  My question is:  After you leave

24   the precinct, do you go back to the

25   precinct to continue to investigate?

185

```
1                    L. GERDES, ESQ.
2       A          No, that was the only time
3   in connection with this case that I was
4   at the precinct.
5       Q          As the detectives would
6   find things or voucher things, would they
7   send you the voucher numbers, et cetera?
8       A          I think they might have
9   given me a lot of the paperwork when they
10  came to Grand Jury.
11      Q          Between the time of
12  10/20/11, when you were at the precinct,
13  and excluding the time when they gave you
14  the photos on 10/24/11, before Mr. Soto
15  was arrested, did you ask the police
16  officer if they came up with any more
17  documents or evidence regarding the
18  incident on 10/20/11?
19      A          Of course, because, you
20  know, we got subpoenas for the phones, or
21  the police did.  I don't remember who got
22  the subpoenas.  So, I knew Detective
23  Bonilla was going to TARU to get the
24  phones downloaded.
25                 So, before Mr. Soto's
```

186

1                  L. GERDES, ESQ.

2    arrest, I saw text messages from the

3    phone.  On 10/24/11, I also learned that

4    they found in the van the Home Depot

5    receipt, which was for the packaging or

6    the purchase, I should say, of two packs

7    of 24 zip ties.

8                  When they told me about

9    that, then Bonilla told me that he would

10   go out to the Home Depot.  I believe it

11   was in Linden, New Jersey, maybe.  The

12   receipt told us which Home Depot location

13   it was.  Yes, it was in Linden, New

14   Jersey.

15                  He went to that store and

16   had one of the loss prevention officers

17   download video surveillance that

18   corresponded to the purchase of these zip

19   ties.  Information on the receipt,

20   basically, identifies the register where

21   this transaction took place.  There was a

22   self-checkout line.

23                  So, they were able to hone

24   in right on this exact self-checkout line

25   at that time.  The detective got the

187

```
1                    L. GERDES, ESQ.
2    video and got stills printed from the
3    video, which captured Mena and Dickinson
4    buying the zip types.
5                    The purchase of these zip
6    ties was made a mere 36 hours before the
7    victim is abducted.  These were large zip
8    ties.  They weren't just, you know, small
9    12-inch zip ties.  They were industrial
10   grade zip ties that are the kind that you
11   would want to use to bind a person.
12                    If you want to talk to me
13   about other uses for them, yes, I'm sure,
14   because Home Depot is probably not in the
15   business of selling zip ties to bind
16   human beings.  So, yeah, there could be
17   other explanations for that.
18                    When I saw that, what I was
19   seeing was evidence that somebody who I
20   knew was involved in this crime, Jonathan
21   Mena, was out purchasing zip ties 36
22   hours prior to Yoshida's abduction with
23   the man who had the van, the victim, you
24   know, used to get to the abduction with
25   that man's van.  They purchased nothing
```

188

```
 1                    L. GERDES, ESQ.
 2     else, other than these zip types.
 3                    I also noticed in the video
 4     that Soto was the driver of the van that
 5     day.  It wasn't Mena who was driving the
 6     van.  Soto was the driver of the van.
 7     These were the zip ties then that binds
 8     the victim.  So, this gave me very, very
 9     probative, relevant and powerful evidence
10     connecting Soto to this case.
11        Q          After 10/20/2011, what
12     other steps did you take to investigate
13     the incident on 10/20/2011?
14        A          I was urging the detective
15     to get this video to me quick.  To get
16     the results of this information quickly.
17     I mean, your client wasn't arrested.
18        Q          I understand.
19        A          You're asking me what other
20     steps.  So, there was a period from
21     10/20/11 until 11/7/2011, where we were
22     seeing, you know, what direction the
23     evidence pointed us in.
24        Q          Absolutely.  I'm just
25     trying to figure out what steps you took
```

```
 1                L. GERDES, ESQ.
 2    along that route to get there.  What
 3    investigative steps --
 4       A          I reviewed the video
 5    surveillance.  I knew that this was
 6    Jonathan Mena, because he was wearing the
 7    same jacket that he was arrested in.  I
 8    also knew that this was clearly Rafaela
 9    Soto, because he too was wearing the
10    same, like, jacket sweatshirt thing that
11    he wore to the police precinct on
12    10/21/11.  So, I was able to compare
13    those two.
14                So, I have him with the
15    person who does the abduction in the car
16    that gets them to the scene of the
17    abduction.  I also have the fact that,
18    you know, I know that the deal has fallen
19    through.  That he is still looking for a
20    buyer and he doesn't have a deal.  I
21    reviewed the subpoenas.  You're asking me
22    a general question.
23       Q          No, I'm not.  It's not a
24    general question.  I just need to know
25    the steps.  I don't want to know what you
```

190

2    knew.

3        A          I'm listing those.  I'm

4    reviewing this evidence.

5        Q          Absolutely.

6        A          That's a step.  My review

7    is a big part of this.

8        Q          I must have misunderstood

9    you then, because I heard you say, I knew

10   that he did X, Y, Z, because of something

11   else.  I just want to know the steps you

12   took.  That's it.

13       A          I'm trying to tell you

14   that.

15       Q          I apologize.

16       A          No problem.  So, I then saw

17   text messages between Mena and Soto that

18   were from Mena's telephone, and that

19   indicated to me about his wife and the

20   baby.  It also indicated -- you know, I

21   reviewed the text message where Mena told

22   him -- when I say, "reviewed," I'm seeing

23   how these pieces of evidence fit together

24   with what we know.

25                  Again, I know from what

191

```
1                    L. GERDES, ESQ.
2    Mena -- excuse me.  From what Dickinson
3    is telling us, there is a third person
4    involved.  I know from the victim that
5    there is only one person who knew both
6    his address and the $100,000 in the safe.
7    I know that the car used belongs to Soto.
8                    Through my review of
9    everything, I know that Soto purchased
10   the zip ties.  Soto is the one who was
11   ringing them up at the register, too.  It
12   wasn't Mena ringing them up at the
13   register.  Soto is the one who rang them
14   up and paid for them.  Soto is the one
15   who then -- it's his van that they're
16   getting in.
17                    I reviewed the text
18   messages where Mena is telling Soto, I
19   found a tiguere who can go over there
20   with me.  I told him, you know, he's only
21   getting ten, because I'm getting twenty.
22      Q           I apologize.  Do you speak
23   Spanish?
24      A           No.
25      Q           Go ahead.
```

192

```
1                    L. GERDES, ESQ.
2        A          I took Spanish in high
3    school, but I'm not, like, fluent or
4    anything like that.  Detective Bonilla
5    speaks a little bit of Spanish.  Then, I
6    was also looking on, like, Urban
7    Dictionary on the computer.
8                    There's, you know, what are
9    Puerto Rican slang words, or different
10   things like that.  I was talking to other
11   people who speak Spanish who were
12   specifically Puerto Rican or Dominican,
13   and talking to people about what this
14   word means.
15                   Basically, it means, like,
16   a -- it has a negative connotation.  It
17   doesn't mean, like, I have a new employee
18   or a new businessman.  In the context of
19   people who are Dominican and Puerto
20   Rican, it's, like, a downhome, dirty dude
21   who will go over there and, like, take
22   care of business.
23       Q          We are going to go over
24   each of the text messages and talk about
25   what you gleaned from each one.  So you
```

193

```
 1                    L. GERDES, ESQ.
 2    reviewed text messages.  You reviewed
 3    this video surveillance.  You asked the
 4    detective to get the video surveillance.
 5                    Did you ask the detective
 6    to get the text messages, or is that
 7    something he did on his own?
 8        A          I can't remember.
 9        Q          Did you fill out any
10    paperwork so that the detective could get
11    into the cell phone as to getting a
12    warrant or something like that?
13        A          I personally did not write
14    up a warrant, I don't believe.
15    Generally, my understanding is that TARU
16    doesn't go into a phone unless they have
17    a warrant.  That's my general
18    understanding.
19        Q          Now, before TARU went into
20    the phone to retrieve the text messages,
21    did you have any communications with
22    TARU?
23        A          I never had any -- prior to
24    Soto's arrest, I never personally had any
25    conversations with TARU.
```

194

```
 1                    L. GERDES, ESQ.
 2       Q          You did indicate earlier,
 3   as well, that Yoshida sent you an e-mail,
 4   and that you reviewed it.  Would that, as
 5   well, be a part of it?
 6       A          No.  The date on that
 7   e-mail, I believe -- I can't remember the
 8   date on the e-mail.  If that's pre Soto's
 9   arrest or post, I can't remember.
10       Q          What else do you remember
11   doing?
12       A          I can't really remember
13   anything else off the top of my head
14   right now.
15       Q          Were you and the detectives
16   in constant communication about what to
17   do on the case and what decisions to make
18   as far as gathering evidence?
19       A          We were in regular contact.
20       Q          I am going to show you what
21   was marked as Defendant's Exhibit A on
22   January 15, 2014.  Can you take a look at
23   that document?
24       A          Sure.
25       Q          Let me know when you're
```

195

1                    L. GERDES, ESQ.
2    done.
3        A          I'm done.
4        Q          Can you tell me what that
5    document is?
6        A          This is a Home Depot
7    receipt that was found.  My understanding
8    from the police is that this was found in
9    Soto's van, along with a Home Depot bag.
10   Like, the store shopping bag.  You know,
11   the little brown plastic bag.  Also, with
12   this was the packaging for two packs of
13   24 zip ties.
14                  On the video, I could see
15   that -- you can see what Soto has in his
16   hand.  It's, essentially, you know, the
17   same length of the packaging and the zip
18   ties and the receipt confirms that those
19   are the 24-inch zip ties.
20       Q          On this receipt, does it
21   indicate whether or not this purchase was
22   paid for in cash or with a credit card?
23       A          It looks like cash.
24       Q          Now, if you were looking at
25   this receipt in a vacuum, would you be

196

```
 1                    L. GERDES, ESQ.
 2    able to tell from this receipt who
 3    purchased the zip ties?
 4        A          Just this by itself, if I
 5    look at this?
 6        Q          Yes.
 7        A          No.  With the video
 8    surveillance, I believe, it showed Soto
 9    taking, actually, the money out of his
10    pocket and making the purchase.
11        Q          My next question about this
12    receipt is:  Can you tell from this
13    receipt what the brand name of the zip
14    ties are?
15        A          At the time, I think, I
16    looked this up on the internet on Home
17    Depot.  I had gone to their website and,
18    I think, that this stood for natural tie.
19        Q          Did you ever go to Home
20    Depot to get a sample or to purchase the
21    zip ties that are reflected on this
22    receipt to compare them to the ones that
23    were recovered from the scene of the
24    incident?
25        A          No, I did not.
```

197

                    L. GERDES, ESQ.

1

2      Q          Did you direct anyone to do

3   that?

4      A          No, I did not.

5      Q          Do you know if any of the

6   detectives went to Home Depot to do that?

7      A          Whether or not they took a

8   zip tie from the scene and asked Home

9   Depot if this zip tie was their zip tie?

10     Q          Or compared it to the ones

11  that were on the shelf.

12     A          Well, what I did was, I

13  looked at the video surveillance, which

14  shows the zip ties in Soto's hand, the

15  pack of zip ties.

16                So, you see the length.

17  You see what the packaging looks like.

18  It was clear packaging.  You see that the

19  packaging was, basically, the same size.

20  When I say, "size," the length of the zip

21  tie.

22                Then I, myself, when I was

23  at the precinct, saw those zip ties.  I

24  didn't see any serial numbers on the zip

25  ties or any stamps on the zip ties that

198

1                    L. GERDES, ESQ.

2    said Home Depot, but I was able to do,

3    myself, a visual comparison of what Soto

4    had in his hands at the register.

5                    Knowing that it was two

6    bags, also.  Knowing then that two bags

7    were found in the van, two empty bags,

8    with the receipt, with the Home Depot

9    bag.  You see them walking out with the

10   Home Depot bag.

11                   So, you know, it's not like

12   they just walked out, oh, we don't need a

13   bag for these.  They put them in a Home

14   Depot shopping bag and walked out.  They

15   take the receipt, put the receipt in the

16   bag and walk out with those items.  So, I

17   did a visual comparison of what I saw

18   Soto purchase versus the zip ties that

19   the police recovered.

20      Q        So, the answer would be

21   that you don't know if the detectives

22   went to Home Depot to compare the zip

23   ties that were recovered to the ones that

24   Home Depot actually sells?

25      A        Correct.

212

1                    L. GERDES, ESQ.

2    knew it to be a fact.  I think that I

3    believed he was shorter.

4                    I saw his picture, which

5    was a shot of his body, and he appeared

6    to be smaller in stature than Mena.  I

7    saw Mena physically at the precinct.

8        Q         Did you see a picture of

9    this entire body?

10       A         No.  I just said I think --

11   I thought I said his upper.  Like,

12   basically, from his shoulder up.  He

13   appeared to have a smaller stature, and

14   the person in here appeared to have a

15   smaller stature.  So, it's all of these

16   things together that are leading me to

17   draw what I believe is the one

18   inescapable conclusion that this is Mena

19   and Soto.

20                   So, it's not just this one

21   picture by itself.  If you look at the

22   hairline, it looks to be similar.  The

23   hairline, the hair length.

24       Q         The hairline in D97?

25       A         D97 and D72, basically.

213

```
 1                    L. GERDES, ESQ.
 2   This isn't a man with, like, a ponytail.
 3   This isn't a black man with an Afro.  You
 4   know, the skin complexion, the length of
 5   the hair.
 6                    Then getting into his van.
 7   The fact that the guy was wearing the
 8   exact same outfit and gets into the
 9   driver's side of the FedEx van.  We knew
10   that this was the same van, because one
11   side's FedEx you can see better than the
12   other.  On the other side, it's, kind of,
13   like, peeling off.
14                    I told you that, I think,
15   you could see that in this video.  At
16   some point, you could see both sides, I
17   believe, of the FedEx van.  It was really
18   no question that this was -- it's a very
19   unique -- I shouldn't say very unique,
20   but the way the markings peeled off, it
21   wasn't just, like, any FedEx van.
22                    So, it was everything in
23   conjunction that led me to conclude that
24   this was Soto.  That's all I can say.
25   When you ask me to point to one photo and
```

214

1              L. GERDES, ESQ.

2     say the marking for the record and how I

3     knew this was Rafael Soto, that's not the

4     way I engaged in reaching that conclusion

5     prior to Soto's arrest.

6        Q        Let me ask you this

7     question:  Just walking about, have you

8     ever seen someone wearing a jacket with a

9     sweatshirt underneath it?

10       A        Sure.

11       Q        Did you maybe think that in

12    that photo that when you saw the two

13    different types of shirts that maybe

14    someone was wearing a jacket with a

15    sweatshirt underneath it?

16       A        Can you show me -- get out

17    the photograph where Soto is wearing this

18    exact same thing.

19       Q        I will, but my question is

20    whether or not --

21       A        But this isn't a red

22    jacket.  This isn't a green-hooded

23    sweatshirt.  It's a black leather jacket

24    and it hits, you know, right here

25    (indicating) at the -- it doesn't look