UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

RAFAEL SOTO,

                           Plaintiff,                    **MEMORANDUM & ORDER**
                                                    12-CV-4241 (MKB)

           v.

THE CITY OF NEW YORK, COUNTY OF
KINGS, DISTRICT ATTORNEY CHARLES J.
HYNES, DETECTIVE DANIEL BONILLA,
POLICE OFFICER ADAM FEDER, ASSISTANT
DISTRICT ATTORNEY JOHN GIANNOTTI,
ASSISTANT DISTRICT ATTORNEY LINDSAY
GERDES, LIEUTENANT CHRISTOPHE
MARROW, and DETECTIVE BRIAN
MEICHSNER,

                           Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Rafael Soto commenced the above-captioned action on August 23, 2012.

(Compl., Docket Entry No. 1.)  On July 26, 2013, Plaintiff filed an Amended Complaint,

bringing claims against the City of New York, County of Kings, District Attorney Charles J.

Hynes, Detective Daniel Bonilla, Police Officer Adam Feder, Assistant District Attorney John

Giannotti, Assistant District Attorney Lindsay Gerdes, Lieutenant Christophe Marrow, and

Detective Brian Meichsner as Defendants.  (Am. Compl., Docket Entry No. 11.)  Plaintiff brings

claims for: (1) violations of the Fourth, Fifth, and Fourteenth Amendments in violation 42 U.S.C.

§ 1983; (2) unlawful stop and search; (3) false arrest; (4) denial of substantive due process;

(5) malicious abuse of process; (6) malicious prosecution; (7) failure to intervene; (8) conspiracy

under 42 U.S.C. § 1983; (9) violation of the Equal Protection Clause of the Fourteenth

Amendment under 42 U.S.C. § 1983; and (10) municipal liability under *Monell v. Department of*

*Social Services*, 436 U.S. 658 (1978).[1]  Defendants move for summary judgment, (Defs. Mot. for Summary Judgment, Docket Entry No. 54; Defs. Mem. in Support of Defs. Mot. for Summary Judgment ("Defs. Mem."), Docket Entry No. 55), and Plaintiff cross-moves for summary judgment and for sanctions.  (Pl. Mots. for Summary Judgment and Sanctions, Docket Entry No. 58.)   For the reasons set forth below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment and sanctions.[2]

## I.  Background

Plaintiff was arrested and charged with multiple counts of robbery in the second degree and burglary in the first and second degrees, and one count each of attempted assault in the first degree, assault in the second degree, kidnapping in the second degree, and unlawful imprisonment in the first degree, stemming from the October 20, 2011 robbery and kidnapping of Masahiro Yoshida (the "robbery-kidnapping").  (Defs. 56.1 ¶ 66; Pl. Resp. 56.1 ¶ 66; Pl. 56.1 ¶¶ 71–73; Defs. Resp. 56.1 ¶¶ 71–73;[3] Deposition of Lindsay Gerdes ("Gerdes Dep.") 277:2–17,

---

[1]  The Amended Complaint does not specify as to certain claims whether they are brought under New York common law or 42 U.S.C. § 1983.  However, Plaintiff states in his cross-motion for summary judgment and in his opposition to Defendants' motion for summary judgment that he "brings this action pursuant to 42 U.S.C. § 1983."  (Pl. Mots. for Summary Judgment and Sanctions, Docket Entry No. 58; Pl. Mem. in Support of Pl. Mots. for Summary Judgment and Sanctions 1, ("Pl. Mem."), Docket Entry No. 60; Pl. Mem. Opp'n to Defs. Mot. for Summary Judgment ("Pl. Opp'n") 1, Docket Entry No. 59.)  Accordingly, the Court addresses Plaintiff's claims as arising under 42 U.S.C. § 1983.

[2]  In his motion papers, Plaintiff withdraws all claims against Defendants except for his false arrest, malicious prosecution, denial of right to fair trial, and failure to intervene claims against Bonilla, Gerdes, and Marrow (collectively the "Individual Defendants") as well as his *Monell* claim against the City of New York and County of Kings (collectively "Municipal Defendants").  (Pl. Mem. 1; Pl. Opp'n 1.)  Accordingly, the Court dismisses all withdrawn claims against all Defendants.

[3]  Plaintiff and Defendants each submitted a statement of material facts pursuant to Rule 56.1 in support of each party's motion for summary judgment.  (*See* Pl. Statement of Undisputed

annexed to Decl. of Gregory Mouton ("Mouton Decl.") as Ex. 27, Docket Entry No. 58-1.[4])

### a. Attempted purchase of the bread route

In the summer of 2011, Masahiro Yoshida tried to purchase a bread delivery route from Plaintiff. (Defs. 56.1 ¶ 29; Pl. Resp. 56.1 ¶ 29; Pl. 56.1 ¶ 31(a); Defs. Resp. 56.1 ¶ 31(a).) The company, Mr. Route Incorporated ("Mr. Route"), brokered the transaction. (Defs. 56.1 ¶ 30; Pl. Resp. 56.1 ¶ 30; Pl. 56.1 ¶ 33(a); Defs. Resp. 56.1 ¶ 33(a).) As part of the process, Yoshida submitted various information to Mr. Route, including a "binder agreement" containing his home address, which was supposed to be sent to Plaintiff if "everything [was] done right." (Defs. 56.1 ¶¶ 32–33; Pl. Resp. 56.1 ¶¶ 32–33; Pl. 56.1 ¶ 33(c); Defs. Resp. 56.1 ¶ 33(c); Deposition of Masahiro Yoshida ("Yoshida Dep.") 14:20–25, annexed to Francolla Decl. as Ex. C.[5]) During the negotiations, to appear as a serious buyer, Yoshida falsely told Plaintiff that he kept $100,000 inside a safe in his apartment. (Pl. 56.1 ¶ 33(a); Defs. Resp. 56.1 ¶ 33(a); Defs. 56.1 ¶ 31; Pl. Resp. 56.1 ¶ 31.)

Yoshida also completed a "ride along" of the bread route with Plaintiff's employee, Jonathan Mena. (Defs. 56.1 ¶ 34; Pl. Resp. 56.1 ¶ 34; Pl. 56.1 ¶ 31(b); Defs. Resp. 56.1 ¶ 31(b).)

---

Facts Pursuant to Local Rule 56.1 ("Pl. 56.1"), Docket Entry No. 62; Defs. Statement Pursuant to Local Rule 56.1 ("Defs. 56.1"), Docket Entry No. 56.) Plaintiff and Defendant also submitted counter-statements of facts. (*See* Pl. Resp. to Defs. Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. Resp. 56.1"), Docket Entry No. 61; Defs. Resp. to Pl. Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Defs. Resp. 56.1"), Docket Entry No. 67.)

[4] Both parties submitted excerpts of Gerdes' Deposition, each with different portions included or omitted. (*See* Ex. G annexed to the Decl. of Brian Francolla ("Francolla Decl."), Docket Entry No. 54-1; Ex. J annexed to Opp'n Decl. of Brian Francolla ("Francolla Opp'n Decl."), Docket Entry No. 65; Ex. B annexed to Decl. of Brian Francolla in Further Support ("Francolla Third Decl."), Docket Entry No. 64.) Ex. 4 annexed to Decl. of Gregory Mouton in Opp'n to Defs. Mot. for Summary Judgment ("Mouton Opp'n Decl."), Docket Entry No. 57.)

[5] Plaintiff submitted additional excerpts from Yoshida's deposition. (*See* Ex. 25 annexed to Mouton Decl.; Ex. 2 annexed to Mouton Opp'n Decl.)

As they drove the route, Yoshida and Mena discussed their personal lives, and Yoshida extended Mena an informal job offer contingent on the route purchase. (Defs. 56.1 ¶ 34; Pl. Resp. 56.1 ¶ 34; Pl. 56.1 ¶ 34; Defs. Resp. 56.1 ¶ 34.) Yoshida may have told Mena about the purported $100,000 he had to make the purchase. (Pl. 56.1 ¶ 33(d); Defs. Resp. 56.1 ¶ 33(d).) Ultimately, negotiations broke down, and the purchase fell through. (Defs. 56.1 ¶ 41; Pl. Resp. 56.1 ¶ 41.)

### b. Kidnapping of Yoshida

In the early morning hours of October 20, 2011, Mena and his friend, Pablo Dickson,[6] kidnapped Yoshida in an attempt to rob him. Earlier that night, Mena called Dickson with a plan to make $20,000 each by robbing someone who had a large sum of money. (Pl. 56.1 ¶¶ 3–6, 24; Defs. Resp. 56.1 ¶¶ 3–6, 24.) Initially, Dickson could not speak with Mena at length, but he called Mena back, discussed the plan, and agreed to it. (Pl. 56.1 ¶¶ 4, 8, 24; Defs. Resp. 56.1 ¶¶ 4, 8, 24.) Mena said it would happen that night. (Pl. 56.1 ¶¶ 8, 24; Defs. Resp. 56.1 ¶¶ 8, 24.)

In the early morning hours of October 20, 2011, Mena picked Dickson up in a van. (Pl. 56.1 ¶¶ 9–10, 24; Defs. Resp. 56.1 ¶¶ 9–10, 24.) At some point, Mena pulled over and covered the van's license plate with a Minnesota license plate. (Pl. 56.1 ¶¶ 13, 24; Defs. Resp. 56.1 ¶¶ 13, 24; Defs. 56.1 ¶ 40; Pl. Resp. 56.1 ¶ 40.) During the drive, Mena confirmed to Dickson that they would each receive a $20,000 "cut" of the money, but that the robbery target had more than $40,000. (Pl. 56.1 ¶¶ 11–12, 24; Defs. Resp. 56.1 ¶¶ 11–12, 24.) Dickson suggested they take all of the money for themselves, but Mena explained that they could not because "the other guy gotta get his cut." (Defs. 56.1 ¶ 21; Pl. Resp. 56.1 ¶ 21; Pl. 56.1 ¶¶ 11–12, 24; Defs. Resp. 56.1 ¶¶ 11–12, 24.)

---

[6] The parties use different spellings of Pablo Dickson's last name. Plaintiff refers to him as "Dickson," while Defendants refer to him as "Dickinson." Throughout, the Court refers to him as Dickson.

At approximately 4:30 AM, Mena and Dickson arrived at an apartment complex where they donned ski masks and confronted their target, Yoshida, at gunpoint. (Pl. 56.1 ¶¶ 14–15, 24; Defs. Resp. 56.1 ¶¶ 14–15, 24; Defs. 56.1 ¶ 3; Pl. Resp. 56.1 ¶ 3.) They hit Yoshida repeatedly with their guns, and demanded that Yoshida take them to his apartment. (Pl. 56.1 ¶¶ 16–17, 24; Defs. Resp. 56.1 ¶¶ 16–17, 24; Defs. 56.1 ¶ 3.) Yoshida proceeded to the first-floor, but Mena knew that he actually lived on the second-floor.[7] (Defs. 56.1 ¶¶ 6, 22; Pl. Resp. 56.1 ¶¶ 6, 22.) Mena told Yoshida that he knew Yoshida had $100,000 in a safe in the apartment. (Pl. 56.1 ¶¶ 17, 24; Defs. Resp. 56.1 ¶¶ 17, 24.) After Yoshida told them that there were other people in his apartment, and that he had money in his van, Mena and Dickson dragged him downstairs to the van. (Defs. 56.1 ¶¶ 11–12; Pl. Resp. 56.1 ¶¶ 11–12.)

Mena and Dickson threw Yoshida into the back of his van and, using zip-ties, tied his ankles together and tied his hands behind his back. (Defs. 56.1 ¶ 12; Pl. Resp. 56.1 ¶ 12.) With Yoshida bound in the back, Mena and Dickson left the area in Yoshida's van. (Defs. 56.1 ¶ 13; Pl. Resp. 56.1 ¶ 13.) After responding to a potential burglary, New York City Police Department ("NYPD") officers discovered Yoshida's van while canvassing the area around his Brooklyn apartment. (Pl. 56.1 ¶ 18; Defs. Resp. 56.1 ¶ 18.) They stopped the van, found Yoshida tied up, and arrested Mena and Dickson. (Defs. 56.1 ¶ 13; Pl. Resp. 56.1 ¶ 13.) The police officers took Mena and Dickson to the 76th Precinct, and Emergency Medical Services transported Yoshida to Long Island College Hospital ("LICH") for treatment. (Defs. 56.1 ¶¶ 18–19; Pl. Resp. 56.1 ¶¶ 18–19; Pl. 56.1 ¶ 20; Defs. Resp. 56.1 ¶ 20; Deposition of Daniel Bonilla ("Bonilla Dep.")

---

[7] According to Defendants, one of the perpetrators knew exactly where Yoshida lived. (Defs. 56.1 ¶ 6.)

31:2–32:3, annexed to Francolla Decl. as Ex. E.[8])

### c. Mena and Plaintiff's communication on the day of the kidnapping

On October 19, 2011, approximately twelve hours before the attempted robbery, Plaintiff and Mena exchanged a series of text messages. At 4:09 PM, Mena messaged Plaintiff, "Hey, what's up?" (Defs. 56.1 ¶ 54; Pl. Resp. 56.1 ¶ 54.) At 4:11 PM, Plaintiff asked Mena if he was "trying to deliver bread," and, a minute later, Mena messaged Plaintiff, "No bro, I'm at home." (Defs. 56.1 ¶¶ 55–56; Pl. Resp. 56.1 ¶¶ 55–56; Pl. 56.1 ¶¶ 60(c)–(d); Defs. Resp. 56.1 ¶¶ 60(c)–(d).) In that message, Mena continued, "[I]'m just waiting on ya for the other thing.[ A]ll the bread shit we can cover tomorrow man," and, thereafter, Plaintiff messaged Mena, "Okay."[9] (Defs. 56.1 ¶¶ 56–57; Pl. Resp. 56.1 ¶¶ 56–57; Pl. 56.1 ¶¶ 60(d)–(e); Defs. Resp. 56.1 ¶¶ 60(d)–(e).) At 4:32 PM, Plaintiff messaged Mena, in Spanish, what the parties agree states, "I just spoke to lo's he told me that he will call me after 5:00 p.m." (Defs. 56.1 ¶ 58; Pl. Resp. 56.1 ¶ 58; Pl. 56.1 ¶ 60(f); Defs. Resp. 56.1 ¶ 60(f).) Defendants believe these are coded messages about plans for the attempted robbery.

Around 8:44 PM, Mena messaged Plaintiff stating in Spanish, "Socio, yay yo tengo un tiguere que puede vajar pa ya conmigo.[ ]Yo le dije que nadamas le podia dar 10 por que a mi me iban a dar 20 solamenta." (Defs. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59.) The parties dispute the translation of the Spanish word "tiguere," but agree that the message otherwise said, "Partner, I already have a dude that can travel over there with me. I told him that I can only give him 10 because I was only going to get 20." (Defs. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59; Pl. 56.1 ¶ 60(g); Defs.

---

[8] Both parties submitted excerpts from Bonilla's deposition. (*See* Ex. 26 annexed to Mouton Decl.; Ex. 3 annexed to Mouton Opp'n Decl.; Ex. F annexed to Francolla Opp'n Decl.)

[9] Plaintiff's message used the Spanish work "Tato," which the parties agree means "okay." (Defs. 56.1 ¶ 57; Pl. Opp'n 56.1 ¶ 57.)

Resp. 56.1 ¶ 60(g).)  Fifteen minutes later, Plaintiff messaged Mena, "I think 10 dollars an hour is fair, please let him know that it's only for a couple weeks, until my wife recovers from surgery thanks." (Defs. 56.1 ¶ 60; Pl. Resp. 56.1 ¶ 60; Pl. 56.1 ¶ 60(h); Defs. Resp. 56.1 ¶ 60(h).)

### d.  The robbery investigation

Defendant Bonilla was assigned as the lead detective investigating Yoshida's robbery-kidnapping.  (Defs. 56.1 ¶ 17.)  Defendant Assistant District Attorney ("ADA") Gerdes was assigned to handle any prosecution arising from the robbery-kidnapping.  (Defs. 56.1 ¶ 23; Pl. Resp. 56.1 ¶ 23; Gerdes Dep. 14:14–15:22.)  Defendant ADA Giannotti was assigned to assist with the investigation. [10]  (Pl. 56.1 ¶ 27; Defs. Resp. 56.1 ¶ 27; Gerdes Dep. 15:18–17:3.)

### i.  Witness interviews

The day of the robbery, Yoshida, Dickson, and Mena were interviewed about the crime. Yoshida was interviewed twice that day: first by Bonilla at LICH, and then by Bonilla and Gerdes at the 76th Precinct.  (Pl. 56.1 ¶ 30; Defs. Resp. 56.1 ¶ 30; Defs. 56.1 ¶ 27; Pl. Resp. 56.1 ¶ 27.)  Yoshida described the bread route transaction, explaining that he gave Mr. Route a "binder agreement" with his address and that he falsely told Plaintiff that he had $100,000 in his apartment safe.  (Defs. 56.1 ¶¶ 29, 31; Pl. Resp. 56.1 ¶¶ 29, 31; Pl. 56.1 ¶¶ 31(a), 33(a)–(c); Defs. Resp. 56.1 ¶¶ 31(a), 33(a)–(c); Yoshida Dep. 15:12–16:4.)  Yoshida explained that the binder agreement with his address was supposed to be sent to Plaintiff, [11] and that Plaintiff might

---

[10]  Defendants do not address Giannotti's role in the robbery investigation, but do not dispute his presence at interviews related to the investigation, including Dickson's videotaped interview.

[11]  According to Defendants, Yoshida stated that he understood that Mr. Route gave Plaintiff his address.  (Defs. 56.1 ¶ 33.)  However, the evidentiary record as to what Yoshida told them is not that clear.  Yoshida testified about the brokering process and the binder agreement. (Yoshida Dep. 14:2–16:4.)  Yoshida explained why he believed Plaintiff *might* have received his

7

have told Mena about the alleged $100,000. (Pl. 56.1 ¶¶ 33(c)–(d); Defs. Resp. 56.1 ¶¶ 33(c)–(d); Defs. 56.1 ¶ 32; Pl. Resp. 56.1 ¶ 32; Yoshida Dep. 14:20–15:25.) Yoshida identified Mena at the Precinct as the person with whom he completed the "ride along" of the bread route. (Pl. 56.1 ¶ 32; Defs. Resp. 56.1 ¶ 32; Defs. 56.1 ¶¶ 34–35; Pl. Resp. 56.1 ¶¶ 34–35.)

Yoshida suspected Plaintiff was involved in the robbery and kidnapping, and communicated those suspicions to Defendants; however, the parties dispute the reasons for his suspicions. (Defs. 56.1 ¶ 28; Pl. Resp. 56.1 ¶ 28.) According to Defendants, Yoshida suspected Plaintiff because Plaintiff was one of only two people that knew: (1) Yoshida's address and (2) Yoshida's claim about having $100,000 in his apartment's safe. (Defs. 56.1 ¶ 28.) Plaintiff contends that Yoshida only stated that Plaintiff *might* have Yoshida's address if Mr. Route provided it to him, and that Plaintiff may have also told Mena about the $100,000.[12] (Pl. Resp. 56.1 ¶ 28; Pl. 56.1 ¶ 33(d).) Yoshida thought it was possible that Mr. Route and Plaintiff were both involved in the robbery-kidnapping.[13] (Pl. 56.1 ¶ 33(f); Defs. Resp. 56.1 ¶ 33 (f); Yoshida

---

address, but he did not testify "that it was his understanding that the binder agreement containing his home address was given to "[P]laintiff by Mr. Route, Incorporated, as part of the negotiation process." (Defs. 56.1 ¶ 33; Pl. Resp. 56.1 ¶ 33.)

[12] In opposition to Plaintiff's motion, Defendants submit the testimony of Dennis Tuchfeld, a broker from Mr. Route, from Mena's prior state criminal trial. (Tr. of Dennis Tuchfeld in *People v. Jonathan Mena* ("Tuchfeld Test."), annexed to Francolla Opp'n Decl. as Ex. D.) Tuchfeld testified that the binder agreement listed Yoshida's address without an apartment number, and was sent to Plaintiff. (Tuchfeld Test. 319:7–21.) It is undisputed that neither Gerdes nor Bonilla contacted anyone at Mr. Route to determine if it provided Yoshida's address to Plaintiff. (Pl. 56.1 ¶ 36; Defs. Resp. 56.1 ¶ 36.) In addition, at his deposition, Bonilla testified that it was "possible" Mena learned of Yoshida's address through other means, including following Yoshida home. (Bonilla Dep. 175:22–176:6; Pl. 56.1 ¶ 35; Defs. Resp. 56.1 ¶ 35.) However, Bonilla does not specify whether this possibility occurred to him at the deposition or at the time he was interviewed during the investigation.

[13] After his interview with Gerdes and Bonilla, on October 24, 2011, Yoshida emailed Gerdes about the robbery, stating that he did not know the relationship between the Mr. Route

---

Dep. 11:12–12:14.)

Dickson was interviewed twice, first by Bonilla, and then by Gerdes and Giannotti in a videotaped interview. (Defs. 56.1 ¶ 18; Pl. Resp. 56.1 ¶ 18; Pl. 56.1 ¶ 27; Defs. Resp. 56.1 ¶ 27; Tr. of Videotaped Interview of Pablo Dickson ("Dickson Int. Tr.") annexed to Mouton Decl. as Ex. 20.) Dickson discussed his phone calls with Mena about the crime and the "cuts" of the money going to him, Mena, and a third unknown person. (Defs. 56.1 ¶¶ 19–21; Pl. Resp. 56.1 ¶¶ 19–21; Pl. 56.1 ¶ 24; Defs. Resp. 56.1 ¶ 24.) Dickson described the robbery, stating that Mena knew where Yoshida lived and that Yoshida had $100,000 in his safe. (Defs. 56.1 ¶ 22; Pl. Resp. 56.1 ¶ 22; Pl. 56.1 ¶ 24; Defs. Resp. 56.1 ¶ 24.)

During his interview with Gerdes and Giannotti, Dickson stated, "[Mena] told me while we was in the van, he was like, 'Yo, my boy told me about this.' And I'm like, 'Who's that?' And he was like Loco, that's cool. He just told me but I, I think down deep inside he's the one who knew."[14] (Dickson Int. Tr. 15; Pl. 56.1 ¶ 28; Defs. Resp. 56.1 ¶ 28.) According to Plaintiff, Dickson did not know who Mena was referring to in that statement, and Dickson did not believe

---

broker, identified as "Dennis," and Plaintiff, and that he did not know if Dennis had a role in the robbery. (Pl. 56.1 ¶¶ 42–43; Defs. Resp. 56.1 ¶¶ 42–43; Email dated Oct. 24, 2011, annexed to Mouton Decl. as Ex. 16.)

[14] Defendants make a general hearsay objection to these statements if offered for the truth of those statements. Although hearsay evidence may not be used to support a motion for summary judgment, *Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999), here Dickson's statements to Gerdes and Giannotti are not being offered for the truth of the matters asserted — *i.e.*, that Mena and Dickson had a conversation, that Mena told Dickson about his "boy", or that Mena's "boy" told Mena about the robbery — instead they are being offered to determine what information Defendants had prior to Plaintiff's arrest. The statements are therefore admissible for this purpose. *Golden v. City of New York*, 418 F. Supp. 2d 226, 233 (E.D.N.Y. 2006). Defendants also do not object to, or contest the authenticity of, the transcript containing those statements.

there was a third person involved in the robbery.[15]  (Pl. 56.1 ¶ 28.)  Dickson stated he knew

Plaintiff, but had not spoken to him since the last time they saw each other.  (Pl. 56.1 ¶ 29; Defs.

Resp. 56.1 ¶ 29.) According to Defendants, Dickson also stated that he and Plaintiff grew up

together.  (Defs. Resp. 56.1 ¶ 29; Dickson Int. Tr. 28.)

Bonilla attempted to interview Mena, but Mena refused to speak, answering only

preliminary background questions.  (Defs. 56.1 ¶ 26; Pl. Resp. 56.1 ¶ 26.)  It is undisputed that at

some point prior to Plaintiff's arrest, Bonilla learned that Mena and Plaintiff were childhood

friends and that Plaintiff hired Mena to work for him on his bread delivery route.  (Defs. 56.1

¶ 38; Pl. Resp. 56.1 ¶ 38.)  Bonilla and Gerdes also learned that Mena and Dickson grew up

together.  (Defs. 56.1 ¶ 39; Pl. Resp. 56.1 ¶ 39.)

### ii.  Search of Plaintiff's van

On the night of the robbery, Defendants Marrow and Meichsner drove to Yoshida's

apartment and found the van used by Dickson and Mena, which was towed back to the 76th

Precinct that night.  (Defs. 56.1 ¶¶ 36–37; Pl. Resp. 56.1 ¶¶ 36–37; Dep. of Brian Meichsner

("Meichsner Dep.") 11:18–12:16, annexed to Francolla Decl. as Ex. I.)  The van was registered

to Plaintiff, and had a peeling FedEx logo on its side.  (Defs. 56.1 ¶ 37; Pl. Resp. 56.1 ¶ 37;

Meichsner Dep. 31:11–16.)  On October 21, 2011, when Plaintiff went to the 76th Precinct to

retrieve his van, he had his photograph taken.[16]  (Defs. 56.1 ¶ 42; Pl. Resp. 56.1 ¶ 42; Pl. 56.1

---

[15]  Defendants characterize this statement as Dickson "merely speculat[ing]" that Mena himself planned the robbery, despite talking about a third party.  (Defs. Resp. 56.1 ¶ 28.)

[16]  Plaintiff asserts that he went to the 76th Precinct because he needed the van for his bread route, and that he "voluntarily gave [non-party] Detective Dalton a copy of his car insurance, driver's license, phone number, and home address."  (Pl. 56.1 ¶¶ 37–39.)  Plaintiff further asserts that after leaving the Precinct, he sent Bonilla a letter asking for permission to retrieve his van.  (Pl. 56.1 ¶ 41; Undated Letter, annexed to Mouton Decl. as Ex. 17.)

¶ 40; Defs. Resp. 56.1 ¶ 40.)

On October 24, 2011, Bonilla, Marrow, and Meichsner searched Plaintiff's van pursuant to a search warrant. (Defs. 56.1 ¶ 44; Pl. Resp. 56.1 ¶ 44; Pl. 56.1 ¶ 44; Defs. Resp. 56.1 ¶ 44.) The officers found zip-ties, zip-tie packaging, and a receipt dated October 17, 2011 from a Home Depot store in New Jersey. (Defs. 56.1 ¶¶ 44–45; Pl. Resp. 56.1 ¶¶ 44–45; Pl. 56.1 ¶ 44; Defs. Resp. 56.1 ¶ 44.) The receipt listed a cash purchase of "24" "NAT TIE." (Defs. 56.1 ¶ 45; Pl. Resp. 56.1 ¶ 45; Pl. 56.1 ¶ 45; Defs. Resp. 56.1 ¶ 45.) According to Defendants, this reflected the purchase of two packages of 24-inch zip-ties. (Defs. 56.1 ¶ 45.) Plaintiff disputes this, asserting that there is no evidence in the record to explain what "24" "NAT TIE" means. (Pl. Resp. 56.1 ¶ 45.) Defendant Gerdes researched "NAT TIE" on the Home Depot website and believed it "stood for natural tie." (Gerdes Dep. 196:15–18.)

One of the officers vouchered the zip-tie packaging and Home Depot receipt along with the other property recovered from Plaintiff's van. (Property Clerk Voucher Number S037732 ("Property Clerk Voucher") annexed to Mouton Decl. as Ex. 8.; Pl. 56.1 ¶ 44; Defs. Resp. 56.1 ¶ 44.) According to Plaintiff, during discovery in this civil action, he was unable to inspect the zip-tie packaging because it was missing. (Pl. Mem. 8.) On January 14, 2014, defense counsel informed Plaintiff's counsel that the evidence vouchered from Plaintiff's van, including the zip-tie packaging, was not available for inspection because they "were picked up on 8/15/13." (Jan. 14, 2014 Email from B. Francolla to G. Mouton ("Jan. 14 Email"), annexed to Mouton Decl. as Ex. 29.) Defense counsel explained that he was not told who "picked up" this evidence. (*Id.*)

_____

Defendants dispute that the record supports these assertions, and note that the letter is not dated, signed or authenticated. Because these facts are immaterial, the Court does not consider them in resolving the parties' motions for summary judgment.

### iii.    Home Depot and surveillance footage

On October 25, 2011, Bonilla visited the New Jersey Home Depot store listed on the receipt.  (Defs. 56.1 ¶ 46; Pl. Resp. 56.1 ¶ 46; Pl. 56.1 ¶ 46; Defs. Resp. 56.1 ¶ 46.)  Bonilla viewed packages of zip-ties on Home Depot's shelves, and observed similar packaging to the zip-tie packaging recovered from Plaintiff's van.[17]  (Pl. 56.1 ¶¶ 47–48; Defs. Resp. 56.1 ¶¶ 47–48.)  Bonilla spoke to a Home Depot Loss Prevention Officer about the receipt, (Defs. 56.1 ¶ 47; Pl. Resp. 56.1 ¶ 47), who, according to Defendants, confirmed that the receipt reflected a purchase of 24-inch zip-ties.[18]  (Defs. 56.1 ¶¶ 45–47; Defs. Reply. Mem. in Support of Mot. for Summary Judgment ("Defs. Reply") 4, Docket Entry No. 63.)  The Loss Prevention Officer retrieved video surveillance footage from the time and date Bonilla requested, October 17, 2011, and, according to Defendants, used the receipt to "isolate the exact footage" of Mena and Plaintiff purchasing the zip-ties.[19]  (Defs. 56.1 ¶ 47; Pl. Resp. 56.1 ¶ 47.)

The footage shows two men at the Home Depot's self-checkout aisle.  (Defs. 56.1 ¶ 48; Pl. Resp. 56.1 ¶ 48.)  Although neither man had any distinguishing marks or facial features,

---

[17]  Because Bonilla did not bring the actual zip-ties to the Home Depot store, he did not make a physical comparison between those found in Plaintiff's van and those sold at the Home Depot.  (Pl. 56.1 ¶ 48; Defs. Resp. 56.1 ¶ 48; Bonilla Dep. 183:14–185:10.)

[18]  Plaintiff asserts that nothing in the record establishes that Bonilla confirmed the receipt showed a purchase of 24-inch zip-ties.  (Pl. Resp. 56.1 ¶¶ 46–47.)

[19]  Plaintiff disputes that the Loss Prevention Officer isolated footage of Mena and Plaintiff purchasing zip-ties, and argues that there is no evidence in the record to support this assertion.  (Pl. Resp. 56.1 ¶ 47.)  It is undisputed that Bonilla could not recall whether he confirmed that the video and register were synchronized.  (Pl. 56.1 ¶ 52; Bonilla Dep. 98:12–16.)  Defendants point to the stipulated testimony of the Loss Prevention Officer offered at Mena's state criminal trial.  (Defs. Reply. 4; Tr. of Bonilla and William Graham's Test. in *People v. Jonathan Mena* ("Tr. of Bonilla and Graham Test."), annexed to Francolla Third Decl. as Ex. A.)  Although Defendants have proffered no basis for its admissibility against Plaintiff in this civil action, the disputed fact is immaterial to the Court's resolution of the motions for summary judgment.

Bonilla believed that the larger man was Mena and "assumed" the smaller man was Plaintiff. (Pl. 56.1 ¶ 56; Defs. Resp. 56.1 ¶ 56; Bonilla Dep. 94:2–95:13.)

The parties dispute the evidentiary value of the footage. According to Defendants, the footage showed Plaintiff and Mena purchasing the zip-ties before exiting the store and departing in the same van used in the robbery. (Defs. 56.1 ¶ 48.) Plaintiff contends that Bonilla could only identify the items by referencing the receipt, and, because there is no evidence establishing what the receipt shows, Bonilla did not observe the men purchasing zip-ties.[20] (Pl. 56.1 ¶ 51; Pl. Resp. 56.1 ¶ 48.) It is undisputed that viewing the footage, Bonilla was able to see two men purchasing two packages, and that the packages were white. (Bonilla Dep. 98:8–11.)

Bonilla had still photographs made from the footage of the two men. (Pl. 56.1 ¶ 50; Defs. Resp. 56.1 ¶ 50.) Prior to Plaintiff's arrest, Gerdes and Bonilla compared the footage with the photographs and Plaintiff's October 21, 2011 photograph. (Pl. 56.1 ¶ 57; Defs. Resp. 56.1 ¶ 57; Defs. 56.1 ¶ 49; Pl. Resp. 56.1 ¶ 49.) They identified Plaintiff in the video based, at least in part, on similarities among all three. (Pl. 56.1 ¶ 57; Defs. Resp. 56.1 ¶ 57; Defs. 56.1 ¶ 49; Pl. Resp. 56.1 ¶ 49.) Specifically, the person's hairline and black hoodie under a black jacket matched Plaintiff's clothing in the October 21, 2011 photograph.[21] (Pl. 56.1 ¶ 57; Defs. Resp. 56.1 ¶ 57;

---

[20] Although Plaintiff cites Bonilla's deposition to assert that "the only way to know the items in the video were zip-ties was by reference to the receipt," (Pl. 56.1 ¶ 51), this mischaracterizes the record. In the cited exchange, Bonilla testified, "We can see the two packages, and it was white. The only way we knew definitely was the receipt. (Bonilla Dep. 98:8–11.)

[21] Defendants assert that they were able to identify Plaintiff in the video given the similarities in height and build. (Defs. 56.1 ¶ 49.) However, Bonilla testified that he could not "definitively" conclude that Plaintiff appeared in the video based on physical characteristics alone, but that it also based on the similar height and build of the person in the video and Plaintiff's precinct photograph. (Bonilla Dep. 94:2–95:13, 132:13–133:24.) Bonilla also testified that he had seen similar hairlines and it was not unique to Plaintiff, and that he has seen

Defs. 56.1 ¶ 49; Pl. Resp. 56.1 ¶ 49.)  In addition, the footage showed a van with FedEx logo, matching Plaintiff's van, pulling to the Home Depot store's parking lot.  (Pl. Resp. 56.1 ¶ 49; Defs. Resp. 56.1 ¶ 46; Bonilla Dep. 92:16–23; Gerdes Dep. 204:5–11.)

### iv.  Mena and Plaintiff's text messages

Prior to Plaintiff's arrest, Bonilla and Gerdes reviewed text messages between Mena and Plaintiff that were exchanged prior to the robbery-kidnapping, which were taken from Mena's phone.[22]  (Defs. 56.1 ¶ 52; Pl. Resp. 56.1 ¶ 52; Pl. 56.1 ¶ 60; Defs. 56.1 ¶ 60; Copies of text messages ("Text Messages") annexed to Francolla Decl. as Ex. P.)  After reviewing Plaintiff's 4:32 PM message to Mena, which the parties agree translated to "I just spoke to lo's he told me that he will call me after 5:00 p.m.," Bonilla believed that "lo's" referred to Pablo Dickson. (Defs. 56.1 ¶ 58; Pl. Resp. 56.1 ¶ 58; Pl. 56.1 ¶¶ 60(f), 61–62 Defs. Resp. 56.1 ¶¶ 60(f), 61–62; Text Messages.)  Mena messaged Plaintiff before the robbery-kidnapping, stating, "Socio, yay yo tengo un tiguere que puede vajar pa ya conmigo.[ ]Yo le dije que nadamas le podia dar 10 por que a mi me iban a dar 20 solamenta."  (Defs. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59; Pl. 56.1 ¶ 63; Defs. Resp. 56.1 ¶ 63.)  Gerdes looked up the word "tiguere" on "urbandictionary.com" and determined that it meant a "downhome, dirty dude who will go over there and, like, take care of

_____

other people wear hoodies under their jackets "as a common practice" in New York.  (Pl. 56.1 ¶ 58; Defs. Resp. 56.1 ¶ 58; Bonilla Dep. 133:15–19.)  Plaintiff asserts that the Precinct photograph was unhelpful, because it was only from Plaintiff's shoulders to his head and did not reveal Plaintiff's height and build.  (Pl. Resp. 56.1 ¶ 50.)

[22]  Many of the messages were in Spanish, but it is undisputed that Bonilla spoke Spanish, and was able to read and translate the messages for Gerdes.  (Defs. 56.1 ¶ 53; Pl. Resp. 56.1 ¶ 53.)

business."[23]  (Pl. 56.1 ¶ 63; Defs. Resp. 56.1 ¶ 63; Gerdes Dep. 190:15–192:22.)  Defendants

assert that Bonilla was independently aware that "tiguere" was slang for a bad person or bad guy,

and conveyed this to Gerdes.  (Defs. Resp. 56.1 ¶ 63; Defs. 56.1 ¶¶ 53, 59.)

### e.  Plaintiff's arrest and interview

On November 7, 2011, Plaintiff was arrested at the 76th Precinct.  (Pl. 56.1 ¶ 71; Defs.

Resp. 56.1 ¶ 71; Defs. 56.1 ¶ 61; Pl. Resp. 56.1 ¶ 61.)  The parties dispute whether Gerdes, and

Marrow and Bonilla jointly decided to arrest Plaintiff.  According to Defendants, Bonilla

received Gerdes' approval prior to the arrest.  (Defs. 56.1 ¶ 62; Defs. Resp. 56.1 ¶ 70.)

According to Plaintiff, Gerdes, Bonilla and Marrow jointly determined there was probable cause

to arrest Plaintiff.  (Pl. 56.1 ¶ 70; Pl. Resp. 56.1 ¶ 62.)

At the Precinct, Plaintiff spoke with Bonilla about zip-ties, generally.[24]  (Dep. of Raphael

Soto ("Pl. Dep.") 116:17–25, annexed to Francolla Decl. as Ex. D.[25])  According to Plaintiff, he

needed zip-ties for his bread route, and "[Mena] uses [zip-ties] for . . . our bread racks, and to

---

[23]  Plaintiff asks the Court to "take judicial notice" of the "unreasonableness" of using urbandictionary.com to translate "tiguere" and to use the definition to determine probable cause because the website is created by the public and contains words and definition "of a vile nature." (Pl. Resp. 56.1 ¶ 59.)  The Court declines Plaintiff's invitation as the appropriate translation is immaterial to the resolution of the motions — both parties agree that, at a minimum, Defendants understood the term to mean a "dude."  (Pl. 56.1 ¶ 60(g); Defs. Resp. 56.1 ¶ 60(g).)  The Court notes that various courts have relied on the website in other contexts.  *See Birmingham v. Mizuno USA, Inc.*, No. 5:09-CV-0566, 2011 WL 1299356, at *7 n.8 (N.D.N.Y. Mar. 31, 2011) (taking judicial notice of an urbandictionary.com definition); *Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs Inc.*, 679 F. Supp. 2d 259, 277 n.41 (N.D.N.Y. 2009) (same); *Boone v. Jackson*, No. 03-CV-8661, 2005 WL 1560511, at *4 (S.D.N.Y. July 1, 2005) (considering urbandictionary.com definition in copyright infringement action).

[24]  Neither party submits any evidence that Bonilla questioned Plaintiff about the particular zip-ties found in his van or on Yoshida.

[25]  Defendants submitted additional excerpts from Plaintiff's deposition.  (*See* Ex. A annexed to Francolla Opp'n Decl.)

keep the bread racks from moving while he is driving." (Pl. Dep. 116:17–25; Defs. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.) It is undisputed that the bread racks Plaintiff discussed were not in the van during the October 24, 2011 search of his van. (Defs. 56.1 ¶ 65; Pl. Resp. 56.1 ¶ 65.) Plaintiff also stated that the zip-ties were for a piece of "metal that [was] collapsing" in his van.[26] (Pl. Dep. 116:17–25; Defs. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.) Plaintiff asserts that the piece of metal was in the van during the October 24, 2011 search of his van. (Pl. Resp. 56.1 ¶ 65.)

### f.    Indictment and dismissal

On November 10, 2011, after hearing evidence, including Plaintiff's testimony, a Grand Jury returned a "no true bill" on the single first-degree robbery charge, dismissing that charge. (Pl. 56.1 ¶ 72; Defs. Resp. 56.1 ¶ 72; Gerdes Dep. 277:2–17.) Gerdes presented additional evidence, and on November 28, 2011, the Grand Jury indicted Plaintiff for multiple counts of robbery in the second degree, burglary in the first and second degrees, and one count each of attempted assault in the first degree, assault in the second degree, kidnapping in the second degree, and unlawful imprisonment in the first degree. (Defs. 56.1 ¶ 66; Pl. Resp. 56.1 ¶ 66; Pl. 56.1 ¶ 73; Defs. Resp. 56.1 ¶ 73; Gerdes Dep. 277:2–17.)

Three months later, Kings County Supreme Court Judge Ruth Shillingford, dismissed the indictment for a defect in the grand jury proceedings under New York Criminal Procedure Law Section 210.35. (Defs. 56.1 ¶ 68: Pl. Resp. 56.1 ¶ 68; Feb. 28, 2011 Order of Hon. Ruth

---

[26] Defendants assert that Plaintiff admitted to Bonilla that he and Mena purchased zip-ties from Home Depot three days before the crime, which would fully corroborate the video. (Defs. 56.1 ¶ 63.) However, although during his deposition in this lawsuit Plaintiff admitted that he and Mena purchased zip-ties three days before the crime, there is no evidence that Plaintiff told Detective Bonilla this fact at the time of his arrest. (Pl. Dep. 116:17–117:18.)

Shillingford ("Feb. 28 Order") 1, annexed to Francolla Decl. as Ex. S.)[27]  In a written opinion, the court explained that after the first-degree robbery charge was dismissed and the prosecution presented additional evidence, the Grand Jury was deadlocked.  (Feb 28 Order 2–3.)  The Judge concluded that when the prosecutor marshalled the evidence and instructed the jury further on the charges, the prosecutor went too far.  (*Id.* at 3.)  According to Judge Shillingford, these acts "resulted in extensive marshalling of the evidence to the point of deliberation in the process." (*Id.*)  Because the Grand Jury returned a "no true bill" on the first-degree robbery charge after Plaintiff's testimony, and continued having difficulty after "extensive additional evidence," the court found that there was a possibility of prejudice.  (*Id.* at 3–4.)  As a result, even if the prosecution established a legally sufficient case, the conduct warranted dismissing the indictment.  (*Id.* at 4.)  The court granted the prosecution leave to re-present the evidence to another Grand Jury.  (*Id.* at 5.)  On April 2, 2012, the Kings County District Attorney dismissed all charges against Plaintiff.  (Defs 56.1 ¶ 69; Certificate of Disposition Dismissal No. 29456 ("Certificate of Disposition"), annexed to Francolla Decl. as Ex. T.)

## II.  Discussion

### a.  Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013).  The role of the court is not

---

[27]  The Order is not numbered.  For convenience, the Court refers to the page numbering assigned by the Court's electronic docketing system.

"to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Absolute and Qualified Immunity

As a preliminary matter, Defendants Gerdes and Bonilla argue that they are entitled to summary judgment because they have absolute or qualified immunity from liability for Plaintiff's false arrest and malicious prosecution claims.[28] (Defs. Mem. 15–20.)

#### i. Absolute immunity

Prosecutors performing duties related to their prosecutorial function are protected from liability under Section 1983 by absolute immunity. *See e.g.*, *Burns v. Reed*, 500 U.S. 478, 486 (1991) ("[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and in presenting the State's case." (internal quotation marks and citations omitted)); *Warney v. Monroe Cty.*, 587 F.3d 113, 120–21 (2d Cir. 2009). The immunity extends not only to the District Attorney but to all employees engaged with the judicial process. *Hill v. City of New York*, 45 F.3d 653, 660–61 (2d Cir. 1995) ("This includes not only officials

---

[28] In a single sentence of their reply brief, Defendants argue for the first time that Defendant Marrow is also entitled to absolute immunity. (Defs. Reply 8.)

performing discretionary acts of a judicial nature, but also individual employees who assist such an official and who act under that official's direction in performing functions closely tied to the judicial process."). However, "[p]olice and other law enforcement officers generally [only] enjoy absolute immunity from suit based on the substance of their testimony in judicial and quasi-judicial proceedings." *Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 296–97 (E.D.N.Y. 2010) (citing *Briscoe v. LaHue*, 460 U.S. 325, 333 (1983) and *Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008)). Because absolute immunity "defeats a suit at the outset," *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976), and bars its covered claims, it is a threshold issue and courts "are encouraged to determine" whether it is available to defendants at the start of a litigation. *Anilao v. Spota*, 774 F. Supp. 2d 457, 476 (E.D.N.Y. 2011); *see Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.").

"To determine whether an official enjoys absolute immunity [the Court] take[s] a 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.'" *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013), *cert. denied* 134 S. Ct. 1934 (2014) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Simon*, 727 F.3d at 172.

### 1. ADA Gerdes

Plaintiff argues that his false arrest claim may proceed against Gerdes because Gerdes does not have absolute immunity for her acts during the investigation of Plaintiff.[29] (Pl. Opp'n

---

[29] Plaintiff concedes in his opposition that ADA Gerdes has absolute immunity from his claims of malicious prosecution, and that his claim therefore fails against Gerdes. (Pl. Opp'n

14–16.)  According to Plaintiff, Gerdes was "intimately involved" in investigating the robbery-kidnapping and, during the investigation, "she made decisions construing evidence against [him]."  (*Id.* at 16.)  Gerdes asserts absolute immunity from Plaintiff's false arrest claim.  Gerdes argues that the undisputed record reflects her role as an advocate, and establishes no conduct precluding absolute immunity from Plaintiff's false arrest claim.  (Defs. Reply 7.)  Because there are material factual disputes about Gerdes' role in the investigation, the Court cannot determine as a matter of law that Gerdes has absolute immunity from Plaintiff's false arrest claim.

"A prosecutor acting in the role of an advocate in connection with a judicial proceeding is entitled to absolute immunity for all acts 'intimately associated with the judicial phase of the criminal process.'"  *Simon*, 727 F.3d at 171 (quoting *Imbler*, 424 U.S. at 430).  However, "[P]rosecutors receive only qualified immunity when performing 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.'"  *Id.* at 172 (quoting *Buckley*, 509 U.S. at 273); *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) ("[O]nly qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions.").  This distinction follows because investigatory acts "have historically and by precedent been regarded as the work of police, not prosecutors," *Simon*, 727 F.3d at 172, and "it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other,'" *Buckley*, 509 U.S. at 273.

"The line between a prosecutor's advocacy and investigating roles might sometimes be

---

15.)  Accordingly, the Court dismisses Plaintiff's malicious prosecution claim against Gerdes. *See Santulli v. Russello*, 519 F. App'x 706, 711 (2d Cir. 2013) ("It is well settled that a prosecutor is entitled to absolute immunity for acts undertaken pursuant to her traditional function as an advocate in the prosecutorial process." (citing *Shmueli v. City of New York*, 424 F.3d 231, 236–38 (2d Cir. 2005))).

difficult to draw." *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000). Indeed, "[g]ood prosecutors may — usually should — perform acts reasonably characterized as investigative at all phases of a criminal proceeding." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012). However, although "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute," *Simon*, 727 F.3d at 174 (quoting *Burns*, 500 U.S. at 495), the Second Circuit has emphasized that "absolute immunity is not so expansive," *Id.* Generally, "evaluating evidence and interviewing witnesses . . . fall[s] on the absolute immunity side of the line," putting searches "for the clues and corroboration" leading to an arrest "on the qualified immunity side." *Giraldo*, 694 F.3d at 166 (quoting *Smith v. Garreto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273)).

Context is critical, and "it is unhelpful to ascertain the prosecutors' functional role by isolating each specific act done or not done." *Warney*, 587 F.3d at 123. "The investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." *Giraldo*, 694 F.3d at 166. The focus is on whether the act was one at the "core of the prosecutorial function." *Simon*, 727 F.3d at 173 n.6 (citing *Giraldo*, 694 F.3d at 167).

To understand fully the functional approach to determining a prosecutor's role, two Second Circuit cases are illustrative. In *Warney*, the Second Circuit addressed the prosecutor's decision to conduct and disclose DNA testing in a post-conviction proceeding. *Warney*, 587 F.3d at 123. The Court highlighted how the decision could vacillate between functions, stating, "[i]f the testing inculpated [plaintiff], it would be a potent tool of the advocacy; if it exculpated

[plaintiff], it might be deemed administrative, in the sense that it would entail disclosure; if it inculpated someone else, it would be investigative, at least to the extent that it might identify the real killer." *Id.* at 124. Nevertheless, absolute immunity applied because deciding to conduct DNA testing and disclosing the exculpatory results were "integral to the [prosecutor's] overarching advocacy function of dealing with post-trial initiatives challenging an underlying criminal conviction." *Id.* at 123–24. In particular, the prosecutor needed to determine if there was a basis to oppose the petition and if testing would exonerate the plaintiff. *Id.*

In *Giraldo*, the Second Circuit considered whether absolute immunity extended to a more traditional investigative function — a witness interview. *Giraldo*, 694 F.3d at 161. There, after police arrested the plaintiff's boyfriend for domestic abuse, she maintained that it was an accident. 694 F.3d at 164. The police took the plaintiff "against her will" to the District Attorney's office, where the prosecutor interrogated her. *Id.* The Second Circuit reversed the denial of absolute immunity. *Id.* at 167. According to the Court, the interview was well within the "legitimate functions" of a prosecutor because once the police arrested the plaintiff's boyfriend, "legal decisions at the core of the prosecutorial function — pursuit of the charges, arraignment, bail, etc. — had to be made by [the prosecutors] and made quickly." *Id.* at 167. The Court further explained that a reasonable prosecutor would need to observe and confirm the plaintiff's account and her credibility in connection with the boyfriend's prosecution. *Id.*

Much of Gerdes' conduct during the robbery investigation is undisputed. The parties agree that "Gerdes, Marrow, and Bonilla met and discussed the evidence" and "jointly investigated" the robbery. (Pl. 56.1 ¶ 69; Defs. Resp. 56.1 ¶ 69.) The day of Mena and

Dickson's arrest, Gerdes interviewed Dickson and, with Bonilla, interviewed Yoshida.[30] (Pl. 56.1 ¶ 30; Defs. Resp. 56.1 ¶ 30.) Gerdes reviewed various pieces of evidence, including the Home Depot footage, still photographs of the footage and a photograph of Plaintiff. (Gerdes Dep. 185:11–189:22.) In addition, Gerdes reviewed Mena and Plaintiff's text messages, and researched the meaning of "tiguere" from those messages. (Pl. 56.1 ¶ 63; Defs. Resp. 56.1 ¶ 63; Defs. 56.1 ¶ 52; Pl. Resp. 56.1 ¶ 52.) It is undisputed that she played some role in Plaintiff's arrest, although it is disputed whether Gerdes "approved" Plaintiff's arrest or "jointly decided" to arrest him. (Defs. Resp. 56.1 ¶ 70; Pl. Resp. 56.1 ¶ 62.)

Although Gerdes asserts that her conduct was focused on evaluating evidence supporting Mena and Dickson's prosecution, the record before the Court is unclear. While some of Gerdes' acts, like her interview of Yoshida, appear to be prosecutorial functions,[31] there are material factual gaps that bear on Gerdes' function in performing other acts. For example, to the extent Gerdes reviewed the zip-tie receipt, Home Depot footage, and text messages to prepare for and proceed with charges against Mena and Dickson, it was a prosecutorial function entitled to absolute immunity. *See Giraldo*, 694 F.3d at 165 (absolute immunity attaches to "conduct 'preliminary to the initiation of a prosecution and actions apart from the courtroom.'" (quoting *Imbler*, 424 U.S. at 431 n.33). However, to the extent Gerdes directed law enforcement to obtain

---

[30] Defendants dispute Plaintiff's assertion that Bonilla was present for Gerdes' interview with Dickson. (Defs. Resp. 56.1 ¶ 27.)

[31] Gerdes' interview of Yoshida was like the interview in *Giraldo*, and went to Gerdes' core prosecutorial function. Having been assigned to lead any prosecution against Mena and Dickson, "[a] reasonable prosecutor easily could — and should — have viewed a first-hand interview and personal weighing of the credibility of [Yoshida's] . . . story as necessary." *Giraldo v. Kessler*, 694 F.3d 161, 167 (2d Cir. 2012); *Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *16 (S.D.N.Y. Sept. 30, 2010) ("[A]lthough he labels the prosecutors' actions as 'investigatory,' Plaintiff alleges that Defendants . . . violated his constitutional rights by interviewing witnesses and evaluating evidence in order to decide whether to indict.").

that evidence, and reviewed it to identify Plaintiff and develop probable cause to arrest him, such

acts are more akin to a "search[] for the clues" or a "gathering and piecing together of evidence

for . . . determination of the perpetrators" entitled to qualified rather than absolute immunity.

*Giraldo*, 694 F.3d at 166; *see Buckley*, 509 U.S. at 273 (distinguishing advocacy functions

from "the detective's role in searching for the clues and corroboration" to support an arrest);

*Flagler v. Trainor*, 663 F.3d 543, 549–50 (2d Cir. 2011) (prosecutor did not have absolute

immunity for "allegedly accessing, or ordering someone to access, [suspect's] voicemail without

her consent, or from persuading [witness'] ex-wife to record telephone calls with [the suspect]"

because those acts were "akin to investigatory acts"); *see also Zahrey*, 221 F.3d at 347 n.2 ("The

majority opinion in *Buckley* . . . suggests that a prosecutor's conduct prior to the establishment of

probable cause should be considered investigative: 'A prosecutor neither is, nor should consider

himself to be, an advocate before he has probable cause to have anyone arrested.'" (quoting

*Buckley*, 509 U.S. at 274)).

Gerdes' testimony provides little clarity as to her function during the investigation of

Plaintiff, at times suggesting she joined with law enforcement to discover Plaintiff's identity and

develop probable cause. (*See* Gerdes Dep. 78:22–79:8 ("[F]rom day one, the idea that there was

this third person involved came to light. . . . [T]he evidence was pointing towards it being Rafael

Soto . . . ."); *id.* at 187:18–188:10 (describing her review of various evidence at the time and

stating "this gave me very, very probative, relevant and powerful evidence connecting Soto to

this case"); *id.* at 188:14–17 ("I was urging the detective to get this video to me quick. To get

the results of this information quickly. I mean, [Soto] wasn't arrested."); *id.* at 188:19–23

("[T]here was a period from 10/20/11 until 11/7/2011, where *we* were seeing, you know, what

direction the evidence pointed *us* in." (emphasis added).) Bonilla's testimony about Gerdes' role

is similarly unhelpful on this issue.  (*See* Bonilla Dep. 19:18–20 (explaining that "ADA Gerdes" was "assisting in the investigation [of Plaintiff]."), *id.* at 100:25–101:17 ("Q. Was she involved in all the investigative steps taken in this matter?  A. Pretty Much . . . . We were in constant contact in regard[s] to the steps being taken.  If she had a suggestion, we would follow that.").)

Because there are disputed factual issues about Gerdes' role and conduct during Plaintiff's investigation, at this stage, the Court cannot resolve those disputes and conclude that she is entitled to absolute immunity as a matter of law.  However, as discussed *infra* Part II.c.i., Plaintiff's false arrest claim is nevertheless dismissed as to all Defendants because there was probable cause for his arrest.

### 2.    Detective Bonilla

Defendants assert that Bonilla is also entitled to absolute immunity from Plaintiff's false arrest and malicious prosecution claims.  According to Defendants, because Gerdes is entitled to absolute immunity, her exercise of "independent judgment" entitles Bonilla to absolute immunity as well.  (Defs. Mem. 19.)  Plaintiff asserts that, because Gerdes lacked "independent judgment," immunity does not apply.  (Pl. Opp'n 16.)

Because a Section 1983 claim is a constitutional tort, the claims are "guided by common-law principles of tort," and a plaintiff must establish causation.  *See Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)); *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999).  Applying those principles, the Second Circuit has held that an officer may escape liability for a constitutional harm where an intervening cause severs the causal connection between the officer's unlawful conduct and the harm to the plaintiff.  *See Townes*, 176 F.3d at 146–47.  However, where an officer misled or pressured the official exercising judgment, that conduct may prevent an informed decision, and

the officer may still be a proximate cause of the injury. *See Bermudez v. City of New York*, 790

F.3d 368, 375–76 (2d Cir. 2015) (finding that a reasonable jury could conclude that investigating

officers' failure to inform the prosecutor "about problems in the initial questioning" of

eyewitnesses "could have prevented [the prosecutor] from making an informed decision about

the reliability of that evidence"); *Zahrey*, 221 F.3d at 344 ("[T]here is a constitutional right not to

be deprived of liberty as a result of the fabrication of evidence by a government officer acting in

an investigatory capacity, at least where the officer foresees that he himself will use the evidence

with a resulting deprivation of liberty."); *Townes*, 176 F.3d at 147 (Intervening exercise of

independent judgment will break the causal chain "in the absence of evidence that the police

officer misled or pressured the official who could be expected to exercise independent

judgment.").

Relying exclusively on a district court's unpublished opinion in *Lundt v. City of New

York*, No. 12-CV-1737, 2013 WL 5298458 (S.D.N.Y. Sept. 20, 2013), Bonilla argues that he is

entitled to absolute immunity because Gerdes exercised independent judgment. (Defs. Mem.

19–20.) In *Lundt*, the court considered, among other claims, a false arrest claim that "rest[ed]

essentially on the assertion that [the arresting officer] ignored exculpatory evidence in his

possession." *Lundt*, 2013 WL 5298458, at *5. The prosecutor, who received absolute immunity,

authorized the arrest with full knowledge of the exculpatory evidence. *Id.* The court noted that

if the prosecutor "ha[d] absolute immunity from any false arrest charge premised on [the

prosecutor's] authorization of an arrest, then [the plaintiff] may not circumvent that immunity by

bringing this claim against the investigating officer." *Id.*

Bonilla's reliance on *Lundt* is misplaced. First, unlike *Lundt*, where the prosecutor

authorized the arrest, here, the parties dispute whether Gerdes authorized the arrest or if Gerdes,

Bonilla, and Marrow jointly decided to arrest Plaintiff. (Defs. 56.1 ¶ 62; Pl. 56.1 ¶ 70.) Second, *Lundt* involved claims based solely on the prosecutor-authorized arrest, whereas Plaintiff relies on Gerdes' allegedly investigative acts, which would not be entitled to absolute immunity. As discussed above, given the unclear record, the Court cannot determine whether Gerdes is entitled to absolute immunity. As a result, unlike *Lundt*, where the court had already granted absolute immunity to the prosecutor, Plaintiff is not circumventing the prosecutor's absolute immunity. Accordingly, Bonilla is not entitled to absolute immunity.[32]

### ii. Qualified Immunity

Even if absolute immunity does not apply, the doctrine of qualified immunity may bar a plaintiff's claims. That doctrine "shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, ---, 131 S. Ct. 2074, 2080 (2011)); *see Morris v. Silvestre*, 604 F. App'x 22, 24–25 (2d Cir. 2015); *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (discussing the elements of qualified immunity). A right is "clearly established" when "the contours of the right are sufficiently clear that a

---

[32] Even assuming that Defendants had properly raised their argument regarding Marrow's absolute immunity, it would fail for the same reasons.

reasonable official would understand that what he is doing violates that right." *Southerland*, 680 F.3d at 141 (alterations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007). Defendants bear the burden of proof to establish that qualified immunity exists. *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012); *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

Because the application of qualified immunity turns first on the existence of a constitutional violation, the Court addresses its applicability alongside Plaintiff's substantive claims below. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) ("As in any § 1983 case on summary judgment, we first determine whether, '[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the [defendants'] conduct violated a constitutional right,' and only thereafter consider whether qualified immunity shields individual defendants." (internal citations omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### c. Section 1983 claims

#### i. False Arrest

In assessing Section 1983 claims for false arrest, courts generally look to the law of the state in which the arrest occurred. *Russo*, 479 F.3d at 203. "Under New York law, 'to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).

"[P]robable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "A police officer has

probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). The reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *Gonzalez*, 728 F.3d at 155. As the Second Circuit has held, "that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *Panetta*, 460 F.3d at 395–96 (internal citation omitted) (alteration in original) (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)); *see Stansbury*, 721 F.3d at 94 ("John's claim that the perpetrator was 5'5" tall is evidence indicating that Stansbury could be innocent, but this evidence was outweighed by the mountain of evidence to the contrary.")

### 1. There was probable cause for Plaintiff's arrest

Here, the undisputed facts, read in the light most favorable to Plaintiff, establish that after a nearly three-week investigation into the robbery-kidnapping, Defendants developed probable cause to arrest Plaintiff for conspiracy in the second degree, robbery in the first and second degrees, assault in the first and second degrees, or unlawful imprisonment in the first degree. Gerdes and Bonilla knew from one of the perpetrators that a third person was possibly involved, and that, immediately after the incident, Yoshida suspected Plaintiff's involvement. (Defs. 56.1 ¶¶ 21, 28; Pl. Resp. 56.1 ¶¶ 21, 28; Pl. 56.1 ¶¶ 12, 24; Defs. Resp. 56.1 ¶¶ 12, 24.) They knew

that during the crime the perpetrators believed Yoshida had $100,000 in a safe, and that at least one of the perpetrators knew exactly where Yoshida lived. (Pl. 56.1 ¶¶ 21–22; Defs. Resp. 56.1 ¶¶ 21–22; Defs. 56.1 ¶¶ 6, 22; Pl. Resp. 56.1 ¶¶ 6, 22) They knew that Yoshida had told Plaintiff about the $100,000 in his apartment safe, and that, if the then-pending purchase transaction had proceeded as expected, Plaintiff was supposed to have Yoshida's address.[33] (Pl. 56.1 ¶ 33; Defs. Resp. 56.1 ¶ 33; Defs. 56.1 ¶¶ 31–33; Pl. Resp. 56.1 ¶¶ 31–33.) They also knew that Mena and Dickson used Plaintiff's van for the crime, and had attempted to conceal its license plate with a decoy license plate to ensure it was untraceable. (Pl. 56.1 ¶¶ 13, 24; Defs. Resp. 56.1 ¶¶ 13, 24; Defs. 56.1 ¶ 40; Pl. Resp. 56.1 ¶ 40.)

Prior to Plaintiff's arrest, Gerdes and Bonilla also knew that Dickson's post-arrest statements and Plaintiff and Mena's text messages from the night of the crime corroborated each other in important respects. Specifically, Gerdes and Bonilla knew that "in the early evening" before the crime, Dickson spoke with Mena briefly but called him back before agreeing to commit the robbery. (Defs. 56.1 ¶ 19 Pl. Resp. 56.1 ¶ 19; Pl. 56.1 ¶¶ 3–7, 24; Defs. Resp. 56.1 ¶¶ 3–7, 24.) Based on Mena and Plaintiff's text messages, Bonilla and Gerdes knew that Dickson's multiple telephone calls were consistent with Mena's text messages to Plaintiff, stating that Mena had spoken with "Lo's" who would have to call Mena back "after 5:00 p.m." (Pl. 56.1 ¶ 58; Defs. Resp. 56.1 ¶ 58.) Bonilla and Gerdes also knew that Dickson's description of his second call to Mena — in which Dickson learned about the $20,000 pay-outs — aligned, in part, with Mena's message to Plaintiff that he found a "dude to travel over there" who would

---

[33] Although Defendants assert that Yoshida told them Plaintiff had obtained his address, the record does not support that conclusion. However, it is undisputed that Yoshida explained the brokering process and that he thought Plaintiff might have received his address through that process. (Pl. 56.1 ¶ 33; Defs. Resp. 56.1 ¶ 33; Yoshida Dep. 13:22–16:4.)

get "10" while Mena would get "20."[34]  (Defs. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59.)

Gerdes and Bonilla also connected Plaintiff to evidence from the crime scene prior to Plaintiff's arrest.  After discovering Yoshida zip-tied, and finding zip-tie packaging and a Home Depot receipt in Plaintiff's van, Bonilla and Gerdes obtained and reviewed the video footage from Home Depot.  (Defs. 56.1 ¶¶ 13, 45–49; Pl. Resp. 56.1 ¶¶ 13, 45–49; Pl. 56.1 ¶¶ 46, 57; Defs. Resp. 56.1 ¶¶ 46, 57.)  From that footage, they knew that two men went to Home Depot in a van with a FedEx logo, matching Plaintiff's van, made a purchase, and then left in the same van.  After reviewing the footage alongside still frame images from the footage and a photograph of Plaintiff, they concluded that Mena and Plaintiff were the two men in the video.  (Defs. 56.1 ¶ 49; Pl. Resp. 56.1 ¶ 49; Pl. 56.1 ¶¶ 50, 56–57; Defs. Resp. 56.1 ¶¶ 50, 56–57.)

Bonilla and Gerdes also concluded, prior to Plaintiff's arrest, Mena and Plaintiff purchased zip-ties at Home Depot based on the Home Depot surveillance footage.  (Defs. 56.1 ¶ 48; Gerdes Dep. 187:18–188:10.)  While Plaintiff challenges the reliability of the evidence that formed the basis of Bonilla and Gerdes' conclusion that Mena and Plaintiff were the two individuals in the footage, Plaintiff does not challenge the fact that they reached this conclusion prior to his arrest.  (Pl. 56.1 ¶¶ 54–59; Pl. Resp. 56.1 ¶ 49.)  In addition, although Plaintiff argues that this conclusion was mistaken, unreasonable or unreliable, he fails to dispute facts supporting the reasonableness of their conclusion.  First, Plaintiff does not dispute that Bonilla saw the zip-tie packaging recovered from Plaintiff's van.  Second, Plaintiff does not dispute that Bonilla knew that the Home Depot receipt, also found in Plaintiff's van, listed a purchase of "24" "NAT TIE."  Third, Plaintiff does not dispute that Gerdes researched "NAT TIE" on the Home Depot

---

[34]  Plaintiff does not dispute that Gerdes and Bonilla understood "10" and "20" to refer to $10,000 and $20,000.  (Pl. 56.1 ¶ 64; Defs. Resp. 56.1 ¶ 64.)

website and believed it "stood for natural tie," (Gerdes Dep. 196:15–18), or that after reviewing

the receipt, Bonilla went to Home Depot and specifically looked at zip-ties, (Pl. 56.1 ¶¶ 45–47;

Defs. Resp. 56.1 ¶¶ 45–47). Fourth, Plaintiff does not dispute that Bonilla observed the two men

in the footage purchasing two packages that were "white," although it was only through the

receipt that Bonilla could "definitely" know what the men were purchasing. (Bonilla Dep. 98:4–

11.) These undisputed facts support the reasonableness of Bonilla's and Gerdes' belief that the

footage revealed Plaintiff and Mena purchasing zip-ties before the crime.

Based on the totality of facts known by Defendants prior to Plaintiff's arrest, they had

probable cause to arrest him for conspiracy to kidnap and for the other substantive offenses he

may have "solicit[ed], request[ed], commanded importune[ed] or intentionally aid[ed]." N.Y.

Penal Law § 20.00; N.Y. Penal Law § 105.15.

In arguing against probable cause, Plaintiff does not undercut — or even address — the

totality of the undisputed facts. Instead, Plaintiff asks the Court to consider each fact in

isolation, and proffers innocent or alternative explanations to undisputed facts, immaterial

disputed facts, and alleged "failures to investigate" that he asserts vitiate probable cause. The

Court addresses each of Plaintiff's arguments below.

### A. Innocent and alternative explanations are insufficient

Plaintiff asserts that Defendants' conclusions were unreasonable because they ignored

alternative or innocent explanations for Plaintiff's conduct, particularly as to Mena and

Plaintiff's text messages and Mena's use of a decoy license plate the night of the robbery. (Pl.

Opp'n 6, 10–11.) As discussed below, these arguments are insufficient to defeat the

reasonableness of Defendants' conclusion that there was probable cause to believe Plaintiff was

involved in criminal activity, because "[t]he fact that an innocent explanation may be consistent

with the facts alleged . . . does not negate probable cause." *Crowley*, 460 F.3d at 395 (quoting *Fama*, 758 F.2d at 838).

Plaintiff asserts that Defendants ignored messages and statements that showed the text messages were about the bread route.[35] However, Defendants' conclusion to the contrary was not unreasonable. Defendants believed that after Plaintiff asked Mena if he was "trying to deliver bread?" Mena explicitly was discussing something else, responding one minute later: "No bro, I'm at home. I'm just waiting on ya for the other thing. [A]ll the bread shit we can cover tomorrow." (Defs. 56.1 ¶¶ 55–56; Pl. Resp. 56.1 ¶¶ 55–56.) Mena's messages never return to the bread route. Further, because Defendants knew that Dickson and Mena were supposed to receive $20,000 each from the robbery, it was reasonable to interpret Mena's text message about paying "20" to himself and "10" to another person as related to the robbery. Mena's "$20,000" payout was consistent with the text message's description of his payout as "20." Although Mena described the second payout as "10" and not "20," given the totality of the facts and similarities, this discrepancy did not render their conclusion unreasonable or negate probable cause. *See United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) ("Although the conversations may have had an innocent meaning, it can hardly be said that the agents' interpretations were unreasonable or implausible."); *United States v. Jones*, No. 00-CR-182, 2000 WL 1448640, at *7 (S.D.N.Y. Sept. 28, 2000) ("[A]lthough the recorded conversations between Jones and the confidential informants an undercover agent may have had an innocent meaning, Marko's interpretations of the recorded conversations were reasonable and Magistrate

---

[35] Plaintiff asserts that his text message discussing a $10 hourly wage related to the bread route and Dickson's statement that he and Mena would get $20,000 each for the robbery precludes any conclusion that Mena's text message about Mena getting "20" and someone else getting "10" was about the crime. (Pl. Opp'n 10–11.)

Judge Eaton could rely on them in finding probable cause.").

Plaintiff also argues that although Mena concealed the license plate on Plaintiff's van during the crime, this was only to conceal Mena's identity. (Pl. Opp'n 6.) However, it was reasonable for Defendants to infer Plaintiff's involvement from this fact. Bonilla and Gerdes knew (1) that concealing the license plate was to ensure the van was untraceable, (Defs. 56.1 ¶ 40; Pl. Resp. 56.1 ¶ 40), and (2) that the van's true owner was not Mena, but Plaintiff, (Defs. 56.1 ¶ 37; Pl. Resp. 56.1 ¶ 37). Concluding that Mena concealed the van's license plates to help conceal Plaintiff was reasonable, and given the totality of all other facts, Defendants were not required to exclude the hypothetical innocent explanation that Mena was concealing his own identity. *See Posner v. City of New York*, No. 11-CV-4859, 2014 WL 185880, at *6 (S.D.N.Y. Jan. 16, 2014) ("The fact that Plaintiff has innocent explanations for the information that was known to Defendants, however, does not mean that they lacked probable cause; it merely means that she might have had viable arguments and defenses to the charges at trial.").

### B. Alleged failures to investigate

Plaintiff also argues that Defendants' alleged failures to investigate certain leads undermine probable cause. According to Plaintiff, Defendants failed to investigate (1) exculpatory information that the third person involved in the robbery-kidnapping was "Loco," (2) whether Plaintiff actually received Yoshida's address from Mr. Route, and (3) whether the broker from Mr. Route was involved. (Pl. Opp'n 4–5.) "[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). Indeed, "[r]easonable avenues of investigation must be pursued . . . [to establish probable cause]." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (quoted approvingly in *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir.

1994)). However, law enforcement is "not required to 'explore and eliminate every theoretically plausible claim of innocence before making an arrest,'" *Wiltshire v. Williams*, 576 F. App'x 48, 49 (2d Cir. 2014) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2011)), and after establishing probable cause, "an officer is not required to continue investigating, sifting and weighing information," *Celestin v. City of New York*, 581 F. Supp. 2d 420, 432 (E.D.N.Y. 2008) (citing *Panetta*, 460 F.3d at 396–98). *See Weiner v. McKeefery*, --- F. Supp. 3d ---, 2015 WL 1055890, at *9 (E.D.N.Y. Mar. 11, 2015) (rejecting argument that officer's failure to review tape recording of underlying incident eliminated probable cause where the sworn statements and interview of victim provided "reasonably trustworthy information" of Plaintiff's crime).

Here, Plaintiff's arguments about Defendants' failures to investigate are insufficient to vitiate the probable cause for his arrest. Even assuming a jury would believe that Dickson told Defendants that "Loco" was the third person involved,[36] the decision not to investigate "Loco" was reasonable. At the time, Defendants already knew that Yoshida suspected Plaintiff's involvement, and Dickson corroborated Yoshida's statements that the perpetrators believed he had $100,000 in his apartment safe. (Pl. 56.1 ¶¶ 17, 24; Defs. Resp. 56.1 ¶¶ 17, 24.) Prior to arresting Plaintiff, Defendants obtained Plaintiff and Mena's text messages and identified Plaintiff on the Home Depot footage, which all suggested Plaintiff was the third person involved with the crime.

Similarly, failing to obtain direct proof that Plaintiff obtained Yoshida's address or that Mr. Route was not involved in the crime did not vitiate probable cause that Plaintiff was

---

[36] The Court notes that, in support of this argument, Plaintiff has arguably mischaracterized the record through a strained reading of Dickson's video-interview transcript. However, because the Court cannot resolve the dispute as to whether Dickson said the word "Loco" as an exclamation or a proper noun, the Court accepts Plaintiff's assertion that "Loco" is a person for purposes deciding of these motions.

involved. These facts do not plainly exculpate Plaintiff such that further investigation was required — indeed, neither fact precluded the possibility of Plaintiff's involvement. *See Jocks*, 316 F.3d at 136 (holding that officer was neither "compelled to accept" nor to investigate plaintiff's "unsubstantiated claims" that could have exculpated his conduct); *Lowth*, 82 F.3d at 572 (refusing to hold that a reasonable police officer would have had to believe the plaintiff's exculpatory claim that "was not obviously true on its face"); *accord Waldron*, 541 F. App'x at 9 ("Even if the officers had looked at the [allegedly exculpatory] receipt, it did not contain information identifying [plaintiff] as the purchaser and, in light of other evidence, was insufficient standing alone to defeat probable cause." (citing *Jocks* and *Lowth*)); *c.f. Davis v. City of New York*, 902 F. Supp. 2d 405, 418 (S.D.N.Y. 2012) (holding that a jury could find that officers ignored exculpatory information when they arrested plaintiff for trespassing, despite learning facts suggesting plaintiff knew someone in the building). As a result, even assuming Defendants' "failure to make a further inquiry when a reasonable person would have [done so was] evidence of lack of probable cause," Defendants did not need to "explore and eliminate every theoretically plausible claim of innocence or prove [P]laintiff's version wrong before arresting him, even if an investigation might have cast doubt upon the basis for the arrest." *Kilburn v. Vill. of Saranac Lake*, 413 F. App'x 362, 363–64 (2d Cir. 2011) (quoting *Curley*, 268 F.3d at 70).

Given the volume of evidence supporting Plaintiff's involvement, the alleged failures to investigate did not negate probable cause. *Waldron*, 541 F. App'x at 9; *O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, at *16 (S.D.N.Y. Mar. 22, 2013) ("Plaintiff has not raised a genuine issue of material fact regarding whether Defendants' alleged investigative failures 'so far departed from what a reasonable person would have undertaken as to . . .

constitute evidence of lack of probable cause.'" (alteration in original) (quoting *Rae v. Cty. of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010)).

### C.   Immaterial disputed facts

Plaintiff attempts to discredit the officers' identification of Plaintiff in the Home Depot footage in support of his argument that there was no probable cause for his arrest. (Pl. Opp'n 7–10; Pl. Mem. 4–6.) According to Plaintiff, Defendants unreasonably identified him in the footage because: (1) many people share Plaintiff and Mena's physical appearance and attire; (2) Defendants did not establish that (a) the receipt reflected zip-tie purchase, or (b) the cash-register and security camera were synchronized; and (3) the license plate on the Fed Ex-marked van was hidden. Even assuming Plaintiff's assertions were true, and drawing all reasonable inferences in his favor, Bonilla and Gerdes were nevertheless reasonable in identifying Plaintiff as one of the individuals in the footage.

Plaintiff isolates each fact to argue that Defendants unreasonably identified him, but it is undisputed that Defendants did not rely on any single aspect of the Home Depot footage to conclude it depicted Plaintiff and Mena purchasing zip-ties. Instead, as Gerdes testified at her deposition in this case — and Plaintiff does not dispute — they considered the context and all available facts. (Gerdes Dep. 324:18–326:11.) That context included the fact that they found the Home Depot receipt in Plaintiff's van, that Bonilla had requested footage from the date and time on the receipt, that two men arrived in a van with a Fed Ex logo and Plaintiff's van had a Fed Ex logo, that Bonilla had previously observed Mena at the precinct and was therefore able to identify him in the footage, that they had a clear photograph of Plaintiff, that one man was a larger individual like Mena, that the smaller man had a hairline and outfit similar to the depiction of Plaintiff in his precinct photograph, that Bonilla had observed zip-ties at Home Depot, that the

two men were purchasing two packages that appeared white. (*Id.*) Under these circumstances, it was reasonable for Defendants to believe they had identified Plaintiff and Mena in the Home Depot footage, and to include that information in the totality of available facts to assess probable cause.

Viewing the evidence in the light most favorable to Plaintiff, and examining the totality of undisputed facts, Defendants had probable cause to arrest Plaintiff. Moreover, even if the Court were to find probable cause lacking, as discussed immediately below, it would at least find arguable probable cause to arrest Plaintiff, which entitles the Individual Defendants to qualified immunity.

## 2.    Qualified Immunity

Even assuming that Defendants did not have probable cause to arrest Plaintiff, the Individual Defendants nevertheless are entitled to summary judgment as to Plaintiff's false arrest claim based on qualified immunity. The Individual Defendants are entitled to qualified immunity because "it was objectively reasonable for them to believe their acts did not violate [Plaintiff's constitutional] rights." *Southerland*, 680 F.3d at 141.

As discussed above, the Court finds that the Individual Defendants had probable cause to arrest Plaintiff, therefore, Plaintiff has not shown a violation of a constitutional right. However, assuming, *arguendo*, that the Individual Defendants lacked probable cause to arrest Plaintiff — an act violating a clearly established constitutional right, *Jenkins v. City of New York*, 478 F.3d 76, 86–87 (2d Cir. 2007) ("[T]here is no doubt that the right to be free from arrest without probable cause was clearly established . . . .") — whether they are entitled to summary judgment based on qualified immunity would turn on whether the Individual Defendants' probable cause determination was objectively reasonable. *Gonzalez*, 728 F.3d at 157. For Fourth Amendment

violations, including false arrest, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest — that is, if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez*, 728 F.3d at 157 (quoting *Jenkins*, 478 F.3d at 86–87) (internal quotation marks omitted); *Morris*, 604 F. App'x at 24–25 ("Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)) (false arrest and malicious prosecution).

Taking the undisputed facts in the light most favorable to Plaintiff, the Individual Defendants had, at least, arguable probable cause to arrest Plaintiff. They knew Dickson and Mena would split their robbery proceeds with a third person who would get more of the proceeds than them. They knew that Mena and Plaintiff had discussed non-work-related plans on the afternoon of the robbery-kidnapping, and discussed payments to Mena and a third-party that were similar to Mena's and Dickson's shares of the proceeds. They knew that Yoshida told Plaintiff that he had $100,000 in his apartment and that Mena and Dickson sought $100,000 from Yoshida and believed he had it in his apartment, and they also knew that Plaintiff might have Yoshida's address. They knew that Mena had used and concealed Plaintiff's van during the crime, and in the van, they found Yoshida zip-tied, along with zip-tie packaging, and a Home Depot receipt from shortly before the crime. They also knew that two men went to Home Depot in a van matching Plaintiff's van and made a purchase. They believed those two men resembled Plaintiff and Mena after personally observing Mena, reviewing Plaintiff's photograph and reviewing the footage of the two men leaving Home Depot, noting that one was larger in size, similar to Mena, and the other smaller in stature, with a similar hair line to Plaintiff. On these

facts, officers of reasonable competence could disagree as to whether Plaintiff was a participant in the crime.

As discussed above, that Plaintiff proffers alternative conclusions and alternative inferences from those undisputed facts does not vitiate probable cause or arguable probable cause. Accordingly, even if Defendants could not establish probable cause, they would be entitled to qualified immunity as to Plaintiff's false arrest claims. Therefore, as to Plaintiff's false arrest claim, the Court denies Plaintiff's cross-motion for summary judgment grants Defendants' motion for summary judgment, and dismisses the claim.

### ii. Malicious Prosecution

Plaintiff asserts a malicious prosecution claim based on the initiation of criminal proceedings against him. Plaintiff argues that because Defendants lacked probable cause to arrest him, an inference of malice attached to their subsequent prosecution, which terminated in his favor. (Pl. Mem. 10–11.) He further argues that the Individual Defendants knew the prosecution would fail because it was "based on assumptions and uninvestigated leads." (*Id.* at 11.) Defendants assert that Plaintiff has failed to produce any evidence to show a lack of probable cause or actual malice to support his malicious prosecution claim. (Defs. Mem. 10–14.)

Under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Morris*, 604 F. App'x at 24 (quoting *Manganiello*, 612 F.3d at 161). In addition, to maintain a Section 1983 claim, a plaintiff must also establish "a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009) (quoting

*Rhoman v. City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

Here, it is undisputed that the proceedings initiated against Plaintiff terminated in his favor when the Kings County District Attorney's Office dismissed all charges against Plaintiff on April 2, 2012, and the charges were subsequently sealed pursuant to New York Criminal Procedure Law Section 160.50. (Defs. 56.1 ¶ 69; Certificate of Disposition.) Defendants argue that Plaintiff cannot establish that Bonilla and Gerdes lacked probable cause to prosecute him. (Defs. Mem. 11.) Accordingly, the Court addresses the probable cause element of Plaintiff's malicious prosecution claim. Because the Court finds that there was probable cause, it declines to address whether Defendants were motivated by malice. The Court also addresses whether Defendants Bonilla and Marrow are entitled to qualified immunity as to Plaintiff's malicious prosecution claim.

### 1. Probable Cause

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable cause." *Lewis v. City of New York.*, 591 F. App'x 21, 22 (2d Cir. 2015) (quoting *Manganiello*, 612 F.3d at 161)). However, where a grand jury indicts on some, but not all charges, the presumption attaches only to those charges in the indictment. *Bermudez*, 790 F.3d at 377 ("Where, as here, a grand jury indicted the plaintiff on *the relevant criminal charge*, New York law creates a presumption of probable cause . . . ." (emphasis added)); *Lowth*, 82 F.3d at 571 ("Because there is no dispute as to the first two [malicious prosecution] elements, the questions we must address are whether sufficient probable cause existed to charge Mrs. Lowth with *each* of the crimes." (emphasis added)); *Knox v. Cty. of Putnam*, No. 10-CV-1671, 2012 WL 4462011, at *4 (S.D.N.Y. Sept. 27, 2012) ("This is insufficient to defeat a claim for malicious prosecution.

Defendants here must have had probable cause for *each* charge for which Plaintiff was prosecuted." (internal quotation marks omitted)); *see also Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (granting a new trial because district court erroneously instructed the jury that probable cause to prosecute as to one charge was sufficient to defeat malicious prosecution claim for three different charges).

Here, it is undisputed that the grand jury indicted Plaintiff on some, but not all, of the charges presented. Because the grand jury returned a "no true bill" on the first degree robbery charge, the probable cause presumption does not attach. *See Bermudez*, 790 F.3d at 377; *Lowth*, 82 F.3d at 571. As to the remaining charges, the indictment creates a presumption of probable cause to prosecute Plaintiff, and Plaintiff must overcome that presumption. As discussed below, Plaintiff cannot show a lack of probable cause.

### A. First degree robbery

"The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury*, 721 F.3d at 95 (citing *Boyd*, 336 F.3d at 76). In the malicious prosecution context, probable cause is the totality of "facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* (quoting *Boyd*, 336 F.3d at 76); *Phillips v. DeAngelis*, 331 F. App'x 894, 895 (2d Cir. 2009) ("We agree with the District Court that in light of the totality of the evidence, Zell had a sufficient basis of probable cause to initiate the prosecution." (alteration and internal quotation marks omitted)). This inquiry considers the "facts known or reasonably believed at the time the prosecution was initiated, and not at the time of arrest." *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 169 (E.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007)). Where there was probable cause to arrest, plaintiff must show

that the defendants learned of some "intervening facts" undermining probable cause "between arrest and initiation of prosecution, [or the] claim[] of malicious prosecution cannot survive." *Thomas v. City of New York*, 562 F. App'x 58, 60 (2d Cir. 2014) (citing *Manganiello*, 612 F.3d at 161–62, and *Lowth*, 82 F.3d at 571); *Lowth*, 82 F.3d at 571 ("In order for probable cause to dissipate [between arrest and prosecution], the groundless nature of the charges must be made apparent by the discovery of some intervening fact."); *Weiner*, --- F. Supp. 3d at ---, 2015 WL 1055890, at *10 ("[P]laintiff must show that 'authorities became aware of exculpatory evidence between the time of the arrest and subsequent prosecution that would undermine the probable cause which supported the arrest.'").

Here, no reasonable jury could find that the Bonilla and Marrow lacked probable cause to prosecute Plaintiff for first degree robbery. As discussed above, probable cause existed for Plaintiff's arrest, and Plaintiff has produced no evidence even suggesting that Gerdes, Bonilla or Marrow became aware of exculpatory evidence that could undermine that probable cause. *See Powell v. Murphy*, 593 F. App'x 25, 28 (2d Cir. 2014) ("[Plaintiff] concedes that defendants did not learn of any intervening facts between arrest and initiation of prosecution to undermine that probable cause, claims of malicious prosecution cannot survive."). Instead, the undisputed facts show that after Plaintiff's arrest, there was even more evidence to support a finding of probable cause for Plaintiff's prosecution, when, in December 2011, Dickson confirmed that Plaintiff was the third person who was to receive a "cut."[37] In addition, Plaintiff's post-arrest statements concerning zip-ties at least confirmed the reasonableness of the belief that he and Mena went to

---

[37] Plaintiff points to no facts in the record that undercut Gerdes' testimony about her exchange with Dickson prior to her decision to proceed with charging Plaintiff.

Home Depot to purchase zip-ties.[38]  (Pl. Dep. 116:17–25; Defs. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.)

Coupled with the undisputed facts supporting his arrest, a reasonably prudent person would feel

even more strongly that Plaintiff "solicit[ed], request[ed], commanded importune[ed] or

intentionally aid[ed]" Mena and Dickson's first degree robbery.  N.Y. Penal Law § 20.00.

Because Plaintiff has provided no evidence to undermine such probable cause, his claim fails as

a matter of law.

### B.    Remaining charges

The Grand Jury indicted Plaintiff on multiple counts of robbery in the second degree,

burglary in the first and second degrees, and one count each of attempted assault in the first

degree, assault in the second degree, kidnapping in the second degree, and unlawful

imprisonment in the first degree, creating a presumption of probable cause as to each.  *Bermudez*,

790 F.3d at 377; *Manganiello*, 612 F.3d at 161–62.  "That presumption may be rebutted only 'by

evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other

police conduct undertaken in bad faith.'"  *Manganiello*, 612 F.3d at 162 (internal quotation

marks omitted) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)); *see Bermudez*,

790 F.3d at 377.  Defendants argue that Plaintiff cannot overcome this presumption.  There is a

threshold question, however, as to whether the presumption applies given the indictment's

dismissal for a grand jury defect.

### (1)    Applicability of presumption

The trial court dismissed the indictment against Plaintiff under New York Criminal

---

[38]  Plaintiff explained that he and Mena purportedly used zip-ties to secure bread racks in
Plaintiff's van, but, as the officers knew, there were no bread racks in the van at the time it was
recovered shortly after Mena's arrest.  (Pl. Dep. 116:17–25; Defs. 56.1 ¶¶ 63, 65; Pl. Resp. 56.1
¶¶ 63, 65.)

Procedure Law 210.35(5), a "catch all" provision permitting the "exceptional remedy" of dismissal in "those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury." *People v. Huston*, 88 N.Y.2d 400, 409 (1996). The New York Court of Appeals has made clear that section 210.35(5) dismissals protect against "unfounded prosecutions," and must follow from even potentially prejudicial defects even where there is legally sufficient evidence because "the CPL requires not only legally sufficient evidence as a prerequisite to indictment but also reasonable cause to believe the person committed an offense." *Id.* at 411; *see People v. Sayavong*, 83 N.Y.2d 702, 710–11 (1994) (dismissing indictment where witness' presence at grand jury violated the secrecy requirement and allowed him to potentially listen and tailor his testimony, undermining the goals of protecting witnesses and fostering truthful testimony).

New York courts have generally recognized that dismissal of an indictment does not negate the presumption of probable cause. *See Hernandez v. City of New York.*, 953 N.Y.S.2d 199, 201 (App. Div. 2012) (The indictment "raised a presumption of probable cause, even though the indictment was subsequently dismissed."); *Lawson v. City of New York.*, 922 N.Y.S.2d 54, 55 (App. Div. 2011) ("The dismissal of the indictment upon the People's motion, based on the conclusion that the evidence against plaintiff was too weak to establish guilt beyond a reasonable doubt . . . does not negate the finding of probable cause." (citing *Colon*, 60 N.Y.2d at 84); *Eisenkraft v. Armstrong*, 567 N.Y.S.2d 840, 841 (App. Div. 1991) ("The indictment . . . created the presumption of probable cause to commence the prosecution against the plaintiff. The dismissal of the indictment failed to overcome this presumption." (internal citations omitted) (citing *Colon*, 60 N.Y.2d at 78)). Similarly, the Second Circuit has noted "the fact that the indictment was subsequently dismissed on procedural grounds does not vitiate the presumption

of probable cause that arises from the issuance of the indictment." *Cornell v. Kapral*, 483 F. App'x 590, 592 (2d Cir. 2012); *see Lopez v. City of New York*, No. 14-CV-1660, 2014 WL 5090041, at *2 (S.D.N.Y. Oct. 10, 2014) (The "presumption holds even if the indictment was subsequently dismissed." (citing *Eisenkraft*, 567 N.Y.S.2d at 841)).

Although the Second Circuit has noted that dismissals for procedural violations do not preclude the presumption of probable cause, at least one court in this Circuit has held that a dismissal on other grounds can negate the presumption. *See Cox v. Cty. of Suffolk*, 827 F. Supp. 935, 937 (E.D.N.Y. 1993). In *Cox*, a grand jury indicted the plaintiff, but, after reviewing the grand jury minutes, the trial court dismissed the indictment, citing a lack of evidence that the defendant possessed the *mens rea* to commit the crime. *Id.* at 937. In a subsequent Section 1983 action, the district court held that the indictment's presumption of probable cause did not apply. *Id.* at 939. The court interpreted New York state precedent to conclude that where a state court reviews and dismisses an indictment "due to total lack of evidence in support of one of the elements of the crime charged, the presumption of probable cause raised by that indictment will fall." *Id.* (citing *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 744 (App. Div. 1979)). However, the court noted the tension between its decision and the New York Court of Appeals' decision in *Colon*, which stated that the presumption "may be overcome *only* by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.* at 939 (quoting *Colon*, 60 N.Y.2d at 82–83).

Defendants argue that the probable cause presumption applies in this case, relying on *Minott v. Duffy*, No. 11-CV-1217, 2014 WL 1386583 (S.D.N.Y. Apr. 8, 2014) and *Jones v. City*

*of New York*, No. 13-CV-0703, 2014 WL 1427855 (E.D.N.Y. Apr. 14, 2014). In *Minott*, the state court dismissed the plaintiff's indictment because there was "not enough evidence against him." *Minott*, 2014 WL 1386583, at *2 (internal quotation marks omitted). In the subsequent malicious prosecution action, the district court distinguished *Cox*, and applied the presumption of probable cause. *Id.* at *16–17. The court found *Cox*'s result "surprising" given that the New York Court of Appeals has clearly stated that "the presumption of probable cause may be unseated 'only by evidence establishing that the police witnesses' acted in bad faith in connection with the grand jury proceeding." *Id.* at *16 (internal quotation marks omitted) (quoting *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (quoting *Colon*, 60 N.Y.2d at 82)). The court distinguished *Cox*'s facts as the state court in *Minott* dismissed the indictment for a lack of sufficient evidence rather than a "total lack of evidence," as in *Cox*. *Id.* at *17. As a result, the court applied the presumption. *Id.*

In *Jones*, the state court reviewed the grand jury testimony and dismissed the plaintiff's indictment because there was no probable cause to support the charges. *Jones*, 2014 WL 1427855 at *2. In the subsequent suit for malicious prosecution, the district court applied the presumption of probable cause to the grand jury indictment despite the dismissal, stating that it disagreed with the state court's conclusion that there was no probable cause. *Id.* at *4–5.

None of these cases — *Jones*, *Minott*, and *Cox* — however, involved a dismissal under New York Criminal Procedure Law Section 210.35(5). Indeed, *Jones* is entirely inapposite because the district court did not address whether the prior dismissal for lack of probable cause affected the presumption of probable cause, and instead determined that there was probable cause, and therefore the dismissal was wrong. *Cox* is likewise inapplicable, because, even if an indictment "lack[ing] [] evidence in support of one of the elements of the crime" is not entitled to

a presumption of probable cause, *Cox*, 827 F. Supp. at 939, that was not Judge Shillingford's finding in Plaintiff's case. Although the Court recognizes New York courts' emphasis on the serious and unique nature of dismissals for grand jury defects, as the court in *Minott* recognized, the New York Court of Appeals has been clear as to when and how a plaintiff may overcome an indictment's presumption of probable cause. *Grucci v. Grucci*, 20 N.Y.3d 893, 898 (2012) ("[I]n cases in which the grand jury has returned an indictment, there is a presumption of probable cause, and the plaintiff can therefore only succeed on a malicious prosecution claim if he can prove that the indictment was procured by fraud, perjury, suppression of evidence, or other bad-faith conduct." (quoting *Colon*, 60 N.Y.2d at 82–83)). Based on the explicit directive from the New York Court of Appeals, and in the absence of any New York State precedent to suggest that a lesser standard should be applied to dismissals under Criminal Procedure Law Section 210.35, the Court adheres to the New York Court of Appeals' explicit instruction and applies the probable cause presumption based on Plaintiff's indictment.

### (2)   Plaintiff cannot overcome the presumption

A plaintiff may overcome the presumption of probable cause by presenting evidence that "the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith." *Bermudez*, 790 F.3d at 377 (internal quotation marks omitted); *Manganiello*, 612 F.3d at 162. Raising doubts about probable cause is insufficient. *Ramashwar v. City of New York*, 231 F. App'x 26, 27 (2d Cir. 2007) (Plaintiff "raised some questions of fact" that "merely tend[ed] to show the absence of probable cause." (citing *Colon*, 60 N.Y.2d at 83)); *Banno v. City of New York*, No. 06-CV-2270, 2015 WL 845709, at *5 (S.D.N.Y. Feb. 25, 2015) (finding that plaintiff did not overcome the presumption where he "merely assert[ed] that for the same reason[s] there [was] a question of fact as to

probable cause for the false arrest claim" (citing *Colon*, 60 N.Y.2d at 83)); *Dukes v. City of New York*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) (finding that plaintiff could not overcome the presumption by "merely claim[ing] that [the officer] failed to interview witnesses and to discover additional evidence"). Likewise, where a plaintiff offers merely his version of events to rebut the presumption, this is nothing more than "mere 'conjecture' and 'surmise' that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith," and is insufficient. *Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)); *see Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) ("Peterson has supplied only his suspicions of impropriety as proof of the defendants' misconduct before the grand jury.").

Here, despite alleging misconduct, Plaintiff has failed to adduce any evidence from which a reasonable juror to conclude that Defendants procured his indictment through fraud, perjury, or other bad faith. While Plaintiff relies on Judge Shillingford's dismissal of the indictment to show bad faith conduct in rebutting the presumption, Judge Shillingford's order provides little detail as to the actual Grand Jury proceeding, and Plaintiff merely surmises there was bad faith. In addition, Plaintiff has neither sought nor produced the grand jury minutes in this matter precluding any further evaluation of what occurred before the grand jury.[39] In addition, Plaintiff attempts to show bad faith, fabrication of evidence, or other misconduct through the same

---

[39] Even if Plaintiff produced grand jury minutes, Defendants would still be immune from liability for claims "based on" their grand jury testimony. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir.), *cert denied*, 135 S. Ct. 2335 (2015) (holding that if a plaintiff's § 1983 claim "requires [the defendant's] grand jury testimony, the defendant enjoys absolute immunity" under *Rehberg v. Paulk*, 566 U.S. ---, 132 S. Ct. 1497 (2012)). However, "[a]lthough prosecutors have absolute immunity for any alleged misconduct in grand jury proceedings, evidence of such misconduct . . . would be critical to undermine the presumption of probable cause . . . ." *Anilao v. Spota*, 918 F. Supp. 2d 157, 177 (E.D.N.Y. 2013).

arguments raised in connection with his false arrest.  However, even accepting those arguments, they are insufficient to defeat the presumption of probable cause.  *See Ramashwar*, 231 F. App'x at 27; *Dukes*, 879 F. Supp. at 343.

## 2.   Qualified Immunity

Plaintiff's malicious prosecution claim against Defendants Bonilla and Marrow also fails as a matter of law because they are entitled to qualified immunity.  As with Plaintiff's false arrest claim, the undisputed facts establish that reasonable officers could disagree about whether there was probable cause to prosecute Plaintiff on each charge presented to the grand jury.  Having essentially corroborated their belief that Plaintiff and Mena purchased zip-ties together before the crime, and, with Dickson's admission that Plaintiff was the third person to receive part of the robbery proceeds, a reasonable officer in Defendants' position would believe there was arguable probable cause to prosecute Plaintiff for his role in the crime.  Although Plaintiff contends that innocent explanations made any belief in his guilt unreasonable, as discussed above, Defendants were not required to eliminate those explanations, and none of them undermined the ultimate conclusion that Plaintiff was involved with the scheme to rob Yoshida.  Accordingly, the undisputed facts establish that Plaintiff's prosecution was supported by arguable probable cause, and that Bonilla and Marrow are entitled to qualified immunity for Plaintiff's malicious prosecution claim as a matter of law.  The Court therefore denies Plaintiff's cross-motion for summary judgment and grants Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim.

### iii.   Denial of Right to Fair Trial — Fabrication of Evidence

Defendants argue that they are entitled to summary judgment on Plaintiff's denial of the right to fair trial claim because Plaintiff cannot point to evidence suggesting that any of the

Individual Defendants made material false statements or fabricated evidence during Plaintiff's prosecution. (Defs. Mem. 23.) Defendants assert that Plaintiff cannot avoid summary judgment based on conclusory assertions. (Defs. Reply 8–9.) Plaintiff argues that the Individual Defendants "created false translations meanings [*sic*] of text messages between Mena and [Plaintiff], among other things." (Pl. Opp'n 21.)

To establish a fair trial claim, a plaintiff must show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)); *see Jocks*, 316 F.3d at 138. Unlike a false arrest or malicious prosecution claim, "[p]robable cause is not a defense" to a fair trial claim *Jovanovic*, 486 F. App'x at 152 (citing *Ricciuti*, 124 F.3d at 129–130).

Plaintiff claims that the Individual Defendants "created false translations meanings [*sic*] of text messages between Mena and [Plaintiff]." (Pl. Opp'n 21–22; Pl. Mem. 12.) Plaintiff challenges only the translation of Mena's text message to Plaintiff the night of the robbery-kidnapping that states, "Socio, yay yo tengo un tiguere que puede vajar pa ya conmigo.[ ]Yo le dije que nadamas le podia dar 10 por que a mi me iban a dar 20 solamenta." (Defs. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59.) For support, Plaintiff highlights two undisputed facts: (1) that Gerdes' interpreted "tiguere" as "bad guy or thug" after reference to "urbandictonary.com," and (2) that the sworn interpretation Gerdes later submitted to the grand jury interpreted "tiguere" as "dude." (Pl. Opp'n 10; Pl. Resp. 56.1 ¶ 59; *see* Notarized Certificate of Interpretation and Attached Sworn Translation ("Grand Jury Translation") annexed to Mouton Opp'n Decl. as Ex. 9.)

This is insufficient to create a genuine issue of material fact as to Plaintiff's fair trial

claim. Drawing all inferences in Plaintiff's favor, no reasonable juror could conclude that Defendants fabricated evidence. Nothing in the record suggests that the Individual Defendants invented or even changed the words in Plaintiff's messages. Moreover, Plaintiff does not dispute that Mena sent him the message using those exact Spanish words, or even that "tiguere" referred to a third-party. (Pl. 56.1 ¶ 60(g); Pl. Resp. 56.1 ¶ 59.) He essentially argues that "tiguere" merely meant "dude" rather than "bad dude." (*Compare* Pl. 56.1 ¶ 60(g) ("dude") *with* Defs. 56.1 ¶ 59 ("bad person" or "bad guy").) "This is essentially a quibble over terminology, [and] is not a genuine issue of material fact . . . ."[40] *Jovanovic v. City of New York*, No. 04-CV-8437, 2010 WL 8500283, at *7 n.3 (S.D.N.Y. Sept. 28, 2010), *aff'd*, *Jovanovic*, 486 F. App'x 149.

In addition, the undisputed facts preclude any finding that a "fabricated" translation caused a deprivation of Plaintiff's liberty. Plaintiff concedes that the interpretation presented to the Grand Jury used the same translation Plaintiff admits is accurate. That translation stated, "Partner, I already have a dude that can travel over there with me. I told him that I can only give him 10 because I was going to only going to [*sic*] get 20." (Grand Jury Translation 2.) Because the evidence presented to the Grand Jury is identical to Plaintiff's claim as to what the evidence is, Plaintiff's claim that Gerdes fabricated a translation that resulted in a deprivation of liberty is without merit, and is frivolous. The Court denies Plaintiff's cross-motion for summary judgment and grants Defendants' motion for summary judgment as to Plaintiff's denial of fair trial claim.

### iv.  Failure to Intervene

Plaintiff claims that the Individual Defendants failed to intervene to prevent his unlawful

---

[40]  Plaintiff also makes the bald assertion that the Individual Defendants "fabricated . . . DD5s," but fails to identify any specific DD5s or other allegedly falsified evidence, apart from the text message interpretations he challenges elsewhere. (Pl. Mem. 12; Pl. Opp'n 21.) Plaintiff's conclusory assertion about false DD5s in his motion papers is insufficient to defeat Defendants' motion or provide support for his summary judgment motion.

arrest, and now argues he is entitled to summary judgment because "there is a clear violation of [Plaintiff's] rights," and a "clear opportunity" for the Individual Defendants to "prevent the harm done to Plaintiff . . . ." (Pl. Mem. 13.) Defendants also move for summary judgment on Plaintiff's failure to intervene claim, noting that Plaintiff does not identify the people who failed to intervene, or the violations they failed to prevent. (Defs. Mem. 25–26.) They argue that the claim nevertheless fails because there are no constitutional violations. (Defs. Mem. 25–26.)

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014), *cert. denied* 135 S. Ct. 1842 (2015) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994) (collecting cases)). An officer may be liable for the preventable harm caused by his or her failure to intervene during a constitutional violation where the officer had "a realistic opportunity" to intervene and prevent the harm. *See Terebesi*, 764 F.3d at 244 (citing *Anderson*, 17 F.3d at 557); *Graham v. City of New York*, 928 F. Supp. 2d 610, 622 (E.D.N.Y. 2013) (Liability may attach "where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official." (quoting *Anderson*, 17 F.3d at 557)). However, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim under § 1983." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 129); *see Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."), *cert. denied* 135 S. Ct. 2843 (2015); *Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying [it]." (quoting *Matthews v. City*

*of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012)).

Here, Plaintiff's failure to intervene claim fails as a matter of law, because there is no underlying constitutional violation. As discussed above, Plaintiff's false arrest, malicious prosecution, and fair trial claims fail as a matter of law. As a result, lacking a predicate violation, his failure to intervene claims fails as well. Accordingly, as to Plaintiff's failure to intervene claim, the Court denies Plaintiff's cross-motion for summary judgment, and grants Defendants' motion for summary judgment.

### d. *Monell* claim

The Municipal Defendants move for summary judgment dismissing Plaintiff's municipal liability claims brought under *Monell*, 436 U.S. at 658. They argue that Plaintiff's claim fails because there is no underlying constitutional violation or facts supporting liability. (Defs. Mem. 29–30.) Plaintiff cross-moves for summary judgment, arguing that the Individual Defendants' committed "egregious violation of rights" and Municipal Defendants "failed to take any steps regarding" Bonilla's "fail[ure] to fill out mandated paperwork and safeguard his notes and evidence." (Pl. Mem. 13–14; Pl. Opp'n 23–24.)

A municipal defendant may be liable for a Section 1983 claim where there is a direct causal connection between the municipality's official policy or custom and the constitutional violation. *See Monell*, 436 U.S. at 694–95; *Torraco*, 615 F.3d at 140 (To establish liability "[the] plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (quoting *Wray*, 490 F.3d at 195)). This is an extension of liability, not an independent cause of action, and therefore requires an underlying constitutional violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (*Monell* "*extends* liability to a municipal organization . . . . [Without an]

underlying constitutional violation, [the court's] decision not to address the municipal defendants' liability under *Monell* was entirely correct.")

Here, because there is no underlying constitutional violation by the Individual Defendants, the Municipal Defendants cannot be liable for a constitutional violation under *Monell*. Therefore, the Court grants Defendants' motion for summary judgment as to municipal liability. [41] *See Torraco*, 615 F.3d at 140.

### e. Motion for Sanctions

Plaintiff seeks sanctions against Defendants for alleged spoliation of the zip-tie packaging, which he was not able to view during discovery. Given the resolution and dismissal of all Plaintiff's claims, this motion is denied as moot. [42]

---

[41] In addition, even if Plaintiff had established an underlying constitutional violation, there is no basis for municipal liability. Plaintiff has produced no evidence that Defendants purported constitutional violation "resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

[42] Plaintiff's motion is also meritless. According to the record, on August 15, 2013, an unknown person "picked up" the zip-tie packaging recovered from Plaintiff's van, which prevented its review during discovery. (Jan. 14 Email.) Plaintiff seeks preclusion of evidence about the packaging, and requests an adverse inference instruction. However, Plaintiff offers no credible evidence that the zip-tie packaging has actually been lost or destroyed, and his speculative arguments are insufficient to sustain a motion for sanctions. "[T]he spoliation doctrine is predicated on evidence actually existing and being destroyed." *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (quoting *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 569 (S.D.N.Y. 2013)). Mere speculation as to a document's existence or loss is insufficient to implicate the spoliation doctrine. *See Khaldei*, 961 F. Supp. 2d at 570, *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013).

### III.  Conclusion

For the forgoing reasons, the Court denies Plaintiff's motions for summary judgment and sanctions and grants Defendants' motion for summary judgment as to all of Plaintiff's claims. The Clerk of Court is directed to close the case.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  September 18, 2015
          Brooklyn, New York